**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ONEIDA CONSUMER, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 2:20-cv-2043 |
| | ) | |
| v. | ) | JUDGE JAMES L. GRAHAM |
| | ) | |
| ELYSE FOX, | ) | |
| | ) | MAGISTRATE JUDGE |
| Defendant. | ) | ELIZABETH PRESTON |
| | ) | DEAVERS |

<u>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

Plaintiffs Oneida Consumer, LLC, Anchor Hocking, LLC, and The Oneida Group, Inc. ("Oneida" or "Plaintiffs") submit this reply ("Reply") in support of their motion ("Motion," at Dkt. 11) for preliminary injunction against Defendant Elyse Fox d/b/a Finest Flatware ("Fox").

The Motion and Reply demonstrate that: (i) Oneida is likely to succeed on the merits of all of the claims in the Complaint; (ii) Oneida is suffering immediate and irreparable harm; (iii) the balance of any potential harms weighs in favor of injunctive relief; (iv) an injunction is in the public interest; and (v) the Court should not require Oneida to pay a security bond.

Respectfully submitted,

<u>/s/ Marla R. Butler</u>
Marla R. Butler (*pro hac vice*)
THOMPSON HINE LLP
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326-4266
Phone: 404-407-3680
Fax: 404-541-2905
Email: Marla.Butler@ThompsonHine.com

Jesse Jenike-Godshalk (0087964)
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 352-6702
Fax: (513) 241-4771
Email: Jesse.Godshalk@ThompsonHine.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................. i

I.     INTRODUCTION ..............................................................................1

II.    ARGUMENT ....................................................................................3

       A.     Fox's Asserted Defenses and Legal Theories Are Without Merit. ........................3

              1.     Oneida Is Not Bound By the Acts or Representations
                     of Robinson. ...............................................................................3

"The mere existence of a trademark licensing agreement does not create an agency relationship between the licensor and licensee as a matter of law." *Jabbour v. Caterpillar Tractor Co.*, Case No. 84-1630, 1985 U.S. App. LEXIS 13850, *16 (6th Cir. Nov. 18, 1985); *Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1326-27 (7th Cir. 1979); *see also Mini Maid Servs. Co. v. Maid Brigade Sys.*, 967 F. 2d 1516, 1520 (11th Cir. 1992). Robinson was merely Oneida's licensee. The two companies did not have a principal/agent relationship such that the acts and representations of Robinson can be imputed to Oneida.

              2.     Fox Received and Was Bound by the Terms and
                     Conditions of the Authorized Dealer Policy Until
                     Oneida Terminated the Relationship. ........................................5

The Authorized Dealer Policy explicitly provided that, by purchasing products from Oneida, dealers were agreeing to adhere to its terms. Fox admits that she purchased flatware from Oneida in 2019 after receiving and reviewing a copy of the policy. Her conduct was sufficient to show agreement to the terms of the Authorized Dealer Policy. *See Hocking Valley Cmty. Hosp. v. Cmty. Health Plan of Ohio*, No. 02CA28, 2009 Ohio App. LEXIS 3775, *9 (Ohio Ct. App. Aug. 6, 2003); *TLG Elecs., Inc. v. Newcome, Inc.*, No. 01AP-821, 2002 Ohio App. LEXIS 911, *6 (Ohio Ct. App. Mar. 5, 2002).

              3.     Neither Estoppel Nor Federal Trademark Law Give Fox
                     the Right to Sell Down Her Remaining Inventory of
                     Oneida Flatware.........................................................................9

The doctrine of equitable estoppel is not available to Fox because she was chargeable with knowledge that her authorized dealer status could be revoked at the discretion of Oneida under the terms of the Authorized Dealer Policy. *See Pedler v. Aetna Life Ins. Co.*, 490 N.E.2d 605, 608 (Ohio 1986). Further, equity does not lie in favor of Fox because Oneida gave her multiple warnings over the course of several months that her authorized dealer status would be revoked and provided her with several

i

options to avoid losing her inventory. In any event, trademark law does not provide a former licensee, such as Fox, with a right to sell remaining inventory after the termination of a license. *Bill Blass, Ltd. v. SAZ Corp*., 751 F.2d 152, 155 (3rd Cir. 1984); *Ryan v. Volpone*, 107 F. Supp. 2d 369, 385 (S.D.N.Y. 2000).

4.      The Sixth Circuit Does Not Recognize the Nominative
        Fair Use Doctrine. ..................................................................................13

The Sixth Circuit has never followed a nominative fair use analysis. *PACCAR Inc. v. Telescan Techs., LLC*, 319 F.3d 243, 256 (6th Cir. 2003), *overruled on other grounds*, *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

5.      The Motion Established that the First Sale Doctrine Does
        Not Apply. ..............................................................................................14

        a.      The Motion Established that Fox is Not Selling
                Genuine Oneida Flatware. ..........................................................14

The flatware in Oneida's inventory is not genuine because it is not covered by Oneida's lifetime warranty policy. *ABG Prime Grp., Inc. v. Innovative Salon Prods.*, No. 17-12280, 2018 U.S. Dist. LEXIS 98196, at *11 (E.D. Mich. June 12, 2018); *Sprint Sols., Inc. v. Lafayette*, No. 2:15-cv-2595-SHM-cgc, 2018 U.S. Dist. LEXIS 104767, at *26–27 (W.D. Tenn. June 22, 2018). Oneida cannot extend its warranty policy to flatware sold by unauthorized resellers, such as Fox, because it cannot ensure that resellers outside of its authorized network adhere to Oneida's robust quality control and customer service standards.

        b.      Whether Fox Purchased Her Flatware from Robinson or
                Oneida is Irrelevant to a First Sale Doctrine Analysis...................17

Regardless of the source of her inventory, Fox's sale of Oneida-branded flatware after the revocation of her authorized dealer status under the Authorized Dealer Policy constitutes a trademark infringement as a matter of law. *See Bill Blass,* 751 F.2d at 154; *Starin Mktg., Inc. v. Swift Distrib., Inc.*, No. 2:16-CV-67, 2018 U.S. Dist. LEXIS 224144, *10-11 (N.D. Ind. Oct. 31, 2018); *Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41 (KPF), 2014 U.S. Dist. LEXIS 63883, *40 (S.D.N.Y. May 8, 2014).

        c.      A Warranty Issued by Fox Will Not Preserve the First
                Sale Doctrine Defense...................................................................18

Any warranty issued by Fox would be inherently inferior to Oneida's lifetime warranty policy and, therefore, constitute a material difference between flatware sold by Oneida and the flatware in her inventory. *See Tacori Enters. V. Michael Joaillier, Inc.*, 207 F. Supp. 3d 799, 805 (S.D. Ohio 2016); *RFA Brands, LLC v. Beauvais*, No. 13-14615, 2014 U.S. Dist. LEXIS 181781, at *26 (E.D. Mich. Dec. 23, 2014).

B.    The Motion Established that Oneida is Likely to Prevail on the Merits of Each of its Claims. ..................................................................................19

    1.    The Motion Established that Oneida is Likely to Prevail on the Merits of its Claims for Trademark Infringement (Count I), False Designation of Origin (Count II), Violation of the ODTPA (Count V), and Trademark Infringement/Unfair Competition Under Ohio Common Law (Count VI). ................................19

These claims are not barred by the first sale and nominative fair use doctrines. *See*, *supra*, Sections II(A)(4)-(5). Fox concedes that Oneida owns the trademarks at issue and that she is using them without authorization, and Oneida has satisfied each of the other elements of these claims, including likelihood of consumer confusion. *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 536 (6th Cir. 2014); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 282 (6th Cir. 1997); *Makers Mark v. Diageo North America, Inc.*, 679 F.3d 410, 422-23 (6th Cir. 2012); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 13 F.3d 1185, 1190 (6th Cir. 1997).

    2.    The Motion Established that Oneida is Likely to Prevail on the Merits of its Claim for False Advertising (Count III). ................................21

All of the cases cited by Fox hold that the sale of genuine goods is a threshold issue for application of the first sale doctrine. The first sale doctrine does not bar Oneida's claims because the flatware in Fox's inventory is not genuine. *See Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825, 834 (S.D. Ohio 2002); *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F. Supp. 224, 230 (S.D.N.Y. 1997); *Tumblebus Inc. v Cranmer*, 399 F.3d 754, 766 (6th Cir. 2005). Even assuming the truth of Fox's allegations regarding her online platforms, Oneida is still likely to prevail on the merits of this claim because she plans to continue promoting her flatware as genuine Oneida flatware and informing customers that her flatware is covered by Oneida's lifetime warranty policy. Both are false statements of fact.

    3.    The Motion Established that Oneida is Likely to Prevail on the Merits of its Claim for Trademark Dilution (Count IV). ...........................23

        a.    The First Sale Doctrine Does Not Apply to Bar the Trademark Dilution Claim. .............................................................23

This claim is not barred by the first sale doctrine. *See*, *supra*, Section II(A)(5); *see also Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 326 (S.D.N.Y. 2007).

        b.    Oneida Has Provided Sufficient Evidence of Fame. ....................23

Oneida's evidence that: 1) it registered its first mark in 1956; 2) has expended substantial sums of money, time, and effort in advertising, promoting and popularizing its marks; and 3) it has received substantial third-party recognition as a leading tableware brand is sufficient to establish fame for the purposes of its trademark dilution claim. *See*, *e.g.*, *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1042 (E.D. Wis. Apr. 12, 2008); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 391 (S.D.N.Y. 2008). None of Fox's cases are instructive on this issue.

c.      Fox's Use of the Oneida Marks Harms The Marks' Reputation. ....................................................................................26

Oneida's inability to subject Fox's inventory to its strict quality control standards is sufficient to demonstrate harm to the reputation of Oneida's marks. *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 734, 750 (W.D. Ky. 2008), *aff'd*, 605 F.3d 382 (6th Cir. 2010); *H-D U.S.A., LLC v. Square Wear LLC*, No. 20-10644, 2020 U.S. Dist. LEXIS 63156, at *9 (E.D. Mich. Apr. 10, 2020); *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15 Civ. 8775 (LGS), 2016 U.S. Dist. LEXIS 87345, at *10-11 (S.D.N.Y. July 5, 2016). In any event, dilution is demonstrated here because Fox is using marks that are identical to Oneida's marks. *State Farm Mutual Automobile Insurance Co. v. Sharon Woods Collision Center, Inc.*, No. 1:07cv457, 2007 U.S. Dist. LEXIS 86651, *30 (S.D. Ohio Nov. 26, 2007); *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 630 (E.D. Tenn. Nov. 27, 2012); *H-D U.S.A., LLC v. Square Wear LLC*, No. 20-10644, 2020 U.S. Dist. LEXIS 63156, at *9 (E.D. Mich. Apr. 10, 2020).

C.      Oneida Has Established That It Will Suffer Irreparable Harm if the Court Does Not Stop Fox's Misconduct. ...............................................................27

1.      Oneida Has Not Delayed in Seeking Injunctive Relief. ...........................28

The passage of slightly over two months between the start of Fox's infringing conduct and the filing of a motion for injunctive relief does not constitute a delay long enough to deny injunctive relief by any standard, including under the cases cited by Fox. *See Kendell Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 867 (S.D. Ohio 2008); *Premix, Inc. v. Zappitelli*, 561 F. Supp. 269, 278 (N.D. Ohio 1983); *R.M. & G Prods., Inv. v. R.E.F. Golf Co.*, 1994 WL 653531, *3 (N.D. Ohio June 21, 1994). Moreover, no prejudice should befall Oneida for complying with the local rule requiring plaintiffs to "attempt to obtain a waiver of service of process under Fed. R. Civ. P. 4(d) before attempting service of process." *See* Loc. R. 4.2.

2.      The Motion Established That Oneida is Suffering Actual Harm...............29

Oneida is entitled to a presumption of harm because the Motion demonstrated a likelihood of confusion between genuine products bearing Oneida's mark and Fox's infringing products. *Lucky's Detroit, LLC v. Double L, Inc.*, 533 Fed. Appx. 553, 555 (6th Cir. 2013); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006). Additionally, the Motion further demonstrated actual harm in the form of: (1) loss of control over the goodwill and reputation that Oneida has taken much time, money, and effort to establish; and (2) association of its ONEIDA Marks with lesser quality products. *See NBBJ East Ltd. P'ship v. NBBJ Training Acad. Inc.*, 201 F. Supp. 2d 800, 808 (S.D. Ohio 2001); *Otter Prods., LLC v. Wang*, No. 18-cv-03198-CMA-SKC, 2019 U.S. Dist. LEXIS 52916, at *11–12, 17–18 (D. Colo. Mar. 28, 2019).

D.   The Balance of Harms Weighs in Favor of Injunctive Relief. ............................30

Fox has not provided any evidence in support of her assertions that the public will be harmed, and the only harm that could befall Fox would be self-inflicted harm for which she should not be rewarded.

E.   The Motion Established That an Injunction Is in the Public Interest. .................31

The Motion established, and Fox does not challenge, that an injunction would be in the public interest because it will prevent consumer confusion and deception in the marketplace, as well as protect Oneida's property interests. Fox merely inaccurately re-asserts that Oneida is trying to rescind a warranty and trying to eliminate her as a competitor.

F.   The Motion Established That Oneida Should Not Be Required to
     Pay a Security Bond. ............................................................................................32

Despite Fox's attempt to mischaracterize their rulings, the cases cited in the Motion support the proposition that Oneida should be excused from posting a bond. *See Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995); *Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 757 (S.D. Ohio 2010); *Univ. Books & Videos, Inc. v. Metro. Dade Cnty.*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999).

III.  CONCLUSION ................................................................................................34

CERTIFICATE OF SERVICE ............................................................................................36

## I.  INTRODUCTION

Fox's opposition ("Opposition" at Dkt. 22) to Oneida's Motion is heavy on style, but light on substance.  Neither equity nor the law is in Fox's favor.  As to equity, Fox argues that she is a self-made businesswoman who has purchased and resold Oneida flatware for years and that Oneida wants to eliminate her as a competitor.  Her argument ignores the fact that Oneida is allowed to choose its authorized resellers and set the rules by which those authorized resellers are permitted to sell Oneida-branded flatware.

Oneida has no intention of putting Fox out of business.  When Oneida informed Fox that she would no longer be an Oneida partner, it did several things that it had no legal obligation to do.  First, Oneida attempted to engage Fox in discussions aimed at purchasing Fox's remaining inventory of Oneida flatware.  Fox did not participate in those discussions in good faith, repeatedly refusing to share the contents of her inventory which she claims she purchased from Oneida and its ex-licensee, Robinson Home Products, Inc. ("Robinson").  Second, Oneida gave Fox multiple warnings over the course of several months that her authorized dealer status would be revoked so that she could make arrangements to dispose of her inventory.  Finally, Oneida informed Fox of how she could access and complete a form that would allow her to remain an authorized dealer as long as she complied with the terms and conditions of the Oneida Group, Inc. Authorized Dealer Policy ("ADP").  She rejected all of these overtures, leaving Oneida no choice but to file this lawsuit.

As to the law, Fox fails to establish that Oneida is precluded from the requested preliminary injunctive relief for several reasons.  First, the Opposition takes issue with the fact that Oneida's pleadings up to this point have contained very little discussion of Robinson, the company from which Fox admits she has acquired most of her inventory since 2009.  Fox

accuses Oneida of hiding its history with Robinson to avoid addressing the companies' former licensing agreement and to avoid addressing the royalties Oneida received from Fox's sales and the alleged fact that Robinson condoned some of the conduct that Oneida now condemns. This is not true.

Oneida is not hiding anything. Oneida cannot address any royalties it received on Fox's sales because she will not share with Oneida the contents of, and records related to, her inventory. Oneida, therefore, cannot confirm that it has received royalties on products in Fox's inventory, and the Court should not accept Fox's claim in this regard as true. And the Motion does not spend any time on Robinson because it and any representations or actions that Robinson may have made with respect to Fox are irrelevant to the matter at hand. Robinson was not a part of Oneida, a subsidiary of Oneida, or an agent of Oneida. It was a mere licensee that executed an arm's length licensing agreement with Oneida. Therefore, contrary to Fox's assertions, none of Robinson's acts or representations can be imputed to Oneida.

Second, despite her protests, Fox's own alleged facts demonstrate that she was bound by the terms and conditions of the ADP. The ADP clearly stated: "By purchasing Products, you ('Dealer') agree to adhere to the following terms and conditions." Fox admits that she purchased flatware from Oneida after receiving a copy of the ADP. As a result, her position that she is somehow above the rules that the ADP sets out is untenable.

Third, Fox's right to sell Oneida-branded flatware terminated at the same time that her authorized dealer status was revoked for noncompliance with the ADP. There is no legal theory that supports Fox's demand to be allowed to sell down her infringing inventory.

Fourth, Fox's attempt to assert the doctrine of nominative fair use is misguided because this doctrine is not recognized by the Sixth Circuit.

Finally, Oneida's lifetime warranty policy only applies to flatware sold by authorized dealers, retailers, and resellers.  The flatware in Fox's inventory lost its coverage under the policy the moment the ADP was terminated with Fox.  As result, the flatware in Fox's inventory is materially different from the flatware offered by Oneida.  The first sale doctrine does not insulate Fox's sale of the flatware in her inventory under these circumstances.

It is undisputed that Fox is selling Oneida-branded flatware without Oneida's authorization.  This misconduct is classic trademark infringement.  None of Fox's asserted affirmative defenses or various legal theories excuse her infringement of Oneida's marks.  Each second her willful misconduct is allowed to continue is another second that Fox will reap profits at the expense of immediate and irreparable harm to Oneida.  The Court should enter the requested preliminary injunction.

## II.    ARGUMENT

### A.    Fox's Asserted Defenses and Legal Theories Are Without Merit.

#### 1.    Oneida Is Not Bound By the Acts or Representations of Robinson.

Fox admitted that, starting in 2009, she purchased the vast majority of her flatware from Robinson.  (Affidavit of Elyse Fox ("Fox Aff."), Dkt. 22-1, PageID: 422, ¶¶ 15-19.)  One of the underlying premises of the Opposition is that Oneida is somehow responsible for the conduct and representations of Robinson simply because Robinson is an ex-licensee of Oneida.  This is fundamentally incorrect on the facts and the law.

Fox attached to her affidavit a purported copy of the August 31, 2009 Master Licensing Agreement ("2009 MLA") between Oneida and Robinson.  (*See generally,* Fox Aff., Ex. A, Dkt. 22-2.)  The 2009 MLA contained a section titled "Independence of Parties" which states:

> Each party shall act as an independent contractor in carrying out its obligations under this Agreement.  Nothing contained in this Agreement shall be construed to

> imply a franchise, joint venture, partnership, or principal/agent relationship between the parties, and neither party by virtue of this Agreement shall have the right, power or authority to act or create any obligation, express or implied, on behalf of the other party. This Agreement shall not be construed to create rights, express or implied, on behalf of or for the use of any party aside from Licensor and Licensee, and Licensor shall not be obligated, separately or jointly, to any third parties solely by virtue of this Agreement.

(Fox Aff., Ex. A, Dkt. 22-2, Section 9.15). Thus, Fox's own purported evidence undercuts the notion that Robinson and Oneida ever had an express principal/agent relationship; any belief Fox had of an apparent principal/agent relationship was not reasonable.[1] *See Ohio State Bar Ass'n v. Martin*, 886 N.E.2d 827, 834 (Ohio 2008) ("In order to establish apparent agency, the evidence must show that the principal held the agent out to the public as possessing sufficient authority to act on his behalf and that the person dealing with the agent knew these facts, and acting in good faith had reason to believe that the agent possessed the necessary authority.").

Even if the Independence of Parties provision was absent from the 2009 MLA, the law on this matter is clear. "The mere existence of a trademark licensing agreement does not create an agency relationship between the licensor and licensee as a matter of law." *Jabbour v. Caterpillar Tractor Co.*, Case No. 84-1630, 1985 U.S. App. LEXIS 13850, *16 (6th Cir. Nov. 18, 1985); *Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1326-27 (7th Cir. 1979); *see also Mini Maid Servs. Co. v. Maid Brigade Sys.*, 967 F. 2d 1516, 1520 (11th Cir. 1992).

In *Oberlin v. Marlin Am.*, the Seventh Circuit expressly rejected this premise. 596 F.2d at 1327. There, a putative phone dealer argued that a trademark licensor should be held liable for the fraudulent conduct of a distributor based on the fact that the licensor permitted the distributor

---

[1] Robinson's sale of product to Fox may have been a violation of the 2009 MLA. (*See* Fox Aff., Ex. A, Dkt. 22-2, Section 9.4 (precluding Robinson from assigning rights under the MLA (e.g. to Fox) without prior written consent of Oneida).)

to use the licensor's marks in the distributor's advertising.  *Id*. at 1326-27.  The Seventh Circuit explained:

> The purpose of the Lanham Act, however, is to ensure the integrity of registered trademarks, not to create a federal law of agency.  Furthermore, the scope of the duty of supervision associated with a registered trademark is commensurate with this narrow purpose.  The duty does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question.  It does not automatically saddle the licensor with the responsibilities under state law of a principal for his agent.

*Id*. at 1327.  Such is the case in the instant matter.  Regardless whether Robinson approved of or encouraged Fox's misconduct, the fact of the matter is that Oneida did not.  Fox cannot impute any actions and representations of Oneida's ex-licensee for the purpose of avoiding trademark infringement liability.  *See id.*

Accordingly, to the extent that they are based on the actions and representations of Robinson, each of Fox's defenses and legal theories fail before they even begin.[2]

### 2.    Fox Received and Was Bound by the Terms and Conditions of the Authorized Dealer Policy Until Oneida Terminated the Relationship.

As stated in the Motion and Complaint, on or around October 9, 2018, Fox became an authorized distributor of Oneida-branded flatware.  (Dkt. 11, PageID, 186 (citing Declaration of Mark Eichhorn ("Eichhorn Dec."), Doc. 11-1, ¶ 11); *see also* Dkt. 1, PageID: 6, ¶ 29.)  On or

---

[2] A finding that Oneida and Robinson did not have a principal/agency relationship is further compelled by the fact the two companies engaged in a hard-fought litigation over Robinson's alleged breach of the 2009 MLA.  A copy of the appellate docket from *Robinson Home Products, Inc. v. Oneida, LTD., et al.*, New York State Supreme Court Appellate Division, 4th Department, Appellate Division Index No. 18-00467, is attached as Exhibit A.  *See Clark v. Warden, Warren Corr. Inst.*, No. 1:18-cv-263, 2019 U.S. Dist. LEXIS 16575, *5 n.3 (S.D. Ohio Feb. 1, 2019) ("The Court may take judicial notice of court records that are available on-line to members of the public."); *Huth v. Hubble*, No. 5:14-cv-1215, 2015 U.S. Dist. LEXIS 26596, *11 (N.D. Ohio Mar. 4, 2015) (Courts may "take judicial notice of the public dockets from state and federal courts available on the courts' websites.").

around December 10, 2018, Oneida provided Fox with a copy of the ADP.  (Dkt. 11, PageID, 186 (citing Eichhorn Dec., Doc. 11-1, PageID: 214, ¶ 11); Dkt. 1, PageID: 6, ¶ 30.)

It is important to note that compliance with the ADP would not have put Fox out of business. Instead, it only required that she limit her sale of Oneida flatware to her own website (www.finestflatware.com). The ADP, which was also distributed and equally applicable to Oneida's other authorized dealers, retail partners, and resellers, granted "a limited, non-exclusive, non-transferable revocable license to use the Oneida IP solely for the purposes of marketing and selling [Oneida] Products." (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 6; *see also* Dkt. 1-7 (same).)  The ADP restricted authorized dealers from selling licensed Oneida-branded flatware as third-party sellers on online forums, "such as Amazon.com or eBay.com," but explicitly permitted authorized dealers to continue selling products through "permissible public websites," including those that were "operated by Dealer in Dealer's legal name or registered fictitious name." (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 2(a); *see also* Dkt. 1-7 (same).)  The license immediately "ceased" upon the termination of a dealer's status as an authorized distributor.  (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 6; *see also* Dkt. 1-7 (same).)

The ADP contained several other provisions that are relevant to the resolution of the Motion.  First, the policy explicitly indicated that it was accepted by the dealer upon his/her purchase of Oneida products.  (Eichhorn Dec., Ex. B, Dkt. 11-3, Introductory Section; *see also* Dkt. 1-7 (same).)  Second, the policy stated that "Dealer shall not alter the Products in any way and shall sell Products in their original packaging. Relabeling, repackaging (including the separation of bundled products or the bundling of products), and other alterations are prohibited." (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 4(a); *see also* Dkt. 1-7 (same).)  Dealers were required to "comply with all instructions provided by Oneida regarding the storage,

6

handling, shipping, disposal, or other aspects of the Products." (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 4(b); *see also* Dkt. 1-7 (same).) Third, the policy "supersede[d] any prior agreement regarding the sale of the Products through websites, mobile applications, or other online forums." (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 2(b); *see also* Dkt. 1-7 (same).) Finally, under the policy, a dealer's authorized status could "be revoked by Oneida in its discretion" at any time. (Eichhorn Dec., Ex. B, Dkt. 11-3, Introductory Section; *see also* Dkt. 1-7 (same).)

Fox wants the Court to ignore these facts and find that she was above the rules that applied to Oneida's other authorized resellers and exempt from the terms and conditions of the ADP. First, she argues that she been "singled-out" for selective enforcement of the ADP by Oneida in an effort to shut down her business for "competitive reasons." (Dkt. 22, PageID: 380-81.) Second, she claims that she never accepted the ADP and, therefore, was not bound by its terms and conditions. (Dkt. 22, PageID: 389.) Fox's own affidavit and pleadings weigh in favor of rejecting both arguments.

Fox avers that, well before this litigation began, she received a letter from Oneida indicating that Oneida was strictly enforcing the ADP as to ***all*** resellers effective April 1, 2020. (Fox Aff., Dkt. 22-1, PageID: 431, ¶ 74.) Although the Fox Affidavit indicates that she received the letter on January 1, 2020, her summary of her understanding of the letter perfectly matches the letter dated January 20, 2020 that Oneida sent to her. In pertinent part, the letter stated:

> As of April 1, 2020, The Oneida Group will strictly enforce the Policy and ***all*** resellers including Finest Flatware will no longer be authorized or licensed to use ONEIDA®'s trademarks or copyrights. ***All*** resellers have been put on notice that ONEIDA® intends to enforce its protected marks.

(Eichhorn Dec., Ex. C, Dkt. 11-4; Dkt. 1-2; *see also* Fox Aff., Dkt. 22-1, PageID: 431, ¶ 74 (emphasis added).) Regardless of when she received the letter, its effect is unmistakable. She

was unequivocally notified and clearly understood that Oneida was strictly enforcing the ADP against all of its resellers.

A deeper dive into her affidavit reveals that her argument that she not was not bound by the terms and conditions of the ADP is similarly untenable. She claims that Oneida representatives confirmed her exclusion from the terms and conditions of the ADP in oral conversations. (Dkt. 22, PageID: 389.) To support this claim, Fox provided a purported email exchange that she had with an Oneida representative wherein Fox asked the representative to confirm prior oral discussions that her operations were "safe" from purview of the ADP. (Fox Aff., Ex. P., Dkt. 22-17.) Contrary to Fox's characterization in the Opposition, the Oneida representative did not provide any confirmation that Fox was "safe" from the ADP. In fact, the Oneida representative's reply email did not respond at all to Fox's comment about the alleged oral discussions. (Fox Aff., Ex. P, Dkt. 22-17.) Fox does not allege that she sent any follow-up emails or letters to Oneida representatives so as to confirm and memorialize in writing her understanding that she was "safe" from the ADP.

To the contrary, Fox herself admits in her Answer that she purchased flatware from Oneida in 2019, after receipt of the ADP. (Dkt. 21, PageID: 399, ¶ 119.) Basic contract law mandates a finding that Fox was, therefore, bound by the terms and conditions of the ADP. *See Hocking Valley Cmty. Hosp. v. Cmty. Health Plan of Ohio*, No. 02CA28, 2009 Ohio App. LEXIS 3775, *9 (Ohio Ct. App. Aug. 6, 2003) ("If one party failed to execute a written contract, yet the parties proceeded to act as if the contract was in effect, the contract is enforceable. Performance can substitute for execution of a written contract against the party who did not execute the contract, as well as against the party who executed the contract.") (internal citations omitted); *TLG Elecs., Inc. v. Newcome, Inc.*, No. 01AP-821, 2002 Ohio App. LEXIS 911, *6

8

(Ohio Ct. App. Mar. 5, 2002) ("Conduct sufficient to show agreement, including performance, is a reasonable mode of acceptance.") (internal quotations omitted).  Therefore, Ms. Fox was bound by the terms and conditions of the ADP.

### 3. Neither Estoppel Nor Federal Trademark Law Give Fox the Right to Sell Down Her Remaining Inventory of Oneida Flatware.

Despite Fox's characterization in the Opposition, Oneida did not single out Fox for revocation of her authorized dealer status in an effort to shut down her business.  Oneida was always willing to continue its partnership with Fox; it simply wanted Fox to operate within the bounds of the ADP.  By its very terms, the ADP would allow Fox to continue selling Oneida-branded flatware on her own website.  (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 2(a); *see also* Dkt. 1-7 (same).)  Moreover, Fox's own affidavit indicates that, during a call with Oneida representatives in November 2018, she "was informed Oneida planned to enforce the new Authorized Dealer Policy" but that there were "a number of options that [the parties] could consider that would allow [them] to continue working together."  (Fox Aff., Dkt. 22-1, PageID: 430-31, ¶ 71.)  Fox chose not to pursue those options.

Furthermore, Fox was not suddenly informed of the revocation out of the blue as she wants the Court to believe.  Oneida's January 20, 2020 letter warned Fox that it was terminating its relationship with her effective March 31, 2020 because she refused to operate within the bounds of the ADP.  (Eichhorn Dec., Dkt. 11-1, PageID: 214, ¶ 13 & Ex. C; *see also* Dkt. 1-2.)

On or around March 10, 2020, Oneida sent Fox another letter reminding her of the upcoming termination.  (Eichhorn Dec., Dkt. 11-1, PageID: 214-15 ¶ 14 & Ex. D; Dkt. 1-3; Fox Aff., Dkt. 22-1, PageID: 432, ¶ 78.)  That same letter informed Fox that she could remain an authorized dealer through compliance with the ADP and by completing Oneida's Online Seller

Application and Agreement, but she refused.  (Eichhorn Dec., Dkt. 11-1, PageID: 214-15 ¶ 14 & Ex. D; *see also* Dkt. 1-3.)

Oneida even expressed an interest in purchasing Fox's inventory, but Fox refused to reveal to Oneida the total contents her entire inventory, making it impossible for Oneida to make her an offer.[3]  (Fox Aff., Dkt. 22-1, PageID: 431, ¶¶ 72-73.)  She has repeatedly refused to reveal her inventory information to Oneida, claiming it is "highly confidential and competitive" information even though she alleges that "[v]irtually all of the Oneida flatware [she] purchased was purchased directly from Oneida or Robinson."  (Fox Aff., Dkt. 22-1, PageID: 427 & 431, ¶¶ 54 & 72.)

In sum, Oneida has bent over backwards to both control and manage its intellectual property while simultaneously treating Fox's business fairly.  But Fox has refused to work with Oneida in good faith at every turn.  Under these circumstances, neither equity, and certainly not the doctrine of equitable estoppel, nor the law permit Fox an indefinite period to sell down her remaining inventory of infringing flatware as demanded in the Opposition.  (Dkt. 22, PageID: 401-02.)

In Ohio, "[e]stoppel is based upon the theory that where one has by his conduct induced another to change his position to his damage, disadvantage, or detriment, he is estopped from benefiting by such conduct."  *Wayne Lakes Park, Inc. v. Shollenbarger*, No. 1118, 1985 Ohio App. LEXIS 5963, *5 (Ohio Ct. App. Jan. 24, 1985).  "Therefore, equitable estoppel requires that the proponent prove four elements: (1) that the adverse party made a factual misrepresentation; (2) that the misrepresentation was misleading; (3) that the misrepresentation induced actual reliance which was reasonable and in good faith; and (4) the proponent suffered

---

[2]  In fact, it was only the day before this Reply brief was filed that Fox agreed to allow Oneida to see some very limited information regarding her inventory.

detriment due to the reliance." *TBLD Corp. v. Ravenna Inv. Co.*, No. C.A. 21043, 2002 Ohio App. LEXIS 5315, *6-7 (Ohio Ct. App. Oct. 2, 2002).

Importantly, equitable estoppel requires a finding of "actual or constructive fraud." *Glidden v. Lumbermen's Mut. Cas. Co.*, 861 N.E.2d 109, ¶ 53 (Ohio 2006).  As the Supreme Court of Ohio has held:

> [T]here can be no estoppel where the party claiming it is chargeable with knowledge of the facts, as where he either knows the facts or is in a position to know them or the circumstances are such that he should have known them; or where the circumstances surrounding the transaction are sufficient to put a person of ordinary prudence on inquiry which would have disclosed the facts.

*Pedler v. Aetna Life Ins. Co.*, 490 N.E.2d 605, 608 (Ohio 1986).

Here, the terms of the ADP were clear.  It expressly provided that Fox's authorized dealer status could be revoked in the discretion of Oneida at any time.  It did not give Fox any right to sell her inventory post-revocation.  Therefore, to the extent that she relied on any oral representations to the contrary, that reliance was not reasonable.  *Cf. Fontbank, Inc. v. Compuserve*, 742 N.E.2d 674, 680 (Ohio Ct. App. 2000) ("[A] principle, analogous to the parol evidence rule and the Statute of Frauds, holds that a fraud claim may not be maintained where the alleged fraud is directly contradicted by a signed writing.").  Even so, Oneida revoked Fox's authorized dealer status for cause – her repeated refusal to comply with the terms of the ADP. Accordingly, the doctrine of equitable estoppel provides no support for Fox's demand to sell the Oneida-branded flatware remaining in her inventory.  And even if it did, the equities lie in favor of Oneida since Oneida did all that it could to work with Fox to keep her business afloat even though it had no legal obligation to do so.

Fox does not cite any to any legal authority to support her demand that the Court allow her to sell down her inventory of infringing Oneida flatware.  That's because the law does not

Case: 2:20-cv-02043-JLG-EPD Doc #: 25 Filed: 07/08/20 Page: 19 of 43  PAGEID #: 573

support her position. *See Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 155 (3rd Cir. 1984); *Ryan v. Volpone*, 107 F. Supp. 2d 369, 385 (S.D.N.Y. 2000) ("Defendant does not have the right to liquidate its inventory and disregard Plaintiff's objections, simply because the products were manufactured prior to termination.").

In *Bill Blass v. SAZ Corp*, a licensee had two licensing agreements with the trademark owner. 751 F.2d at 153. One of the licensing agreements was silent as to the disposition of the trademarked items left in the licensee's inventory after the expiration of the license. *Id.* at 153. The licensee argued that "because the [licensing agreement] contains no express provision covering post-expiration liquidating of inventory, it was intended by the licensor that inventory could be liquidated over an indefinite period." *Id.* at 155. The Third Circuit rejected that argument and affirmed an injunction in favor of the trademark holder, ruling that "the far more reasonable construction is that the licensee under the [licensing agreement] undertook the risk that if it kept its inventory at too high a level the inventory might not be sold by the expiration date of the license." *Id.* at 155.

*Bill Blass v. SAZ Corp* is on all fours with the instant case. Fox was well aware of the terms of the ADP. She knew that her authorized dealer status could be revoked at any time. Nevertheless, Oneida gave her multiple warnings over the course of several months that it was going to strictly enforce the ADP and revoke her authorized dealer status for noncompliance. Fox chose to maintain a large inventory while disregarding the terms and conditions of the ADP. Oneida's right to control and manage its intellectual property should not be limited as a result of Fox's conscious decision to ignore the ADP.

### 4.    The Sixth Circuit Does Not Recognize the Nominative Fair Use Doctrine.

In a single sentence, Fox asserts, without any explanation, that her "use of the Oneida mark constitutes nominative fair use."  (Dkt. 22, PageID: 404.)  Not so.

The Sixth "[C]ircuit has never followed the nominative fair use analysis, always having applied the *Frisch's Restaurants* test [i.e. the traditional multi-factor test for likelihood of consumer confusion]."  *PACCAR Inc. v. Telescan Techs., LLC*, 319 F.3d 243, 256 (6th Cir. 2003) (declining to adopt the Ninth Circuit's nominative fair use analysis), *overruled on other grounds*, *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004); *Express Welding, Inc. v. Superior Trailers, LLC*, 700 F. Supp. 2d 789, 802 (E.D. Mich. 2010) ("The Sixth Circuit has declined to recognize the defense of nominative fair use."); *Volkswagen AG v. Dorling Kindersley Publ'g, Inc.*, 614 F. Supp. 2d 793, 811 (E.D. Mich. 2009) ("[T]his Court is not in a position to adopt the doctrine when the Sixth Circuit has explicitly declined to do so."); *Chrysler Corp. v. Newfield Publ'ns, Inc.*, 880 F. Supp. 504, 512 (E.D. Mich. 1995) ("[T]his Court is not in a position to adopt the nominative fair use defense, when the Sixth Circuit has not chosen to do so.").

The instant case does not present any circumstances that would compel the Court to stray from the precedent of this Circuit.  Indeed, even *State Farm Mutual Automobile Insurance Co. v. Sharon Woods Collision Center, Inc.* – the case that Fox cites to urge the Court to apply the nominative fair use doctrine – acknowledges that Sixth Circuit "courts have declined to adopt the Ninth Circuit's nominative fair use analysis."  No. 1:07cv457, 2007 U.S. Dist. LEXIS 86651, *23 (S.D. Ohio Nov. 26, 2007) (collecting cases).

The Court should reject Fox's invitations to ignore Sixth Circuit precedent and apply a nominative fair use analysis to this case.

13

**5.      The Motion Established that the First Sale Doctrine Does Not Apply.**

The Opposition correctly asserts that the first sale doctrine "generally provides that the resale of *genuine* trademarked goods does not constitute trademark infringement."  (Dkt. 22, PageID: 393 (emphasis added).)  The problem is that everything that comes after that assertion in the Opposition regarding the first sale doctrine is either a mischaracterization of the facts, a misquote of legal authority, or a misstatement of how the doctrine operates.

As explained in the Motion, the first sale doctrine does not insulate Fox's misconduct because, as a result of losing the protection of Oneida's lifetime warranty due to the revocation of her authorized dealer status, the flatware she is selling is not genuine.  Fox maintains that the first sale doctrine applies because: 1) she mistakenly believes that Oneida's warranty policy is a contractual right that Oneida cannot disclaim; 2) the flatware was allegedly purchased from Oneida and Robinson during Fox's time as an authorized dealer; and 3) she provides her own warranty on the items in her inventory.  (Dkt. 11, PageID: 393-400.)  Fox misses the mark on each account.

**a.      The Motion Established that Fox is Not Selling Genuine Oneida Flatware.**

Although the analysis here involves many steps, it is not complicated.  Quite simply, the first sale doctrine does not apply to Fox's resale of the flatware in her inventory because that flatware is not *genuine*.  (Dkt. 11, PageID: 190 (citing *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 369 (6th Cir. 2007) ("[T]he first sale doctrine does not apply is when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner.") (internal quotations omitted); *RFA Brands, LLC v. Beauvais*, No. 13-14615, 2014 U.S. Dist. LEXIS 181781, at *26 (E.D. Mich. Dec. 23, 2014)).)

14

The flatware is not genuine because it is not covered under the Oneida lifetime warranty policy. (Dkt. 11, PageID: 190 (citing *ABG Prime Grp., Inc. v. Innovative Salon Prods.*, No. 17-12280, 2018 U.S. Dist. LEXIS 98196, at *11 (E.D. Mich. June 12, 2018) ("First Sale Doctrine does not apply where an unauthorized reseller resells a product missing a warranty term."); *Sprint Sols., Inc. v. Lafayette*, No. 2:15-cv-2595-SHM-cgc, 2018 U.S. Dist. LEXIS 104767, at *26–27 (W.D. Tenn. June 22, 2018)).)

Oneida cannot extend its warranty policy to flatware sold by unauthorized dealers, retailers, and resellers, such as Fox, because: 1) it cannot control whether they adhere to Oneida's robust quality control and customer service standards; 2) Oneida cannot track sales by anyone other than authorized retailers, dealers and resellers and, therefore, cannot determine how much of the inventory being sold in the market has been discontinued; and 3) Oneida cannot ensure that products sold by unauthorized sellers are packaged in compliance with Oneida's required product packaging configurations. (Eichhorn Dec., Dkt. 11-1, PageID: 212-13, ¶¶ 9-10.) Fox admits that, even when she was an authorized dealer, she sometimes repackaged the flatware that she sold and made custom configurations of product (Fox Aff., Dkt. 22-1, PageID: 427, ¶¶ 48, 50), even though this was a clear violation of the ADP (Eichhorn Dec., Ex. B, Dkt. 11-3, Section 4(a); *see also* Dkt. 1-7 (same)). Now that Fox has been deauthorized, Oneida has no way to exercise any control over such conduct, which may lead to damaged merchandise, the quality of which Oneida cannot possibly warrant.

Fox attempts to distort these simple facts and basic rules of law to fit her argument that the flatware in her inventory is genuine and that Oneida cannot "disclaim" its warranty on that flatware to remove it from the protection of the first sale doctrine. She cites no legal authority in support of her position, other than Ohio's Uniform Commercial Code provision defining

"express warranty" and an Ohio lower court case addressing whether evidence of additional terms to an incomplete purchase order should have been admitted at trial in a breach of contract case.  *See Ohio Savings Bank v. H.L. Vokes Co.*, 560 N.E.2d 1328, 1334 (Ohio Ct. App. 1989) (holding "evidence regarding the engineers' specifications and how they were compiled, which would constitute additional terms of the contract, should have been admitted to explain or supplement the contract between the parties").

Neither of those authorities are at all relevant to the instant matter because Oneida is not disclaiming a warranty offered to and accepted by Fox.  Oneida never extended a warranty to Fox.  Fox even acknowledges as much in the Opposition:

> More importantly, all of the Oneida product carried/carries with it a limited lifetime warranty for the original owner . . . Of critical importance, all parties understood the term 'original owner' in the warranty that Oneida and Oneida's exclusive licensee issued on the product sold to Ms. Fox meant the original consumer owner, and thus the warranty transferred to the consumer purchasers of Ms. Fox's Oneida product when that product was resold by Ms. Fox.

(Dkt. 22, PageID: 395-96.)

Oneida offers a warranty to ***consumers*** who purchase flatware from Oneida's authorized dealers.  Oneida's warranty simply is not and never was effective on any flatware sold by sellers outside of its authorized dealer network for the reasons explained above.  By its terms, Oneida's offer to provide a warranty to consumers on flatware in Fox's inventory ceased the moment that Fox's authorized dealer status was terminated.

Courts around the country, including in the Sixth Circuit, have encountered similar warranty policies from trademark owners and have agreed that these policies are legitimate and can remove the sale of warrantless goods from the ambit of the first sale doctrine.  *See Sprint*, 2018 U.S. Dist. LEXIS 104767, at *26–27 (collecting cases and finding that the first sale defense did not apply where the defendants' conduct voided the warranties on the phones at issue);

*Skullcandy, Inc. v. Filter USA*, No. 2:18-CV-00748-DAK, 2019 U.S. Dist. LEXIS 104393, *21 (D. Utah June 21, 2019) (first sale doctrine did not apply to headphones sold by unauthorized dealer when trademark owner's warranty applied only to products that "ha[d] been subjected to [trademark owner's] strict quality controls"); *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 837 F. Supp. 2d 208, 231 (S.D.N.Y. 2011) (first sale doctrine did not protect unauthorized resales of audio equipment where trademark owner had legitimate policy of refusing warranty service on such items); *Dell, Inc. v. This Old Store, Inc.*, No. H-07-0561, 2007 U.S. Dist. LEXIS 73952, *13-14 (S.D. Tex. Oct. 3, 2007) (holding that plaintiff sufficiently alleged a material difference where its warranty did not reach computers resold by defendants); *see also Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) ("Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective.").

Oneida's warranty policy is legitimate and was in place well before this dispute with Fox began. Fox's assertions that Oneida is attempting to "disclaim" a warranty belie the facts and the law.

> **b.    Whether Fox Purchased Her Flatware from Robinson or Oneida is Irrelevant to a First Sale Doctrine Analysis.**

Fox argues that Robinson—not Oneida—was "the actual manufacturer of the vast majority of the Oneida product that Ms. Fox has in inventory." (Dkt. 22, PageID: 396.) In any event, this fact does not entitle her to assert a first sale defense.

As a former limited-licensee under the ADP, Fox's "sale of trademarked goods after termination of a license amounts to trademark infringement." *Bill Blass,* 751 F.2d at 154; *accord Valvoline Co. v. Magic Quick Lube*, No. 09-CV-10829, 2009 U.S. Dist. LEXIS 100944, *8-9 (E.D. Mich. Oct. 29, 2009) (continuing to sell trademarked goods after trademark owner revoked

17

authorization constitutes trademark infringement).  "Generally, a former licensee may not invoke the exhaustion doctrine for any goods sold after the termination of the licensing agreement, even if they were manufactured while the agreement was still valid."  *Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41 (KPF), 2014 U.S. Dist. LEXIS 63883, *40 (S.D.N.Y. May 8, 2014); *accord Starin Mktg., Inc. v. Swift Distrib., Inc.*, No. 2:16-CV-67, 2018 U.S. Dist. LEXIS 224144, *10-11 (N.D. Ind. Oct. 31, 2018) ("Because the first sale doctrine does not apply to prior licensees after the termination of the licensing agreement, [the former licensee's] argument is unlikely to be successful in the final disposition of the case.").  "The logic underlying this maxim is that [the] licensor's approval for any sales terminated along with the licensing agreement, irrespective of whether the goods were manufactured while the licensing agreement was valid."  *Microban Prods.*, 2014 U.S. Dist. LEXIS 63883, *40.

Accordingly, Fox's allegations that she purchased her flatware from Robinson or Oneida[4] during the time that she was an authorized dealer are inconsequential to the outcome here. Regardless of the source of her inventory, Fox lost the ability to assert the first sale doctrine as a defense the moment that her status as an authorized dealer was terminated.

### c.    A Warranty Issued by Fox Will Not Preserve the First Sale Doctrine Defense.

As a last-ditch effort to maintain the cloak of the first sale defense, Fox claims that if Oneida refuses warranty claims on flatware sold from her inventory, "she will honor those warranty claims herself."  (Dkt. 22, PageID: 398-99.)  But the facts demonstrate otherwise.  Fox can only replace products from her limited and steadily decreasing inventory for so long.  Once Fox's current inventory is depleted, customers that purchase flatware from her will be left with

---

[4] Oneida is not admitting or conceding that Fox purchased any of the flatware at issue from Oneida.

no options should they need to place their flatware.  And again, the flatware in Fox's inventory is not subject to Oneida's strict quality control standards.  (Eichhorn Dec., Dkt. 11-1, PageID: 212-13, ¶¶ 9-10.)  Therefore, fulfillment of any warranty claim from Fox's inventory would be inherently inferior to Oneida's fulfillment of the same claim.  This constitutes a material difference sufficient to strip away the first sale defense.  (*See* Dkt. 11, PageID: 190-191 (citing *RFA Brands,* 2014 U.S. Dist. LEXIS 181781, *26; *see also Tacori Enters. V. Michael Joaillier, Inc.*, 207 F. Supp. 3d 799, 805 (S.D. Ohio 2016) ("The difference between Tacori's standard warranty and the warranty offered by James Free could constitute a 'material difference.'").)

Like her efforts to craft defenses using the doctrines of equitable estoppel and nominative fair use, Fox's attempt to defend this action based on the first sale doctrine is misguided and ill-conceived.

**B.      The Motion Established that Oneida is Likely to Prevail on the Merits of Each of its Claims.**

As shown above, the Motion defeats each of Fox's asserted affirmative defenses.  And, as explained below, none of Fox's other legal theories will stop Oneida from prevailing on the merits of the claims in its Complaint.

**1.      The Motion Established that Oneida is Likely to Prevail on the Merits of its Claims for Trademark Infringement (Count I), False Designation of Origin (Count II), Violation of the ODTPA (Count V), and Trademark Infringement/Unfair Competition Under Ohio Common Law (Count VI).**

Fox appears to agree with Oneida that the claims for trademark infringement under the Lanham Act, false designation of origin, violation of the ODTPA, and trademark infringement/unfair are all subject to the same analysis.  (*Compare* Dkt. 11, PageID: 192 (citing *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006); *Mountain Top Beverage Grp., Inc. v. Wildlife Brewing N.B., Inc.*, 338 F. Supp. 2d 827, 831–32 (S.D. Ohio 2003)) *with* Dkt. 22,

19

PageID: 403 (citing *Interactive Products Corp v. a2z Mobile Office Solutions, Inc.*, 195 F. Supp. 2d 1024 (S.D. Ohio 2001); *Victoria's Secret Stores v. Artco Equip. Co.*, 194 F. Supp. 2d 704 (S.D. Ohio 2002)).)  That is, to succeed on these claims, Oneida must show "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." (*See* Dkt. 11, PageID: 192 (citing *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013); 15 U.S.C. § 1114(1)(a)).)

Fox does not challenge—and thereby concedes—that Oneida owns the trademarks at issue and that Fox is using the marks in commerce without authorization.  Instead, she mounts two lines of attack against these claims.  First, Fox argues that the claims are precluded by the first sale and nominative fair use doctrines.  (Dkt. 22, PageID: 404.) As explained above, those defenses are unavailable here.  (*See*, *supra*, Sections II(A)(4)-(5).)

Second, Fox argues that these claims fail because Oneida has not presented any "evidence of actual consumer confusion." (Dkt. 22, PageID: 403.)  This argument, like several others that Fox has made, misses the mark.  Oneida does not need to show actual confusion to prevail on this claim, only a likelihood of confusion.  (Dkt. 11, PageID: 198 (citing *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 536 (6th Cir. 2014); *see also Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 282 (6th Cir. 1997); *Makers Mark v. Diageo North America, Inc.*, 679 F.3d 410, 422-23 (6th Cir. 2012).)  Evidence of actual confusion is just one of eight factors that courts typically consider when determining likelihood of confusion (*id.*, PageID: 194), and Fox presents no evidence or argument on the remaining seven factors.  In any event, here Fox's admitted commitment to the continued sale of the Oneida flatware in her inventory despite having her authorized dealer status revoked is all that is

necessary to satisfy the 'likelihood of confusion' element. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 13 F.3d 1185, 1190 (6th Cir. 1997) ("hold[ing] that proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'").

### 2. The Motion Established that Oneida is Likely to Prevail on the Merits of its Claim for False Advertising (Count III).

Both Fox and Oneida agree that the Sixth Circuit has adopted the following five-part test for false advertising claims:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

(*See* Dkt. 22, PageID: 404 (citing *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 798 (6th Cir. 2015); Dkt. 11, PageID: 199-200 (same).) As established in the Motion, Oneida meets all five elements. Fox's attack on the false advertising claim is nearly identical to her attacks on Counts I, II, V, and IV and is similarly futile.

First, she argues that the first sale doctrine is a complete defense to Oneida's false advertising claim. (Dkt. 22, PageID: 404-05.) The first sale doctrine is unavailable to Fox because the flatware in her inventory is not genuine. (*See*, *supra*, Section II(A)(5).) None of Fox's authority compels a different conclusion. Each of her cited cases clearly hold that the sale of ***genuine*** goods is a threshold issue for application of the first sale doctrine. *See Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825, 834 (S.D. Ohio 2002) (infringing conduct of off-price clothing retailer was not insulated because there was a likelihood that the garments at issue "cannot be considered ***genuine*** for purposes of the Lanham Act") (emphasis added); *Liz Claiborne, Inc. v.*

*Mademoiselle Knitwear, Inc.*, 979 F. Supp. 224, 230 (S.D.N.Y. 1997) ("trademark law does not reach the sale of ***genuine*** goods") (internal quotations omitted) (emphasis added); *Tumblebus Inc. v Cranmer*, 399 F.3d 754, 766 (6th Cir. 2005) (holding that "[t]he first-sale doctrine does not apply in the case at bar, however, because [defendant was] not using the TUMBLEBUS mark to resell a ***genuine*** good produced by Tumblebus Inc.") (emphasis added).

Second, as with Counts I, II, V, and IV, Fox concedes that Oneida has satisfied most of the requirements for its false advertising claim and only attacks Oneida on the first of the five elements. (Dkt. 22, PageID: 404-06.)  Alleging that she has removed all references to being an authorized Oneida dealer from her website and social media and claiming that she does not and cannot control the "by line" on her Amazon listings, Fox argues that Oneida cannot satisfy the false or misleading statement element. (Dkt. 22, PageID: 405-07.)

Even assuming, *arguendo*, that her unsupported allegations regarding her online platforms are true, Fox admits that she did not completely scrub all authorized dealer references from her social media platforms until ***after*** she received a cease-and-desist letter dated April 16, 2020 from the undersigned counsel. (Fox Aff., Dkt. 22-1, PageID: 432, ¶¶ 80-82.)  This, by itself, is an admission of misconduct by Fox.

Fox also flatly admits throughout the Opposition that she plans to continue promoting her flatware as genuine Oneida flatware and informing customers that her flatware is covered by Oneida's lifetime warranty policy.  Both are false statements of fact.  As explained throughout the Motion and this Reply, Fox's flatware is not covered by Oneida's lifetime warranty and, therefore, is not genuine as a matter of law.  Accordingly, these statements satisfy the false or misleading element for false advertising, and Oneida is likely to prevail on the merits of this claim.  (*See* Dkt. 11, PageID: 200 (citing *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723,

735 (6th Cir. 2012); *Haas Door Co. v. Haas Garage Door Co.*, No. 3:13 CV 2507, 2016 U.S. Dist. LEXIS 33970, at *47 (N.D. Ohio Mar. 16, 2016)).)

### 3. The Motion Established that Oneida is Likely to Prevail on the Merits of its Claim for Trademark Dilution (Count IV).

Oneida demonstrated that it satisfies all of the elements for its trademark dilution claim: 1) its marks are famous; 2) its marks are distinctive; 3) its marks have been used in commerce; 4) Fox's use of Oneida's marks began decades after the marks became famous; and 5) Fox's use of Oneida's marks harms their reputations.  (Dkt. 11, PageID: 201-203 (citing *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006); *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 629 (E.D. Tenn. 2012)).)

Fox argues that: 1) the first sale doctrine is a complete defense; 2) Oneida did not produce evidence sufficient to show fame; and 3) that her use of Oneida's marks will not result in dilution.  (Dkt. 22, PageID: 408-11.)  Each of these arguments is undercut by the law.

### a. The First Sale Doctrine Does Not Apply to Bar the Trademark Dilution Claim.

Again, Fox defaults to asserting the first sale doctrine, and, again, it provides no refuge. (*See*, *supra*, Section II(A)(5); Dkt. 11, PageID: 190-91.); *accord Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC,* 500 F. Supp. 2d 296, 326 (S.D.N.Y. 2007) ("The first sale doctrine only ensures that an unauthorized distributor of a trademarked item is not liable for trademark infringement or dilution when the distributor resells a branded item in an unchanged state.") (internal quotations and brackets omitted)).

### b. Oneida Has Provided Sufficient Evidence of Fame.

Although the trademark dilution test for fame is stringent, Fox would have this Court believe that the bar is so impossibly high that no amount of evidence could ever reach it.  Even

one of Fox's own cases instructs that the bar is not insurmountable. *See Coach Services Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1376 (Fed. Cir. 2012) ("While the burden to show fame in the dilution context is high — and higher than that for likelihood of confusion purposes — it is not insurmountable.").

Courts have routinely found the fame element for trademark dilution satisfied upon the submission of evidence similar to that submitted by Oneida. *See*, *e.g.*, *H-D U.S.A., LLC v. SunFrog*, *LLC*, 311 F. Supp. 3d 1000, 1042 (E.D. Wis. Apr. 12, 2008); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 391 (S.D.N.Y. 2008) (finding Louis Vuitton's Monogram Multicolore mark famous when a company official averred that "the company engaged in widespread advertising, publicity, promotion and sales of products bearing the Monogram Multicolore mark, and enjoyed a deluge of unsolicited media coverage and attention") (internal quotations and brackets omitted).

In *H-D U.S.A., LLC v. SunFrog*, *LLC*, the court provided the following explanation when ruling that Harley-Davidson's marks were famous:

> First, they have been continuously and widely used throughout the United States for decades, and some for over 100 years.  Second, Harley-Davidson and its licensees have sold many billions of dollars of products and services under these marks, and spent many millions of dollars extensively promoting them.  Third, the Famous Marks have attracted wide and unsolicited media attention.  Fourth, Harley-Davidson owns numerous federal registrations for the Famous Marks covering a variety of products and services.  Most of these registrations, including those covering apparel, are incontestable, and thus constitute conclusive evidence of their validity and Harley-Davidson's ownership of those marks.

311 F. Supp at 1042.  Similarly, the Eichhorn Declaration explains that Oneida registered its first trademark several decades ago in 1956, that Oneida has "expended substantial sums of money, time and effort in advertising, promoting and popularizing" its marks, and that Oneida has

"received substantial third-party recognition as a leading tableware brand." (Eichhorn Dec., Dkt. 11-1, PageID: 211-12, ¶¶ 4, 7.) This is more than sufficient evidence of fame.

None of the cases cited in the Opposition are instructive on this matter. The plaintiff in *House of Bryant Publications v. City of Lake City, TN* argued that the mark ROCKY TOP was famous, but, unlike Oneida, it did not provide any evidence concerning the time, money, and effort spent on promoting and popularizing the mark, the geographic reach of the mark outside of the American South, or the marketplace reach of the mark outside of the niche of college sports. 30 F. Supp. 3d 711, at 715 (E.D. Tenn. July 2, 2014). Instead, the only support for fame that the plaintiff cited was: 1) the fact that the song, "Rocky Top," was copyrighted; 2) the mark ROCKY TOP was a federally-registered trademark; and 3) the notion that the mark "invokes ideas about the state of Tennessee and the University of Tennessee." *Id.* Not surprisingly, the court ruled that the plaintiff failed to prove fame. *Id.* at 716.

In *Kibler v. Hall*, a music producer brought a trademark dilution claim based on the alleged unauthorized use of the mark DJ LOGIC. 843 F.3d 1068, at 1072 (6th Cir. 2016). In support of the fame element, the plaintiff pointed to the facts that he had been "a guest contributor on a Grammy-winning album" and that his mark had been registered for a total of about four years at the time of the suit. *Id.* at 1072. Oneida's trademarks, by contrast, have been federally registered for several decades, and its efforts to achieve and maintain its marks' fame run much deeper and go far beyond one-time actions, such as contributing to a single Grammy-winning album.

In *Maker's Mark Distillery, Inc. v. Diageo N.A., Inc.* – the case given the most attention by Fox – Maker's Mark's own marketing director "all but conceded that the company's name -- as distinguished from its [red wax seal] mark, which [wa]s at issue in dilution -- may not be

famous even within the company's niche market of whisky drinkers."  703 F. Supp. 2d 671, 699-700 (W.D. Ky. 2010).   From that concession regarding the company's name, the court extrapolated that "one could assume that Maker's Mark's red wax seal is not widely known among the general consuming public."  *Id.* at 699.  Obviously, Oneida has made no such concession regarding its name or any of its marks.  Oneida maintains that its marks have "received substantial third-party recognition as a leading tableware brand."  (Eichhorn Dec., Dkt. 11-1, PageID: 212, ¶ 7.)

Fox's reliance on these cases is misplaced.  Oneida has submitted sufficient evidence of fame, and the Court need look no further than Fox's own website to find that "Oneida is [sic] the #1 brand in flatware/silverware for over 100 years."[5]

### c.     Fox's Use of the Oneida Marks Harms The Marks' Reputation.

Fox is wrong when she says that her infringing conduct "is not likely to cause dilution of the Plaintiffs' mark" or, stated differently, harm the reputation of Oneida's marks.  (Dkt. 22, PageID: 410.)  It is well-settled that a plaintiff's inability to control quality assurance standards for products branded with its mark is all that is necessary to establish dilution by tarnishment. (*See* Dkt. 11, PageID: 202-03 (citing *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 734, 750 (W.D. Ky. 2008), *aff'd*, 605 F.3d 382 (6th Cir. 2010);  *H-D U.S.A., LLC v. Square Wear LLC*, No. 20-10644, 2020 U.S. Dist. LEXIS 63156, at *9 (E.D. Mich. Apr. 10, 2020); *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15 Civ. 8775 (LGS), 2016 U.S. Dist. LEXIS 87345, at *10-11 (S.D.N.Y. July 5, 2016)).)  Because Fox is no longer an authorized dealer,

---

[5] A July 8, 2020 screenshot from Fox's www.finestflatware.com website is attached as Exhibit B.  *See Schneider Saddlery Co. v. Best Shot Pet Prods. Int'l, LLC*, No. 1:06-CV-02602, 2009 U.S. Dist. LEXIS 27227, *24 (N.D. Ohio Mar. 31, 2009) (Courts may take judicial notice "where, as here, the images are printed from the parties' own web-sites.").

Oneida has no ability to subject Fox's inventory to its strict quality control standards. This inability alone satisfies the "harm to the mark's reputation" element of the trademark dilution claim.

But there's more. This element is also established where the senior and junior marks are identical. *State Farm Mut. Auto. Ins. Co.*, 2007 U.S. Dist. LEXIS 86651, *30; *see also Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 630 (E.D. Tenn. Nov. 27, 2012) (granting summary judgment to plaintiff on trademark dilution claims where defendants admitted marks "were identical, and indeed intended to be indistinguishable"); *H-D U.S.A., LLC v. Square Wear LLC*, No. 20-10644, 2020 U.S. Dist. LEXIS 63156, at *9 (E.D. Mich. Apr. 10, 2020) ("direct evidence of dilution is not necessary if actual dilution can be reliably proved through circumstantial evidence—the obvious case is one where the junior and senior marks are identical")). It is undisputed that the flatware in Fox's inventory carry Oneida's marks.

Accordingly, Fox's position that her use of the marks will not harm their reputation is untenable.

### C. Oneida Has Established That It Will Suffer Irreparable Harm if the Court Does Not Stop Fox's Misconduct.

The Motion established that the irreparable harm factor weighs in favor of injunctive relief for Oneida. (Dkt. 11, PageID: 203-205.) In response Fox attempts to manufacture arguments of delay based, in part, on the fact that the parties agreed to a service waiver pursuant to Fed. R. Civ. P. 4(d). (Dkt. 22, PageID: 412.) And she points to the "15 plus years" she successfully sold Oneida-branded flatware on Amazon.com to argue that there is no evidence of confusion. (Dkt. 22, PageID: 412.) Not only do these arguments lack merit, they are also irrelevant. This case is not about the relationship that Oneida and Fox may have had before Fox's misconduct began. This case is about her present insistence to continue unlawfully selling

materially different Oneida flatware after her status as an authorized dealer was revoked, thus causing irreparable harm to Oneida.

### 1.     Oneida Has Not Delayed in Seeking Injunctive Relief.

There has been no delay in this case. The ADP terminated on March 31, 2020. (Eichhorn Dec., Dkt. 11-1, PageID: 214, ¶¶ 13-14 & Ex. C.) Oneida filed this action on April 22, 2020 and filed the Motion on June 3, 2020. The passage of slightly over two months between the start of the infringing conduct and the filing of a motion for injunctive relief does not constitute a delay long enough to deny injunctive relief by any standard, including under the cases cited by Fox.

In each of her cases, much more time elapsed between the time the plaintiff discovered the infringing conduct and the time the plaintiff sought injunctive relief. *See Kendell Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 867 (S.D. Ohio 2008) (plaintiff took *six months* to sue defendant after discovering infringing activity); *Premix, Inc. v. Zappitelli*, 561 F. Supp. 269, 278 (N.D. Ohio 1983) (summarily finding no irreparable harm in breach of employment agreement case where former employee had changed employment *over a year* before former employer move for a preliminary injunction); *R.M. & G Prods., Inv. v. R.E.F. Golf Co.*, 1994 WL 653531, *3 (N.D. Ohio June 21, 1994) (delay of "*over one year* in filing its motion for preliminary injunction undercuts any argument of [plaintiff] regarding irreparable harm") (emphasis and brackets added).

Moreover, the court in *Kendell Holdings v. Eden Cryogenics* went out of its way to explain that part of the reason it was denying injunctive relief to the plaintiff was because the defendants had stopped their unlawful behavior and returned the intellectual property at issue:

> This conclusion is reinforced by Defendants' statements that the shop drawings at
> issue are not even being used by Defendants. At the Local Rule 65.1 conference,

> Defendants' counsel informed the Court that, even when Defendants received Plaintiff's cease and desist letter in February 2008, the shop drawings and other information were not being used by Defendants, and they have definitely not been used since February. Additionally, Defendants have already returned the majority of the drawings to Plaintiffs.

630 F. Supp. 2d at 868. Thus, in addition to the fact that the plaintiff in *Kendall Holdings* took a much longer time to file its action than Oneida did, that case can be further distinguished from the instant matter by the fact that Fox is committed to continuing to infringe Oneida's marks.

Finally, Fox should not be allowed to pervert Oneida's compliance with Court rules into a weapon that prevents injunctive relief. This Court requires plaintiffs to "attempt to obtain a waiver of service of process under Fed. R. Civ. P. 4(d) before attempting service of process." Loc. R. 4.2; *see also Carter v. Wilkinson*, Case No. 2:05-cv-0380, 2007 U.S. Dist. LEXIS 84939, *13 (S.D. Ohio Dec. 5, 2007) ("waiver of service is the preferred method of advising a defendant that he or she has been sued and triggering the time for filing a response to the complaint"). Allowing any prejudice to befall Oneida simply for adhering to the mandates of the Court would be inequitable.

### 2. The Motion Established That Oneida is Suffering Actual Harm.

The Motion established that Oneida is entitled to a presumption of irreparable harm because Oneida has demonstrated a likelihood of confusion between genuine products bearing Oneida's mark and Fox's infringing products. (Dkt. 11, PageID: 203-04 (citing *Lucky's Detroit, LLC v. Double L, Inc.*, 533 Fed. Appx. 553, 555 (6th Cir. 2013); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006); *Big Boy Rests. v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866, 872 (E.D. Mich. 2002); *Mexican Food Specialties, Inc. v. Festida Foods, Ltd.*, 953 F. Supp. 846, 854 (E.D. Mich. 1997)).) That alone is sufficient to establish the irreparable harm necessary for a preliminary injunction.

29

But the Motion went even further, demonstrating actual harm in the form of: (1) loss of control over the goodwill and reputation that Oneida has taken much time, money, and effort to establish; and (2) association of its ONEIDA Marks with lesser quality products.  (Dkt. 11, PageID: 203-04 (citing *NBBJ East Ltd. P'ship v. NBBJ Training Acad. Inc.*, 201 F. Supp. 2d 800, 808 (S.D. Ohio 2001); *Otter Prods., LLC v. Wang*, No. 18-cv-03198-CMA-SKC, 2019 U.S. Dist. LEXIS 52916, at *11–12, 17–18 (D. Colo. Mar. 28, 2019); *Osawa & Co. v. B&H Photo*, 589 F. Supp. 1163, 1168–70 (S.D.N.Y. 1984)).)

Fox's past relationship with Robinson and Oneida, no matter how long or memorable to Fox, is irrelevant in determining whether Oneida is currently suffering irreparable harm.  All that matters here is that Fox is currently robbing Oneida of its right to control and manage its marks and reputation.  *Lorillard Tobacco,* 453 F.3d at 381-82 ("In these cases, though, the harm stems not from the actual quality of the goods (which is legally irrelevant) but rather from Lorillard's loss of control over the quality of goods that bear its marks.") (parens in original).  The Court should see Fox's renditions of its past relationship with Robinson and Oneida for what it is – an effort to distort the facts and distract the Court from focusing on the immediate and irreparable harm that Oneida is suffering.

### D.    The Balance of Harms Weighs in Favor of Injunctive Relief.

The balance of harms weighs in favor of Oneida.  It has enough supply of flatware to supply the purchasing demands of the public, and any conceivable harm to Fox is both self-inflicted and not legally cognizable.  (Dkt. 11, PageID: 205-06 (citing *Perfetti Van Melle USA v. Cadbury Adams USA LLC*, 732 F. Supp. 2d 712, 726 (E.D. Ky. 2010); *Magpul Indus. Corp. v. Mayo*, No. 1:13 CV 01782, 2013 U.S. Dist. LEXIS 120320, at *12 (N.D. Ohio Aug. 23, 2013);

30

*Valvoline Co. v. Magic Quick Lube*, No. 09-CV-10829, 2009 U.S. Dist. LEXIS 100944, *16 (E.D. Mich. Oct. 29, 2009)).)

Fox counters by arguing: 1) Oneida is unable to support the purchasing demands of the public; and 2) the requested injunction will effectively close her business. (Dkt. 22, PageID: 413.)

Fox's arguments are insufficient to tip the balance of harms away from injunctive relief. First, although Fox claims that "[t]hroughout 2019, on a near daily basis, Oneida's customer service team would refer their customers to Ms. Fox when Plaintiffs were unable to fulfill the customer requests/claims," she has not provided a single email, call log, inventory report, or any other evidence to support this bald claim. (Dkt. 22, PageID: 413.)

Second, as explained above, Oneida went to great lengths to gain control over its marks while simultaneously protecting Fox's business, including sending multiple letters informing Fox of the impending termination of her authorized dealer status for noncompliance with the ADP. (*See*, *supra*, Section II(3).) Fox had ample notice to sell down her inventory or make arrangements to become compliant with the ADP and, thereby, remain an authorized reseller. She chose not to. Fox should not be rewarded in any manner for her self-inflicted harms.

### E.    The Motion Established That an Injunction Is in the Public Interest.

Oneida has demonstrated that an injunction will both prevent consumer confusion and deception in the marketplace, as well as protect Oneida's intellectual property interests. (Dkt. 11, PageID: 206-07 (citing *Lorillard Tobacco,* 453 F.3d at 383).) Fox does not even challenge this.

Instead, she once again argues that Oneida is attempting to pull off an after-the-fact rescission of its warranty, vaguely asserts that Oneida lacks evidence in support of its claims, and

accuses Oneida of inappropriately trying to eliminate Fox as a competitor. (Dkt. 22, PageID: 413-14.)

As explained above, Oneida's warranty only applies and has always only applied to flatware sold by authorized dealers, retailers, and others in its authorized sales network.  (*See*, *supra*, Section II(A)(5)(a).)  This is the only way that Oneida can ensure that flatware carrying its marks meet its rigorous quality control standards.

Oneida has provided sufficient evidence in support of all of its claims as explained throughout the Motion and this Reply.

Finally, Oneida has not engaged in any inappropriate behavior and conduct with respect to Fox.  Indeed, as explained in Section II(D), *supra*, Oneida used its best efforts to assist Fox and prevent her from infringing on its marks prior to the termination of the ADP.

## F.     The Motion Established That Oneida Should Not Be Required to Pay a Security Bond.

Despite Fox's attempt to mischaracterize their rulings, the cases cited in the Motion support the proposition that Oneida should be excused from posting a bond.  (Dkt. 11, PageID: 207-08 (citing *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995); *Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 757 (S.D. Ohio 2010); *Univ. Books & Videos, Inc. v. Metro. Dade Cnty.*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999)).)  And Fox's attempt to raise a concern as to Oneida's "economic wherewithal" should be given no consideration.

The court in *University Books & Video v. Metropolitan Dade County*, looked at several instances across the county in which injunctions have been issued without a bond:

> [C]ourts have held that security is not required in the following circumstances: (1) when the party seeking the injunction has a high probability of succeeding in the merits of its claim; (2) when the party to be enjoined is a municipality or county government that likely would not incur any significant cost or monetary damages from the issuance of the injunction; (3) when demanding a bond from the party

seeking the injunction would injure the constitutional rights of the party or the public.

33 F. Supp. 2d at 1374 (internal citation omitted).  Fox observed that "two of the circumstances presented by [*University Books & Videos v. Metropolitan Dade County*] where security is not required are not applicable in the present case."  (Dkt. 22, PageID: 415.)  However, at no point in the opinion did the court even intimate that the quoted passage was any sort of legal test under which all, or frankly any one, of the circumstances had to be met before a court would issue an injunction without requiring payment of a bond, as Fox insinuates.  Moreover, Fox's observation implicitly concedes that one of the circumstances – "the party seeking the injunction has a high probability of succeeding in the merits of its claim" – is applicable to Oneida in the present case.

Fox's attempt to distinguish *Ohio State University v. Thomas* is similarly unsuccessful.  She argues that the case is not instructive because "the state and federal rules of civil procedure treat public entities differently than private entities under the Rule 65(c) security requirements."  (Dkt. 22, PageID: 415.)   No provision of the Federal Rules of Civil Procedure supports this proposition.  And only a tortured reading of *Ohio State University v. Thomas* would lead to such a conclusion.  Ohio State's status as a public institution had absolutely nothing to do with this Court's decision not to require a bond.  The Court dispensed with the bond requirement because Ohio State, just like Oneida, had met all of the requirements for a preliminary injunction:  "Here, based on the fact that all four factors in the preliminary injunction analysis favor Ohio State and Ohio State would certainly able to pay any potential damages awarded against it, the Court finds that no bond is required."  738 F. Supp. 2d at 757.

Finally, Oneida is a large company that could pay any potential damages award against it.  The news article that Fox submitted in support of her concern as to Oneida's "economic wherewithal" constitutes inadmissible hearsay and should not be given any weight by the Court.

*O'Brien v. Waste Mgmt. of Ohio*, Case No. 1:18-CV-2982, 2019 U.S. Dist. LEXIS 27812, *5 (S.D. Ohio Feb. 21, 2019) ("Thus, the Court will not consider the hearsay news article."); *see also Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, Nos. 3:07-0979; No. 3:08-0031, 2010 U.S. Dist. LEXIS 87866, *37 (M.D. Tenn. Aug. 24, 2010) ("the news articles in which the quotations appear are classic inadmissible hearsay, and they cannot be considered evidence for summary judgment purposes").

In any event, Fox filed an Answer and did not assert any counterclaims against Oneida. Accordingly, there is no danger that a damages award would go unfulfilled.

## III. CONCLUSION

The Court should grant Oneida's Motion for Preliminary Injunction because Oneida is likely to prevail on the merits of its claims; Oneida is continuing to suffer irreparable harm that outweighs any potential harm to Fox; and a preliminary injunction will serve the public interest.

Respectfully submitted,

*/s/ Marla R. Butler*

Marla R. Butler (*pro hac vice*)
THOMPSON HINE LLP
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326-4266
Phone: 404-407-3680
Fax: 404-541-2905
Email: Marla.Butler@ThompsonHine.com

Jesse Jenike-Godshalk (0087964)
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 352-6702
Fax: (513) 241-4771
Email: Jesse.Godshalk@ThompsonHine.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2020, I electronically filed the foregoing with the Court using the CM/ECF system.  Notice of this filing will be sent to all parties via the Court's system. Parties may access this filing through the Court's system.

*/s/ Marla R. Butler*