**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ONEIDA CONSUMER, LLC, *et al.*,** | : | |
| | : | |
| **Plaintiffs,** | : | **CASE NO. 2:20-cv-02043-JLG-EPD** |
| | : | |
| **v.** | : | |
| | : | **JUDGE GRAHAM** |
| **ELYSE FOX d/b/a FINEST FLATWARE,** | : | |
| | : | **MAGISTRATE JUDGE ELIZABETH** |
| | : | **PRESTON DEAVERS** |
| **Defendant.** | : | |

---

## DEFENDANT ELYSE FOX d/b/a FINEST FLATWARE'S BRIEF ON LEGAL ISSUES RELEVANT TO PLAINTIFF ONEIDA'S CLAIMS

Defendant Elyse Fox, dba Finest Flatware is submitting her legal brief addressing the legal issues relevant to Oneida's claims in this lawsuit pursuant to the Court's Order of August 14, 2020.

Respectfully submitted,

/s/ Robert G. Schuler
Robert G. Schuler          (0039258)
Robert G. Cohen           (0041707)
Saša Trivunić             (0096722)
KEGLER, BROWN, HILL + RITTER CO., L.P.A.
65 East State Street, Suite 1800
Columbus, Ohio  43215
PH:  614-462-5400; Fax:  614-464-2634
rschuler@keglerbrown.com
rcohen@keglerbrown.com
strivunic@keglerbrown.com

Counsel for Defendant
Elyse Fox d/b/a Finest Flatware

Robert E. Zaytoun      (NC Bar #6942)
Matthew D. Ballew    (NC Bar #39515)
John R. Taylor        (NC Bar #43248)
ZAYTOUN, BALLEW & TAYLOR, PLLC
3130 Fairhill Drive, Suite 100
Raleigh, NC 27612
PH: 919-832-6690; Fax: 919-831-4793
rzaytoun@zaytounlaw.com
mballew@zaytounlaw.com
jtaylor@zaytounlaw.com
Co-Counsel for Defendant
Admitted Pro Hac 06/09/2020

**TABLE OF CONTENTS AND**
<u>**SUMMARY OF POINTS AND AUTHORITIES**</u>

I.      Introduction ............................................................................................... 1

II.     Transferability of Oneida's Warranty to a Reseller's Customer .............................. 1

        A.  Relevant facts to which the law will be applied ..................................................... 1

        B.  **Oneida's contention that it limited its warranty to only goods sold by authorized dealers is contrary to both its express warranty terms and New York statutory law which governed the same** ..................................................................... 4

        New York General Business Law 369-b precluded Oneida or Robinson from limiting the manufacturer's warranty on the Oneida flatware to only product resold by authorized dealers. Thus, even if Oneida or Robinson had ever attempted to limit the manufacturer's warranty on the Oneida flatware sold— which neither did prior to December 2018 — that effort would have been in in violation of and void under applicable New York law.

        C.  **Defendant Fox's right to pass on the Oneida warranty to her customers, was understood by the contracting parties, and was part of the basis of her bargain with Robinson and Oneida** ..................................................................... 5

        Under Ohio Revised Code Section 1302.26 (UCC 2-313), the manufacturer's warranty on all Oneida flatware passed to Ms. Fox when she purchased her flatware from Oneida and Robinson. The terms of that warranty were unrestricted as to the nature of the reseller that later resold the product. After title to that product passed from Oneida/Robinson to Ms. Fox, Oneida could no more change the warranty on those goods than it could go back to Ms. Fox and attempt to increase the price and obtain additional money for her previous purchase of the goods. *See Ohio Sav Bank v. H. L. Vokes Co.*, 54 Ohio App. 3d 68, 71 (8th Dist.1989). Any attempt by Oneida to change the terms of its warranty after the underlying product had been sold to Ms. Fox, necessarily required the consent of Ms. Fox. *Gold Kist, Inc. v. Citizens & Southern Nat'l Bank of S.C.*, 286 S.C. 272, 274-75, 333 S.E.2d 67 (S.C.Ct.App.1985); *Nicholson v. Jayco, Inc.*, N.D.Ohio No. 5:15-cv-2010, 2016 BL 323076 (Sept. 29, 2016)

        D.  **Basic principles of warranty law also support the transferability of the manufacturer's warranty by Ms. Fox to her customers** ..................................................... 11

        Warranties are creatures of contract and as such are controlled by contract law principles. *See Hyundai Motor Am., Inc. v. Goodin*, 2005 BL 69490 (Ind. Feb. 22, 2005). Notwithstanding, most jurisdictions do not require privity of contract in order to sustain a claim for breach of warranty. *See, e.g., Nicholson v. Jayco, Inc.*, N.D.Ohio No. 5:15-cv-2010, 2016 BL 323076 (Sept. 29, 2016) ("Privity is not required to impose liability for breach of an express warranty.") By not requiring vertical privity of

contract, the law many years ago paved the way for the clear transferability of warranties to the end consumer.

Several sections of the Ohio Revised Code are instructive on the transferability of the unrestricted manufacturer's warranty on Oneida flatware to Ms. Fox's customers. Official Comment 2 to R.C. 1203.26 states that, "the warranty sections of this Article [Chapter] are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts *or to the direct parties to such a contract*." In other words, by enacting R.C. 1302.26, the legislature did not intend to limit the extension of a seller's warranty to a party outside the contract, if that was the contracting parties' intention. Clearly that was the case here, as Ms. Fox was actually supplied with extra manufacturer's warranty cards to include in her packages to her consumer purchasers.

Moreover, Comment 1 to Ohio R.C. 1302.29 provides that the statutory section is designed to "protect a buyer from *unexpected and unbargained language of disclaimer."* Here, Oneida never discussed any restriction on its manufacturer's warranty prior to the time Ms. Fox made her purchases from Oneida and/or Robinson. Such unbargained for disclaimers are precluded by Ohio R.C. 1302.29.

**E. Can a trademark owner later cancel a warranty that was part of the sales transaction by de-authorizing a reseller?** ............................................................... 15

No.  An unrestricted warranty issued with purchased goods becomes part of the sales transaction, as it was part of the bargain obtained by the buyer.  See Ohio R.C. 1302.26.  In this case it was part of the bargain Ms. Fox received when she purchased her Oneida flatware.  Like any other contract term, it cannot be amended or limited after the sales transaction without a subsequent agreement by the buyer.  *Gold Kist, Inc. v. Citizens & Southern Nat'l Bank of S.C.*, 286 S.C. 272, 274-75, 333 S.E.2d 67 (S.C.Ct.App.1985); *See Ohio Sav Bank v. H. L. Vokes Co.*, 54 Ohio App. 3d 68, 71 (8th Dist.1989).

**F. Does the failure or refusal by a reseller to enter into an agreement  allowing Oneida an opportunity to inspect the reseller's goods give Oneida a basis to cancel its warranty?** ................................................................................................. 16

No. Again, given that a warranty is a creature of contract, *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226, 48 A.3d 366 (N.J. Super. Ct. App. Div. 2012) ("[C]laims of breach of warranty [] derive from the law of contracts."), the sole issue is determining what the terms of the manufacturer's warranty were at the time the contract, i.e. the underlying sales transaction, occurred.  Oneida's written warranty is not now, nor was it at the time that it and Robinson sold product to Ms. Fox, limited to only authorized dealers, or customers of authorized dealers.  As explained above, Oneida cannot amend that warranty now and make the amended terms retroactive.

III.  **What rights does a trademark owner have to control product after it has been sold by the trademark owner.** ............................................................................ 17

   A.  **Relevant facts to which the law will be applied** .................................................. 17

   B.  **U.S. law has long recognized that trademark rights are limited by the first sale doctrine.** ................................................................................................................ 19

Under the first sale doctrine, "the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of that product." 263 F.3d 1297, 1301 (11th Cir.2001). Under this doctrine, "a markholder may no longer control branded goods after releasing them into the stream of commerce. After the first sale, the brandholder's control is deemed exhausted. Down-the-line retailers are free to display and advertise the branded goods." *Osawa & Co. v. B&H Photo*, 589 F.Supp. 1163, 1173 (S.D.N.Y.1984). Stated otherwise, under the first sale doctrine, "a markholder may no longer control branded goods after releasing them into the stream of commerce." *McDonald's Corp. v. Shop at Home, Inc.*, 82 F.Supp.2d 801, 812 (M.D.Tenn.2000). As explained by the Ninth Circuit Court of Appeals in *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073 (9th Cir.1995) "the 'first sale' rule preserves an area for competition by limiting the producer's power to control the resale of its product." "The right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Id.* As explained by the Court in *Sebastian*, a trademark owner cannot stop an unauthorized reseller which legally acquired the trademarked product from selling that product downstream. The trademark owner's ability to control the distribution of its product ends once it places that product into the stream of commerce.

The holding in *Sebastian* squarely applies to the facts in this case.

   1.  ***Under the first sale doctrine, a trademark owner has the right to control the quality of its trademark goods before they enter the stream of commerce.*** ...... 22

The owner of a trademark is entitled to require "that no merchandise be distributed without its first being inspected by the holder or its agent to insure quality." *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), c*ert. denied*, 484 U.S. 817, 108, S.Ct. 71, 98, L.Ed.2d 34 (1987); *FURminator, Inc. v. Kirk Weaver Enters., Inc.*, 545 F.Supp.2d 685, 690 (N.D.Ohio 2008) ("Courts in the Sixth Circuit are in agreement with the Second Circuit" that, "[i]f the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.") However, once the trademark owner approves of a sale, the rights of the trademark owner are exhausted. *McDonald's Corp.*, 82 F.Supp.2d. at 811 ("It does not matter that the owner of the trademark objects to the use of its mark, as long as one approved sale has already

occurred.") (citing Restatement of the Law 3d, Unfair Competition, Section 24 (1995))

**2.  *Some courts have recognized a post-first sale quality control exception to the first sale doctrine in limited, fact-specific circumstances*.................................27**

While neither the United States Sixth Circuit Court of Appeals, nor any district court within the Sixth Circuit, has ever adopted a quality control exception to the first sales doctrine, the United States Second Circuit Court of Appeals has adopted such an exception when a reseller intentionally subverts quality control measures that a trademark owner has established to maintain the quality of its branded product after those goods are released into the stream of commerce. See *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir.1996), and *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir.2009).  As articulated by that court:

> [A] trademark holder is entitled to an injunction *against one who would subvert its quality control measures upon a showing* that (i) the asserted quality control procedures are established, legitimate, substantial, and nonpretextual, (ii) it abides by these procedures, and (iii) sales of products that fail to conform to these procedures will diminish the value of the mark.

*Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 244 (2d Cir.2009)(citing *Warner-Lambert*, 86 F.3d at 6).  The Davidoff/Warner-Lambert quality control exception has no application in this case for multiple reasons including that Ms. Fox has never been alleged to have subverted any quality control measures.

More significantly, Oneida never had any quality control measure in place at the time that Ms. Fox purchased her inventory. For related reasons, Oneida cannot meet the quality control exception as articulated by the district court in *Skullcandy, Inc. v. Filter USA, Inc.*, 2019 U.S. Dist. LEXIS 104393.  Not only did Oneida not have quality control measures in place at the time it sold product to Ms. Fox, but it never plead what its quality control measures were and how the products sold by Ms. Fox "fail to meet these quality control measures," a necessary pleading requirement. *Id.* at *23 (quoting *Wellnext LLC v. OVM LLC,* S.D. Fla. No. 17-CV-62107, 2017 U.S. Dist. LEXIS 218128, *3).

**3.  *What are a trademark owner's rights to take steps to protect its trademark when it believes that a reseller is failing to exercise reasonable care of the goods?*. 32**

A trademark owner has the ability to implement post-first sale quality control measures vis-à-vis authorized dealer agreements.  See *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir.1996), and *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir.2009). Such agreements can require authorized dealers to abide by the trademark owner's post-sale quality control measures, and require the authorized dealer not to sell product to unauthorized dealers.  However, as explained by the Ninth Circuit Court of Appeals in *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073 (9th Cir. 1995), if an authorized dealer sells to an unauthorized dealer, the brand owner's recourse is not to sue the unauthorized

reseller in a trademark infringement action, but to pursue a breach of contract action against the authorized reseller that breached the authorized dealer agreement.

**4. *Does Ms. Fox have a duty (under contract, common law, uniform commercial code) to care for the product?*** ............................................................................. *33*

No. Neither Ms. Fox' purchase orders with or confirmations from Robinson or Oneida, nor the common law or the Uniform Commercial Code impose such a duty on her. Notwithstanding, she has always maintained the high quality of her inventory as reflected by the facts she has a lifetime positive rating of 99% on Amazon, with over 12,000 purchaser feedbacks, and a lifetime positive rating of 100% on eBay, with over 100,000 sales of Oneida flatware. (Fox Aff. ¶25).

**IV. The Doctrines of Estoppel and Abandonment are relevant and applicable here against Oneida's efforts to destroy Ms. Fox's business.** ...............................................34

**V. CONCLUSION** ...............................................................................................36

I.       **Introduction.**

Pursuant to the Court's Order of August 14, 2020, Defendant Elyse Fox submits the following brief addressing the legal issues relevant to Oneida's claims in this lawsuit, including (1) the transferability of Oneida's warranty by Ms. Fox to her customers, and (2) what rights Oneida has, if any, to issue and enforce new quality control measures against a reseller *ex post facto*, i.e., after it has sold product to that reseller with no such measures in place at the time of sale.

In addressing these broader legal issues, Ms. Fox has set forth the relevant facts and applicable law that controls the specific questions that the Court identified in its August 14, 2020 Order, including (a) can a trademark owner later cancel a warranty that was part of the sales transaction by de-authorizing a reseller; (b) does the failure or refusal by a reseller to enter into an agreement  allowing Oneida an opportunity to inspect the reseller's goods give Oneida a basis to cancel its warranty; (c) what are a trademark owner's rights to take steps to protect its trademark when it has reason to believe a reseller is failing to exercise reasonable care of the goods; and (d) does Ms. Fox have a duty (under contract, common law, uniform commercial code) to care for the product. Those specific questions are individually addressed after setting forth the broader legal principles that control this case.

II.       **Transferability of Oneida's Warranty to a Reseller's Customer.**

        A.  **Relevant facts to which the law will be applied.**

Since at least as early as 2010, the published warranty on Oneida's flatware has remained substantively unchanged.  That complete warranty reads as follows:

WARRANTY INFORMATION
Stainless Steel Limited Lifetime Warranty

What is Covered: Each piece of fine quality stainless is warranted against original defects in workmanship and materials.

What is Not Covered: This warranty does not cover any damage or defects caused by misuse, abuse, or failure to use proper care in accordance with the instructions provided.

How Long Coverage Lasts: This warranty provides a limited lifetime period of coverage. The duration of the lifetime coverage is measured by lifetime of the original owner.

What Our Company Will Do: Our company will, at its option, send a replacement piece (not the complete set) at no cost to you. A similar piece will be used for replacement if the original pattern is no longer available.

How You Get Service: Notify us by sending a letter, the affected piece(s), proof of purchase and original warranty to the address below. You will be responsible for return shipping costs.

(See Exhibit F to Elyse Fox's June 24, 2020 Affidavit (hereinafter referred to as "Fox Aff. ¶__"), containing a copy of Oneida's current warranty as it appears on its website.)  This warranty is substantively identical to the warranty published on Oneida's website in 2015, 2012, and 2010. (See Elyse Fox Supplemental Affidavit dated August 28, 2020 (hereinafter referred to as "Fox Supp. Aff. ¶__"), ¶ 5).  Moreover, Oneida's current manufacturer's flatware warranty is substantively identical to the warranty on the Oneida flatware when it was manufactured and sold by Oneida's exclusive licensee, Robinson.  (Fox Aff. ¶¶29-30).

A review of the terms of the published Oneida flatware warranty, at all relevant times, reveals the written warranty was never restricted or otherwise limited based upon the identity or status of a reseller or dealer, whether authorized or not.  (See Fox Supp. Aff. ¶5, and exhibits referenced therein).  Oneida's representations in this lawsuit to the contrary are simply not true. This is further confirmed by the supplemental affidavits of both Defendant Fox (Fox Supp. Aff. ¶ 6) and Laureen M. Montalbano, Robinson Home Products Inc.'s Sales Manager from 2007 to 2020 (Montalbano Supp. Aff. ¶10).

2

Nor did the warranty terms contain <u>any</u> language restricting Defendant Fox's ability to transfer the warranty to subsequent purchasers.  Oneida could have included such terms but did not, and Defendant Fox never agreed to modify the same.  The warranty terms shown above were an essential part of the bargained-for agreement Ms. Fox relied upon as she purchased millions of dollars of flatware which Oneida knew were for resale.  These plain warranty terms ensured that Ms. Fox's future customers would always be covered by a warranty "measured by the lifetime of the original owner." She would never have purchased the product without such a transferrable warranty.

Contrary to the terms of its expressed warranty policy, Oneida just recently began denying warranty claims to customers of Defendant Fox who purchased flatware from Ms. Fox while she was an authorized dealer of Ms. Fox.  By way of example, on July 24, and December 5, 2019, Ms. Fox sold Oneida flatware to Nancy Thomas.  (Fox Supp. Aff. ¶10). These sales were made by Ms. Fox while she was an authorized dealer of Oneida flatware, and long before Oneida came up with the new litigation position that unauthorized dealers could not pass on the Oneida warranty.  (Fox Supp. Aff. ¶11).  On July 11, 2020, Ms. Thomas made a warranty claim on her purchase, claiming one of the forks purchased had bent tines.  (Fox Supp. Aff. ¶12). *Six weeks after* the warranty claim was made, Oneida responded to Ms. Thomas, denying the claim because Oneida had stopped doing business with Ms. Fox.  (*Id.*).  Oneida directed Ms. Thomas back to Ms. Fox.  *Id.*  Ms. Fox satisfied the warranty claim *the same day* she was notified of the claim by Ms. Thomas.  (Fox Supp. Aff. ¶13).

These actions by Oneida are in breach of the warranty obligations it owes to Ms. Fox and her customers, and they are further evidence of Oneida's underlying motive to hurt Ms. Fox's business in any way it can.

**B. Oneida's contention that it limited its warranty to only goods sold by authorized dealers is contrary to both its express warranty terms and New York statutory law which governed the same.**

As set forth above, the manufacturer's warranty on Oneida flatware is not currently, nor has it ever been, limited based upon the status of the reseller which sold the product to the end consumer. Nowhere in its published warranty statements did Oneida ever limit its manufacturer's warranty to claims brought by only those who purchased their product from authorized Oneida dealers. Even Oneida's current published manufacturer's warranty does not contain such a restriction. Any argument to the contrary now by Oneida is an after-the-fact litigation creation.

Not only would including such a warranty limitation have been detrimental to Oneida's profits generated by resellers such as Defendant Fox, but also historically both Oneida and Robinson were precluded from doing so by law. Prior to 2017 Oneida was headquartered in New York. (Fox Supp. Aff. ¶39). Robinson was headquartered in New York at all times that Ms. Fox did business with Robinson. (Id. at ¶40). New York currently has, and at all relevant times had, a statute directly on point that *prohibits* a manufacturer from limiting its warranty on a product based solely on a dealer's identity or status as an authorized dealer. New York General Business Law 369-b provides as follows:

> A warranty or guarantee of merchandise may not be limited by a manufacturer doing business in this state solely for the reason that such merchandise is sold by a particular dealer or dealers, or that the dealer who sold the merchandise at retail has, since the date of sale, either gone out of business or no longer sells such merchandise. Any attempt to limit the manufacturer's warranty or guarantee for the aforesaid reason is void.

N.Y.GBL 369-b. As the Practice Commentary to section 369-b makes clear, the purpose of the law is to:

> prevent denial of manufacturer warranty service to customers . . . because goods were sold by unauthorized dealers . . . Abuse may arise if the manufacturer seeks

4

> to avoid an express warranty because the "wrong" dealer sold the goods . . . this is the evil at which [GBL] 369-b is aimed.

GBL 369-b, Practice Commentaries, McKinney's Consol. Laws of N.Y., Vol. 19, at 523-24 (Givens).  Thus, even if Oneida or Robinson had ever attempted to limit the manufacturer's warranty on the Oneida flatware sold—which neither did—that effort would have been in violation of and void under applicable New York law.

### C. Defendant Fox's right to pass on the Oneida warranty to her customers, was understood by the contracting parties, and was part of the basis of her bargain with Robinson and Oneida.

When a contract is for the sale of goods, the Uniform Commercial Code applies.  *See Summit Tree & Landscaping v. Stow Contracting, LLC*, 9th Dist. Summit No. 24515, 2009-Ohio-5794, ¶ 1 ("Ohio's Uniform Commercial Code applies because the agreement in this case involved the sale of goods.").  In Ohio, R.C. 1302.02 (Ohio's version of UCC 2-102) states that, "[u]nless the context otherwise requires, sections 1302.01 to 1302.98, inclusive, of the Revised Code," Ohio's codification of the UCC, "apply to transactions in goods."  Here, Fox contracted with Oneida and Robinson, at different points in time, to purchase flatware.  These were contracts for the sale of goods, not services. Therefore, the Uniform Commercial Code applies to all purchases of flatware that Ms. Fox made from Oneida and Robinson.

As set forth in Ohio Revised Code Section 1302.26 (UCC 2-313), an express warranty is created when an affirmation of fact is made by a seller to a buyer:

**1302.26 Express warranties by affirmation, promise, description, sample - UCC 2-313.**

(A) Express warranties by the seller are created as follows:

> (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

5

At all relevant times that Ms. Fox purchased Oneida flatware from either Oneida or Robinson, there was a published manufacturer's warranty that provided "each piece of fine quality stainless is warranted against original defects in workmanship and materials."  To the extent that the flatware had such defects, Oneida and Robinson promised to replace the goods.  An express warranty was created at the time that Oneida and/or Robinson (the Sellers) sold Oneida product to Ms. Fox (the Buyer).

The limited lifetime express warranty became part of the basis of the bargain and was a valuable contract right that passed to Ms. Fox and that she relied upon at the time of sale.  After title to that product passed from Oneida/Robinson to Ms. Fox, Oneida could no more change the warranty on those goods than it could go back to Ms. Fox and attempt to increase the price and demand additional payment for the goods she had already purchased.  *See Ohio Sav Bank v. H. L. Vokes Co.*, 54 Ohio App. 3d 68, 71 (8th Dist.1989) (holding where express warranty became a basis of the bargain, seller's subsequent disclaimer of the express warranty is "*ineffective*." *Id*. at 72 (emphasis added)).

Moreover, the parties understood that this manufacturer's warranty was transferable by Ms. Fox to her consumer customers.  This is first evidenced by the plain terms of the express warrant which contain <u>no</u> limitation on transferability.  This is further evidenced by the clear understanding of <u>both</u> Ms. Fox (Fox Aff. ¶ 31.) and Robinson, Oneida's former exclusive licensee and the actual manufacturer of the vast majority of the Oneida product that Ms. Fox has in inventory. (Montalbano Aff. ¶ 16 and 19.).

Robinson had full knowledge of, and approved, Ms. Fox's marketing and resale to her customers of all Oneida flatware *with* the manufacturer's limited warranty, which was for "the lifetime of the original owner."  (Fox Aff. ¶ 31; Montalbano Aff. ¶ 16.)  Indeed, Robinson even

supplied Ms. Fox with extra manufacturer warranty cards for Ms. Fox to include in her packages of Oneida flatware to Ms. Fox's customers.  (Fox Supp. Aff. ¶ 36; Montalbano Supp. Aff. ¶ 8.) The sole purpose of supplying these warranty cards to Ms. Fox was so that she could notify her customers of the warranty that existed on the product which she sold.

Ms. Fox purchased a substantial volume of inventory from Robinson *because* she was permitted to pass along the warranty to her end-user customers, and Robinson agreed to honor that warranty.  (Fox Aff. ¶¶ 31-32; Montalbano Aff. ¶¶ 16-17.)  Ms. Fox would not have continued to purchase Oneida flatware from Robinson if she was not permitted to resell the flatware to customers with the warranty included, and Robinson was aware of this fact. (Fox Aff. ¶ 33; Montalbano Aff. ¶ 18.)  Ms. Fox' ability to pass on the manufacturer's warranty to her customers was an essential element and basis the bargain between Ms. Fox and Robinson each time she purchased inventory.

After Oneida re-assumed control over the Oneida brand in 2019, it treated its flatware sales to Ms. Fox in the exact same manner, all being sold with the understanding that Ms. Fox would market and resell the inventory with the lifetime warranty attached and applicable.  That is, after Oneida retook control over the Oneida brand in the United States from Robinson, ***Oneida also honored the warranty claims made by Ms. Fox's customers on product purchased from Ms. Fox that Ms. Fox previously purchased from Oneida or Robinson***.  (Fox Aff. ¶ 76.)  They did so because the express terms of the warranty clearly require the same.  This course of performance clearly indicates that Ms. Fox had the ability and right to pass on the manufacturer's warranty to her customers. *See Fine Line Communs., Inc. v. I. Schumann & Co.*, 2010-Ohio-1438 (the facts and circumstances that give rise to the terms of a contract include custom and course of dealings between the parties); *Circuit Solutions, Inc. v. Mueller Elec. Co.,* 2008-Ohio-3048 (same).

113087\000001\4825-3281-5817v9

Significantly, Oneida honored the manufacturer's warranty on claims made by customers of Ms. Fox with Oneida having full knowledge of her reselling business operations. At no point in time while Ms. Fox was still purchasing goods from Oneida, did Oneida ever suggest that its warranty was limited to sales made only by authorized dealers of Oneida, or that its warranty was not transferrable to Ms. Fox's customers. (Fox Supp. Aff. ¶¶ 6-7). As explained above, Oneida cannot now retroactively limit its warranty after it became a basis of the bargain of a past sales contract with Ms. Fox. *Ohio Sav Bank v. H. L. Vokes Co.*, 54 Ohio App. 3d 68, 71 (8th Dist.1989).

While it is true that under R.C. 1302.12(A) (Ohio's codification of UCC 2-209), "[a]n agreement modifying a contract" under the UCC "needs no consideration to be binding," this does *not* mean that one party to a contract may unilaterally alter the terms of a contract—including warranty coverage—when that warranty was part of the basis of the parties' bargain in the first place. In *Gold Kist, Inc. v. Citizens & Southern Nat'l Bank of S.C.*, a highly instructive case interpreting near identical UCC provisions, farmers bought corn seed from the plaintiff after the plaintiff represented that it would produce a high tonnage of corn per acre. 286 S.C. 272, 274-75, 333 S.E.2d 67 (S.C.Ct.App.1985). The plaintiff argued that it effectively disclaimed any express or implied warranties, but the court disagreed. *Id.* at 276-77.

Specifically, the *Gold Kist* court found that, at the time the plaintiff and farmers "entered into an oral contract . . . [t]here is no evidence that the disclaimer was brought to [the farmers'] attention." *Id.* at 277. Therefore, since the disclaimer was not raised until later, it "was not a part of the bargain between the parties." *Id.* The court further noted that, under South Carolina's version of UCC 2-209, "a disclaimer made after the closing of the sale can be made a binding part of the contract *if the parties agree to the modification.*" *Id.* at 277-78 (emphasis added). Otherwise, a seller's attempt to modify the terms of a warranty "amounts to a post-contract, unbargained-for

unilateral attempt [] to limit its obligations under the contract." *Id.* at 276-77.  Such an attempt is not enforceable. *Id.* at 278.

Here, Oneida is *ex post facto* manufacturing an argument against Ms. Fox that the court expressly forbade in *Gold Kist*: the imposition of a "post-contract, unbargained-for unilateral attempt [] to limit its obligations under the contract," by refusing to extend the manufacturer's warranty to Fox's purchasers. 286 S.C. at 276-77.  Without any contractual or legal support, Oneida is claiming that it can now limit the manufacturer's warranty on product it or Robinson sold to Ms. Fox years ago by unilaterally stripping Ms. Fox of her status as an authorized Oneida dealer, which it did in April of this year.  The Court should not allow this to stand.

Before selling any product to Ms. Fox that they knew she was going to resell in the marketplace, both Oneida and Robinson each had full authority (at their respective times) to limit the terms of their warranty agreement with respect to Ms. Fox or her customers.  Before selling to Ms. Fox, they both could have published new or different warranty terms regarding authorized dealers or transferability restrictions and required her to agree to the same.  Robinson and Oneida chose not to do so, and instead chose to reap substantial profits by selling to Ms. Fox with the understanding that she was allowed to resell to customers at any time in the future with a transferrable warranty.  Therefore, since Oneida "failed to limit the warranty" at the time of contracting with Fox, and since Fox has not agreed to this attempted modification, the warranty should remain in full force. *Jones*, 142 Ga.App. at 843.

The law is clear that a manufacturer must take steps at the time of sale to put in place express warranty disclaimers or restrictions before the same are enforceable.  When this occurs at the time of contracting, courts will enforce clear warranty disclaimers, or other limitations on the scope of a warranty. *See e.g. Nicholson v. Jayco, Inc.*, N.D.Ohio No. 5:15-cv-2010, 2016 BL

9

323076 (Sept. 29, 2016) (court found in favor of defendant manufacturer who argued their repair warranty did not apply as the evidence showed the warranty terms at the time of sale to plaintiff included express language disclaiming coverage if the RV was used for commercial purposes and that the plaintiff was aware of the same at the time purchase); *Hoffman v. Daimler Trucks North America, LLC*, 940 F.Supp.2d 347 (W.D.Va.2013) (where the evidence showed a defendant manufacturer's warranty contained express terms at the time of sale stating that the warranty was "nontransferable and extends only to the original purchaser acquiring the product directly from [the manufacturer] and shall not be construed to extend to any third party, *including, but not limited to, the ultimate purchaser of the end product*," (emphasis added), the plaintiff's breach of warranty claim against the defendant manufacturer was dismissed plaintiff was not the original purchaser).

These cases reflect basic common sense: a seller who offers a warranty, and does not explicitly limit that warranty with the purchaser at the time of sale, cannot unilaterally limit its warranty obligations after the fact. Allowing a seller to do so would turn fundamental principles of contract law on their head. Ms. Fox is allowed under the law to rely on and enforce the warranty that she agreed to and purchased for many years from both Robinson and Oneida.

The key is what the parties understood, relied upon, and agreed to when the contract was made. Contracts for the sale of goods may be later modified without consideration, but the modification must be mutually understood and agreed upon to be enforceable. No reasonable argument can be made that Ms. Fox ever agreed that Oneida could retroactively eliminate the manufacturer's warranty that existed on her inventory simply by declaring that she was no longer an authorized Oneida dealer. For Plaintiff to suggest otherwise is without a good faith basis in fact.

113087\000001\4825-3281-5817v9

**D. Basic principles of warranty law also support the transferability of the manufacturer's warranty by Ms. Fox to her customers.**

In considering the transferability of the Oneida warranty by Ms. Fox, it is also instructive to review basic concepts of warranty law. Warranties are creatures of contract and as such are controlled by contract law principles. *See Hyundai Motor Am., Inc. v. Goodin*, 2005 BL 69490 (Ind. Feb. 22, 2005) ("Although warranty liability originated as a tort doctrine, it was assimilated by the law of contracts and ultimately became part of the law of sales."); *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226, 48 A.3d 366 (N.J. Super. Ct. App. Div. 2012) ("[C]laims of breach of warranty [] derive from the law of contracts."). Accordingly, traditional contract principles apply to claims for breach of warranty.

Although warranties are governed by contract law, there are some differences between warranties and traditional contracts. For example, most jurisdictions do not require privity of contract in order to sustain a claim for breach of warranty. *See, e.g., Nicholson v. Jayco, Inc.*, N.D.Ohio No. 5:15-cv-2010, 2016 BL 323076 (Sept. 29, 2016) ("Privity is not required to impose liability for breach of an express warranty."); *Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260 (10th Cir.1984) (holding that, when the plaintiff is "trying to recover from the manufacturer for express warranties allegedly made by the manufacturer . . . a vertical privity requirement is and should be unnecessary.").

By not requiring vertical privity of contract, the law many years ago paved the way for the clear transferability of warranties to the end consumer. Courts have cited myriad reasons for abolishing the vertical privity requirement in breach of warranty cases, but "[p]rincipal among these is the view that, in today's economy, manufactured products typically reach the consuming public through one or more intermediaries." *Hyundai Motor*, 2005 BL 69490 at *8. In such cases,

11

"it makes little sense to allow the ultimate consumer redress against *his* immediate vendors only." *Elden v. Simmons*, 1981 OK 81, 631 P.2d 739, 742 (Okla.1981) (emphasis in original).

Even in states where vertical privity *is* required to sustain a claim for breach of warranty, end consumers who purchased goods from an intermediary can still recover from the manufacturer. For example, in *Jones v. Cranman's Sporting Goods*, the plaintiff purchased a rifle from a sporting goods store, which exploded during loading and injured him. 142 Ga.App. 838, 237 S.E.2d 402 (Ga.Ct.App.1977).  The plaintiff sued both the rifle manufacturer and the sporting goods store. *Id.* at 838.  When the plaintiff purchased the rifle, it was "accompanied by a card which expressly stated that the rifle was 'fully guaranteed'" by the manufacturer. *Id.* at 841.  Therefore, even though the plaintiff purchased the rifle from a retailer, the manufacturer's guarantee "became part of the bargain of sale and thus privity existed." *Id.* at 843.

Several sections of the Ohio Revised Code are also instructive on the transferability of the manufacturer's warranty on Oneida flatware. First, R.C. 1302.26, Ohio's codified version of UCC 2-313, dictates how a seller can create an express warranty.  Official Comment 2 to R.C. 1203.26 states that, "[a]lthough this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as a part of a contract for sale, the warranty sections of this Article [Chapter] are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts *or to the direct parties to such a contract*." (Emphasis added.)

In other words, by enacting R.C. 1302.26, the legislature did not intend to limit the extension of a seller's warranty to a party outside the contract, if that was the contracting parties' intention.  Notably, "[t]he provisions of Section 2-318," enacted in Ohio in R.C. 1302.31 and discussed below, "expressly recognize this case law development."

12

Furthermore, Official Comment 4 emphasizes that "the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell."  As such, R.C. 1302.26 "is adopted of those cases which refuse[,] except in unusual circumstances[,] to recognize a *material deletion of the seller's obligation*." (Emphasis added.)  Here, Oneida is attempting to, after the fact, enforce a material deletion of its obligation, by refusing to honor its manufacturer's lifetime warranty to any of Fox's purchasers after Oneida revoked Ms. Fox' status as an authorized dealer.  There are no facts or law that support Oneida's attempted retroactive elimination of its warranty only for Ms. Fox's customers.  Instead, under R.C. 1302.26, Oneida's unrestricted promise at the time of sale to honor its warranty for all purchasers of Oneida product became a basis of the parties' bargain, and the Court should not permit Oneida to materially delete its obligation after the fact.

Next, R.C. 1302.29, Ohio's codified version of UCC 2-316, explains how a seller can exclude or modify a warranty.  Under Subsection (A), "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other."  However, "subject to the provisions of section 1302.05 of the Revised Code on parol or extrinsic evidence, <u>negation or limitation is inoperative to the extent that such construction is unreasonable</u>."  (emphasis added).

In practice, this section applies when a manufacturer includes warranty language in one part of a contract at the time of sale, but also attempts to limit or exclude warranty coverage in another part of the same contract.  This is clearly not the case at bar.  Here, Oneida is attempting to unilaterally eliminate valuable warranty coverage *after* it already contracted with Ms. Fox.

Nevertheless, the rationale behind R.C. 1302.29 is still illuminating.  Official Comment 1 states that "[t]his section is designed principally to deal with those frequent clauses in sales

13

contracts which seek to exclude" all warranty coverage. (Emphasis added.)  This implies that there are other potential reasons for enacting—and applying—R.C. 1302.29.  Comment 1 then clarifies that, ultimately, R.C. 1302.29 is designed to "protect a buyer from *unexpected and unbargained language of disclaimer[,]* by denying effect to such language when inconsistent with language of express warranty." (emphasis added).  This rationale aligns with the parties' current dispute, as Oneida is attempting to subject its buyer, Ms. Fox, and her foreseeable purchasers, to "unexpected and unbargained language of disclaimer," which is entirely inconsistent with the warranty protections that Oneida promised in the first place.

Indeed, consider the recent warranty claim made by Ms. Nichols described in the statement of facts above.  Ms. Nichols purchased Oneida flatware from Ms. Fox in 2019 when Ms. Fox was authorized by Oneida.  Ms. Nichols was provided a copy of the manufacturer's warranty that exists on all Oneida flatware, the terms of which contain no transferability or authorized dealer restrictions.  Instead, it warrants against defects in manufacture and promises to replace defective goods.  When Ms. Nichols recently made a warranty claim to Oneida, Oneida's true motives in this action against Ms. Fox were further revealed.  Without legal justification and in breach of their warranty obligations, Oneida denied the claim simply because Ms. Nichols said she purchased her product from Ms. Fox.  Where in Oneida's published warranty statement is such a disclaimer made?  What possible argument can be made that such unbargained for disclaimer is reasonable?

Finally, R.C. 1302.31, Ohio's codified version of UCC 2-318, covers third-party beneficiaries of express or implied warranties.  The Uniform Commercial Code provides three alternative versions of section 2-318, allowing states to pick the alternative (or some version thereof) that they prefer. *See Hyundai*, 2005 BL 69490 at *7-8 (discussing alternatives A, B, and C to UCC 2-318).  Ohio enacted alternative A in R.C. 1302.31, which extends a seller's warranty

coverage to "any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty." The final sentence of R.C. 1302.31 makes clear that "*[a] seller may not exclude or limit the operation of this section*." (emphasis added).

Once again, the Official Comments are helpful in understanding the legislature's intention for R.C. 1302.31. First, Official Comment 1 states that, notwithstanding the last sentence of R.C. 1302.31, "a seller is [not] precluded from excluding or disclaiming a warranty which might otherwise arise in connection with the sale." However, such exclusion or disclaimer must be "permitted by Section 2-316," discussed above. Furthermore, R.C. 1302.31 is not intended to "preclude the seller from limiting the remedies of his own buyer and of any beneficiaries, in any manner provided in Sections 2-718 or 2-719." Ultimately, "[w]hat this last sentence forbids is exclusion of liability by the seller to the persons to whom the warranties which he has made to his buyer would extend."

Here, Oneida expressly represented that its manufacturer's warranty would extend for the lifetime of the original consumer purchaser with no transferability restrictions stated of any kind. At the time of contracting with Ms. Fox, Oneida chose not to exclude or disclaim its warranty coverage pursuant to R.C. 1302.29 (Ohio's version of UCC 2-316). Therefore, as guided by Comment 1, section R.C. 1320.31 bars Oneida from subsequently excluding its warranty coverage for Fox's purchasers, after it already promised to extend coverage to them.

### E. Can a trademark owner later cancel a warranty that was part of the sales transaction by de-authorizing a reseller?

On the second page of the Court's August 14, 2020 Order, the Court asks the parties to address the specific question of whether a trademark owner can later cancel a warranty that was

part of a sales transaction with a reseller simply by de-authorizing the reseller after the sale occurs. As explained above, the answer is clearly no.  An unrestricted warranty issued with purchased goods becomes part of the sales transaction, as it was part of the bargain obtained by the buyer. See Ohio R.C. 1302.26.  In this case it was part of the bargain Ms. Fox received when she purchased her Oneida flatware.  Like any other contract term, it cannot be amended or limited after the sales transaction without a subsequent agreement by the buyer.  *Gold Kist, Inc. v. Citizens & Southern Nat'l Bank of S.C.*, 286 S.C. 272, 274-75, 333 S.E.2d 67 (S.C.Ct.App.1985); *See Ohio Sav Bank v. H. L. Vokes Co.*, 54 Ohio App. 3d 68, 71 (8th Dist.1989).

This does not mean that a trademark owner cannot limit the terms of its warranty <u>before</u> it enters into the sales transaction with a reseller.  It is possible to do so.  For example, a trademark owner may be able to restrict the applicability of its warranty to a particular length of time, or to a specific group of buyers or parties downstream in the sales transaction.  The critical question is: what did the warranty provide at the time it became part of the basis of the bargain?  Here, at all relevant times the manufacturer's warranty on Oneida flatware was completely unrestricted as to whom could assert a claim under the warranty.  Oneida has absolutely no ability to retroactively place restrictions on its warranty after the product was sold, whether to a customer or to a reseller.

> **F. Does the failure or refusal by a reseller to enter into an agreement allowing Oneida an opportunity to inspect the reseller's goods give Oneida a basis to cancel its warranty?**

The answer to this question is no.  Again, given that a warranty is a creature of contract, *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226, 48 A.3d 366 (N.J. Super. Ct. App. Div. 2012) ("[C]laims of breach of warranty [] derive from the law of contracts."), the starting point in answering the question is determining what the terms of the manufacturer's warranty were at the time the underlying sales transaction occurred.  Oneida's written warranty is not now, nor was it

at the time that it and Robinson sold product to Ms. Fox, limited to only authorized dealers, or customers of authorized dealers.  As explained above, Oneida cannot amend that warranty now and make the amended terms retroactive.

That is not to say that Oneida did not have the right to limit its warranty coverage to only those dealers that entered into authorized dealer policies with Oneida.  See *Hoffman v. Daimler Trucks North America, LLC*, 940 F.Supp.2d 347 (W.D.Va.2013) (limitations in an express warranty are enforceable by the seller). If Oneida had previously included written and disclosed limitations in its express warranty, and those warranty limitations had become part of the basis of the bargain with Ms. Fox, then those limitations may have been enforceable now.

The undisputed facts simply do not support a conclusion that Oneida ever restricted its warranty at the time it or Robinson sold goods to Ms. Fox.  Accordingly, Ms. Fox has never been under any obligation to allow Oneida to inspect her inventory, and Oneida may not unilaterally cancel any warranty as a result of Ms. Fox exercising her clear right to refuse Oneida's new demands to inspect her inventory for the first time in over seventeen years of doing business as an Oneida reseller.

## III.    What rights does a trademark owner have to control product after it has been sold by the trademark owner?

### A.  Relevant facts to which the law will be applied.

Ms. Fox has been selling Oneida flatware since 2002.  (Fox Orig. Aff. ¶ 7.)  Whenever she has had inventory of Oneida product, she has stored that inventory in one of four locations: (1) in rooms in her house; (2) in a storage room in her son's house, located on the lot next door; (3) in a commercially-leased warehouse facility located within 5 miles of her home in Chapel Hill, North Carolina; or (4) in rooms in her former house in New Jersey.  (Fox Supp. Aff. ¶ 14.)  Each of these locations is above-grade, dry, and shielded from direct sunlight.  (Id. at ¶ 15.)  None of Ms. Fox's

inventory, stored in any of these three locations, has ever suffered any damage related to weather, water, heat, or other damaging conditions.  (Id. at ¶ 16.)  Moreover, in her seventeen years of selling Oneida product, Ms. Fox has never received a single customer complaint that related in any way to Ms. Fox's inventory storage or maintenance.  (Id. at ¶ 17.)

Contrary to Oneida's statements to this Court, prior to December 2018, neither Oneida nor Robinson had any quality control standards relating to how they expected resellers or dealers of Oneida product to maintain their inventory of Oneida flatware.  (Id. at ¶ 18.)  During her first sixteen years of selling Oneida flatware, neither Oneida nor Robinson ever (1) provided Ms. Fox with any measures on how her inventory should be stored, (2) asked her any questions on how she stored her inventory, or (3) asked to inspect any of her storage location facilities.  (Id. at ¶ 19.)  In fact, during her entire business relationship with Oneida, Ms. Fox's inventory storage and/or maintenance was never even a point of discussion.  (Id.)  Any attempt by Oneida to create such policies after-the-fact to enforce against Ms. Fox is mere pretext to control *her*, not the quality of Oneida branded product.

The first time Oneida ever notified Ms. Fox of any measures on how her inventory should be maintained was in December 2018, when Oneida sent Ms. Fox its Authorized Dealer Policy.  (Id. at ¶ 20.)   That policy contained the following statement:

> Product Handling/Storage: Dealer shall comply with all instructions provided by Oneida regarding the storage, handling, shipping, disposal or other aspects of the Product.  Dealer shall store Products in a cool, dry place, away from direct sunlight, extreme heat, and dampness.

(Id.)  This was the same policy that provided a dealer could no longer sell inventory on third-party ecommerce websites or use customized packaging.  (Id. at ¶ 21.)  Because Ms. Fox would not agree to those two terms, she immediately contacted Oneida and informed Oneida of her objection to the same.  (Id.)  Oneida told Ms. Fox that she did not have to abide with the same.  (Id. at ¶ 22.)

18

Significantly, after Oneida sent Ms. Fox the Authorized Dealer Policy in December 2018, Oneida never sent Ms. Fox any other instructions "regarding the storage, handling, shipping, disposal or other aspects of the Product."   (Id. at ¶ 23.)  Moreover, Oneida never asked to see Ms. Fox's storage facilities, nor made any inquiries about how she stored her inventory, during the entirety of 2019.  (Id. at ¶ 24.)  Once again, it was never an issue.  (Id.)

Oneida knew that Ms. Fox would never agree to be bound by the terms of the Authorized Dealer Policy.  Doing so would instantly destroy the legitimate business Oneida knew she had worked to build on ecommerce platforms over the course of nearly two decades.  Oneida's "policy" was never intended or used by Oneida to guide the maintenance, storage, or transport of Ms. Fox's inventory; it was mailed out to create a paper trial and manufacture a reason to bring legal claims against her.  That is the definition of pretext.

### B.  U.S. law has long recognized that trademark rights are limited by the first sale doctrine.

Under the Lanham Act, a trademark owner's right to control distribution of its own products is limited by the "first sale" doctrine.  This principle has been upheld consistently since the Supreme Court issued its opinion in *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924).  In that case, the defendant purchased genuine COTY toilet powder from the plaintiff, subjected the powder to pressure, added a binder, and sold the new compound in a metal container under the COTY trademark.  *Id.* at 366.  The Supreme Court found no trademark infringement.  *Id.* at 369.  Rather, the Supreme Court recognized that a trademark does not confer a right to prohibit use of the trademark in all circumstances.  *Id.* at 368-69.  The trademark owner has only the limited right to prohibit uses of the mark which are likely to cause confusion to buyers:

> When the mark is used in such a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth.  It is not taboo.

*Id.* at 368. The *Coty* decision was the origin of the first sale doctrine under trademark law.

Since *Coty* was decided nearly one hundred years ago, the first sale doctrine has consistently been accepted and applied as the law in this country and has been further developed by the lower courts. The rule is based on the premise that "trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *Brilliance Audio, Inc. v. Haights Cross Commc'n, Inc.*, 474 F.3d 365, 369 (6th Cir.2007) (quoting *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.1987)).

As the Eleventh Circuit noted in *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, the first sale doctrine has also been commonly referred to as the "exhaustion doctrine," because "the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of that product." 263 F.3d 1297, 1301 (11th Cir.2001). Thus, once the trademark owner places the goods in the stream of commerce, the subsequent purchaser is free to resell those goods and use the trademark to describe the goods.

As another court described:

> Under this doctrine, as applied within the borders of a sovereignty, a markholder may no longer control branded goods after releasing them into the stream of commerce. After the first sale, the brandholder's control is deemed exhausted. Down-the-line retailers are free to display and advertise the branded goods.

*Osawa & Co. v. B&H Photo*, 589 F.Supp. 1163, 1173 (S.D.N.Y.1984). Stated otherwise, under the first sale doctrine, "a markholder may no longer control branded goods <u>after</u> releasing them into the stream of commerce." *McDonald's Corp. v. Shop at Home, Inc.*, 82 F.Supp.2d 801, 812 (M.D.Tenn.2000) (quoting *Liz Claiborne, Inc. Mademoiselle Knitwear, Inc.*, 979 F.Supp. 224, 230 (S.D.N.Y.1997) (emphasis added). In this way, the first sale doctrine balances the trademark

113087\000001\4825-3281-5817v9

owner's rights against the subsequent purchaser's property right to resell the goods it lawfully purchased.

The importance of this line of demarcation, *i.e.* the time at which the brand owner places its goods in the stream of commerce, was further discussed by the Ninth Circuit in *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073 (9th Cir.1995). *Sebastian* involved a plaintiff manufacturer of hair care products that sold its product only to professional salons, who were members of the plaintiff's professional salon program. *Id.* at 1074. The plaintiff attempted to limit the distribution of its product to consumers only through those professional salons members. *Id.* It did so by requiring members of the program not to sell the plaintiff's products to non-member salons. *Id.* The defendant in *Sebastian* was not a member of the program, but had purchased branded goods from a member of the program, apparently in violation of the seller's previous agreement with the plaintiff. *Id.* The plaintiff sued the defendant for trademark infringement, and obtained a preliminary injunction precluding the defendant from selling the trademarked goods that the defendant had lawfully purchased on the open market. *Id.* The defendant appealed. *Id.*

In reversing the district court's decision, the Ninth Circuit recognized that, under the first sale doctrine, "**the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product**." *Id.* (emphasis added). Therefore, "[r]esale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition." *Id.* The court explained the rationale for the first sale doctrine, and its rejection of the defendant's arguments trying to circumvent the same, by saying:

> The 'first sale' rule provides a sensible and stable accommodation between strong and potentially conflicting forces. By guaranteeing that a product will be identified with its producer, it serves the legitimate purposes of trademark law—the producer gains the good will associated with the quality of its product, and the consumer gets exactly what the consumer bargains for, the genuine product of the particular producer. On the other hand, the 'first sale' rule preserves an area for competition

21

by limiting the producer's power to control the resale of its product.  The 'first sale' doctrine has proven to be a reliable and useful guide in an area in which a high volume of business-driven litigation must be expected.

For the express purpose of controlling the downstream distribution of its products to the ultimate consumers and eliminating 'diversion' to unauthorized retailers, [Plaintiff] seeks to avoid the 'first sale' rule and enjoin [Defendant] from reselling [Plaintiff's] products that [Defendant] has purchased on the open market.  We reject [Plaintiff's] attempt to circumvent the 'first sale' rule.

*Id.* at 1074-75.

The holding in *Sebastian* squarely applies to the facts in this case.  The only substantive difference between *Sebastian* and the present case is that, unlike the reseller in *Sebastian*, Ms. Fox did not purchase her inventory on the open market from other Oneida dealers, in violation of those resellers' agreements with Oneida.  Rather, she purchased her Oneida product <u>directly from either Oneida or Robinson, with their full understanding that she would be reselling that product to consumers.</u>  Thus, Oneida's attempt to circumvent the first sale doctrine is much more egregious than the plaintiff's attempt in *Sebastian*.  Like the court in *Sebastian*, this Court properly rejected Oneida's argument.

### 1. *Under the first sale doctrine, a trademark owner has the right to control the quality of its trademark goods before they enter the stream of commerce.*

In considering a trademark owner's ability to maintain quality control over its branded goods, a distinction must be made between the right to control the quality of those goods <u>before they are sold,</u> and the right to control those goods <u>after</u> they have been released into the stream of commerce.  A trademark owner's ability to control the quality of their branded goods <u>before</u> their first sale has been incorporated into the first sale doctrine, but the ability to control branded goods <u>after</u> the first sale has not.

A threshold issue for applying the first sale doctrine is determining whether the goods sold by the reseller are genuine.  The first sale doctrine applies to genuine goods, and "presupposes that

22

the goods were authorized to be made, in the first instance." *Too, Inc. v. TJX Cos.*, 229 F.Supp.2d 825, 834 (S.D.Ohio 2002) (citing *Liz Claiborne*, 979 F.Supp. at 230).  It is through the genuineness requirement of the first sale doctrine that a trademark owner is able to control the quality of its product, before those goods are released into the stream of commerce.

The trademark owner's right to control the quality of the goods that bear its mark, before those goods are released into the stream of commerce, was at the core of the Second Circuit's decision in *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), c*ert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987).  In *El Greco*, the plaintiff trademark owner ordered seven lots of shoes from its foreign manufacturer.  806 F.2d at 393.  After receiving and accepting the first five lots of shoes, the plaintiff cancelled its order for the two remaining lots, which the manufacturer had already produced.  *Id.* at 394.  The manufacturer then sold the shoes bearing the plaintiff's trademark to the defendant, a discount retailer, who then sold the shoes in its retail stores.  *Id.*The plaintiff sued the defendant for trademark infringement.  *Id.*

In defense of the claim, the defendant argued that the sale of "genuine" goods cannot give rise to the necessary likelihood of confusion.  *Id.*  The defendant argued, and the district court agreed, that the goods were genuine because they had been manufactured at the plaintiff's direction.  *Id.* at 394-95.  The Second Circuit reversed, however, finding that the shoes were not genuine.  *Id.* at 396.  Specifically, the court noted that the shoes were distributed without first being inspected by the plaintiff trademark holder to ensure quality, and therefore did not receive an inspection certificate from the plaintiff.  *Id.* at 395-96. As the court referenced earlier in its discussion, "[t]he holder of a trademark is entitled to require, as El Greco did here, that <u>no merchandise be distributed without its first being inspected</u> by the holder or its agent to insure

quality." *Id.* at 395 (emphasis added). Therefore, since the two lots of shoes at issue were distributed without the trademark holder's inspection, the shoes were not genuine. *Id.* at 395-96.

Although the Sixth Circuit has never addressed the *El Greco* definition of genuineness, district courts within the Sixth Circuit have. Those courts have generally followed *El Greco*'s definition of "genuine," and have required that goods must first be *authorized* by the trademark owner for sale before those goods are considered "genuine." *See, e.g., FURminator, Inc. v. Kirk Weaver Enters., Inc.*, 545 F.Supp.2d 685, 690 (N.D.Ohio 2008) ("Courts in the Sixth Circuit are in agreement with the Second Circuit" that, "[i]f the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.") (quoting *Ryan v. Volpone Stamp. Co.*, 107 F.Supp.2d 369, 382 (S.D.N.Y.2000)); *McDonald's Corp.*, 82 F.Supp.2d. at 811 ("It does not matter that the owner of the trademark objects to the use of its mark, as long as one approved sale has already occurred.") (citing Restatement of the Law 3d, Unfair Competition, Section 24 (1995)); *Too, Inc.*, 229 F.Supp.2d at 834 (citing *Liz Claiborne*, 979 F.Supp. at 230.

This Court's decision in *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.* is instructive of how a brand owner is allowed to exercise quality control over its goods until the time those goods are authorized to be sold. 363 F.Supp.2d 952 (S.D.Ohio 2005). In *Abercrombie*, the plaintiff sought to enjoin a discount retail clothing chain in Kentucky, Indiana, and Ohio from selling clothing Abercrombie believed was counterfeit. *Id*. at 954. At a hearing, it was explained that some of the clothing at issue may have been approved for manufacture by Abercrombie's overseas manufacturers, rejected by Abercrombie, and then never authorized for first sale and distribution. *Id.* at 955-56. Other product had been authorized for first sale and distribution by

Abercrombie, but only in a market outside of the United States, pursuant to a "Sell-Off Compliance Agreement." *Id*. at 955.

Ultimately, this Court in *Abercrombie* engaged in an exercise of drawing lines between several legal situations, on the one hand, and infringing situations, on the other. *Id*. at 962. In particular, the Court indicated an "easy 'line' to draw" was one "demarcating any merchandise manufactured without Abercrombie's approval or rejected by Abercrombie and sold without a 'Sell-Off Compliance Agreement.' Under the first sale doctrine, this merchandise was not 'authorized to be made, in the first instance,' nor has an approved sale of this merchandise occurred." *Id*. The Court then agreed with Abercrombie's argument "that this category of merchandise falls squarely within the *El Greco* rule and this Court's decision in *Too, Inc. v. TJX Companies, Inc.*" *Id*. (emphasis added).

This Court in *Abercrombie* then went on to examine where to draw the line with respect to the "grey goods," *i.e.* clothing sold pursuant to a "Sell-Off Compliance Agreement" between the parties, where the manufacturer was given authorization to sell rejected merchandise outside of the United States, but not inside the United States. *Id*. at 963. In doing so, this Court noted how other courts had found grey goods to be genuine when "their production was *authorized* by contract, they were labeled with the trademark with the intent that they be sold in the United States, and they were sufficiently similar that they could not give rise to the confusion section 1114 was intended to prevent." *Id*. at 964 (quoting *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68 (2d Cir.1987), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L. Ed. 2d 99 (1987)). Accordingly, this Court in *Abercrombie* treated the defendant's grey goods as genuine, but ultimately rejected the defendant's right to resell those goods in the United States because they

were materially different from the branded goods that plaintiff was reselling in the United States. *Id.* at 966.

Thus, while a trademark owner has the right to control the quality of its branded goods, generally that right is extinguished at the time the trademark owner sells its goods to another or authorizes the sale of those goods.   At that point, the goods are considered genuine and are subject to the first sale doctrine. *McDonald's Corp.*, 82 F.Supp.2d at 812 ("[A] markholder may no longer control branded goods <u>after</u> releasing them into the stream of commerce.") (emphasis added).

In the instant case, there is no reasonable dispute over whether the flatware in Ms. Fox's inventory is genuine.  Over the course of her roughly seventeen-year career selling Oneida flatware, all of the Oneida flatware that Ms. Fox purchased was manufactured under the authority of either Robinson or Oneida.  (Fox Orig. Aff. ¶ 52.)  Moreover, Ms. Fox purchased all of her inventory directly from, or with the permission of, Oneida or Robinson.  (Id. at ¶ 53.)  From 2005 to 2009, Oneida approved—and categorically encouraged—Ms. Fox to sell her inventory on eBay and Amazon.  (Id. at ¶ 13.)   From 2009 to 2018, Robinson provided its express approval for Ms. Fox to sell her inventory on eBay and Amazon, worked hand-in-hand with her to increase her sales on such platforms, and honored her customer's warranty claims.  (Id. at ¶¶ 21, 27-28, 31.)

But Ms. Fox does not just rely on her Affidavit testimony to support this fact.  She has also introduced the Affidavit testimony of Laureen M. Montalbano, Robinson's Sales Manager from 2007 to 2020.  Ms. Montalbano avers in her Affidavit that, over the ten-year period that Ms. Fox did business with Robinson, Ms. Fox purchased millions of dollars' worth of Oneida flatware from Robinson.  (Montalbano Orig. Aff. ¶ 7.)  Oneida has offered nothing to refute this testimony.

Given the undisputed nature of the testimony supporting the genuineness of Ms. Fox's inventory, Oneida's ability to control the distribution of that inventory ended after it and/or

Robinson released those products into the stream of commerce—*i.e.* when they sold them to Ms. Fox.  As the Ninth Circuit held in *Sebastian Int'l*, "the [trademark owner's] right **to control distribution of its trademarked product does not extend beyond the first sale of the product**." 53 F.3d at 1074 (emphasis added).  Once Oneida and/or Robinson sold the Oneida product to Ms. Fox—not only without restriction, but with full knowledge on how that product would be resold to consumers—Oneida lost any ability to control the distribution of that product later in time. Oneida's trademark rights in the products in Ms. Fox's inventory have been exhausted.

### 2. *Some courts have recognized a post-first sale quality control exception to the first sale doctrine in limited, fact-specific circumstances.*

There are at least two post-first sale quality control exceptions to the first sale doctrine that have been recognized by some jurisdictions in the United States.  Although neither of these lines of cases have been recognized by the Sixth Circuit, or any district court within the Sixth Circuit, it is instructive to briefly review both lines of cases.

The first line of cases involves resellers who intentionally subvert quality control measures that a trademark owner has established to maintain the quality of its branded product after those goods are released into the stream of commerce.  Representative decisions in this area are two decisions of the Second Circuit: *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir.1996), and *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir.2009).  In *Warner-Lambert*, the plaintiff, brand owner of the HALLS cough drop mark, made certain efforts to maintain the quality of HALLS cough drops on retail store shelves. 86 F.3d at 5.  The plaintiff mark owner had discovered through research that its cough drops had only a limited shelf life before they  began to deteriorate and lose their effectiveness.  *Id.*  Accordingly, the brand owner established a 24-month shelf life for its product.  *Id.*  It attempted to enforce that policy by placing the expiration date on its product packaging, having representatives monitor its product on retail store shelves, and then

issuing credits to retailers for new product to replace outdated supplies.  *Id.*  The defendant had acquired HALLS cough drops at a discount, because the cough drops had a short shelf life remaining at the time of purchase.  *Id.*  The defendant then repackaged the goods to remove the expiration date, so the short remaining shelf life would not be ascertainable.  *Id.*  The defendant then resold the product to unsuspecting drug stores.  *Id.*

*Zino Davidoff* involved similar attempts to subvert the brand owner's post-first sale quality control measures.  In *Zino Davidoff*, the plaintiff brand owner limited sales of its COOL WATER products to luxury retailers, and had declined to sell to CVS, the defendant. 571 F.3d at 241. Though not an authorized retailer, CVS was nonetheless able to secure stock of COOL WATER product from outside the plaintiff's normal distribution channels.  *Id.* Some of the COOL WATER fragrances sold by CVS were counterfeit, and some of the COOL WATER stock purchased by CVS was comprised of gray-market goods.  *Id.*  That is, goods that were manufactured under authorization from the plaintiff, legally purchased outside the United States from authorized distributors, but then imported to the United States by persons other than plaintiff and without the plaintiff's permission.  *Id.*  The plaintiff had incorporated universal product coding ("UPC") on its products to help easily identify counterfeit products, and to identify the batch number of defective batches of its product.  *Id.*  at 240-41.  CVS was selling COOL WATER product on which the UPC bar code had been removed or altered.  *Id.* at 241-42.

In both cases, the Second Circuit ruled in favor of the brand owner and against the reseller who had attempted to intentionally subvert established quality control measures that the brand owner had put in place to maintain the quality of its goods *after* those goods had been released into the stream of commerce.  In so doing, the Second Circuit articulated the following tests:

> [A] trademark holder is entitled to an injunction *against one who would subvert its quality control measures upon a showing* that (i) the asserted quality control procedures are

established, legitimate, substantial, and nonpretextual, (ii) it abides by these procedures, and (iii) sales of products that fail to conform to these procedures will diminish the value of the mark.

*Id.* at 244 (citing *Warner-Lambert*, 86 F.3d at 6).

For multiple reasons, the Second Circuit's post-first sale quality control exception set forth in *Warner-Lambert* and *Zino Davidoff* has no applicability to the present case. First and foremost, Ms. Fox has <u>never</u> attempted to subvert any of Oneida's quality control measures. She has simply sold her inventory of genuine Oneida product, as Oneida and Robinson had previously authorized. Moreover, for the vast majority of her business relationship with Oneida, there were no quality control measures *whatsoever*. Certainly no such measures existed at the time she purchased product from Oneida.

As to the control measures set forth in Oneida's 2019 Authorized Dealer Policy, those measures were never discussed, were never agreed to by Ms. Fox, and were never enforced against anyone by Oneida. <u>Oneida knew Ms. Fox would never agree to its new Authorized Dealer Policy, which would have required her to terminate her entire business presence on Amazon, eBay, and similar online platforms. It is clear this Oneida "policy" was mere pretext, a paper trail laid by Oneida to manufacture a reason to bring a federal lawsuit against Ms. Fox to try and force her out of the marketplace. Thus, the holdings in *Warner-Lambert* and *Zino Davidoff* in favor of the brand owner do not apply and not support Oneida's claim here.</u>

The Second Circuit's post-first sale quality control exception, set forth in *Warner-Lambert* and *Zino Davidoff*, was extended by the District of Utah in *Skullcandy, Inc. v. Filter USA, Inc.*, 2019 U.S. Dist. LEXIS 104393. In *Skullcandy*, the court extended the quality control exception from the Second Circuit to situations wherein the reseller may not have actively attempted to subvert, but nonetheless violated, quality control measures that a brand owner had put in place to

maintain the quality of its goods after those goods had been released into the stream of commerce. However, in extending the exception, the court made clear that in such a case the brand owner must also establish the following:

> After establishing the three *Warner-Lambert* factors, a mark holder must have established that the unauthorized reseller either failed to abide by the trademark holder's quality controls, *id.* at 6, or interfered with the trademark holder's ability to implement its quality controls, *Zino*, 571 F.3d at 243. *See also Wellnext LLC v. OVM LLC*, No. 17-CV-62107, 2017 U.S. Dist. LEXIS 218128, 2018 WL 7048129, at *3 (S.D. Fla. Feb. 16, 2018) ("In order to support such a claim at the motion to dismiss stage, the Complaint must allege (1) what Plaintiff's quality control measures are and (2) how the products sold by Defendants fail to meet these quality control measures.") (quotation marks omitted).

*Id.* at *22-23.

Even if the Sixth Circuit were to ever adopt the expanded post-first sale quality control exception articulated by the district court in *Skullcandy*, the exception still would not apply in this case. Not only can Oneida not establish the three *Warner-Lambert* factors, it also cannot establish that Ms. Fox failed to abide by established quality control measures Oneida had in place. Any allegations by Oneida to the contrary are unsupported, mere conjecture, and made without basis in fact. This cannot be enough to meet Oneida's high burden from the case law to show that the long-standing protections of the first sale doctrine have no application to Ms. Fox.

Furthermore, the above block quote from *Skullcandy* also identifies yet another reason why the post-first sale quality control exception has no bearing on the present case: it was never pled by Oneida. As the above quote makes clear, "the complaint must allege (1) what Plaintiff's quality control measures are and (2) how the products sold by Defendants fail to meet these quality control measures." *Id.* at *23 (quoting *Wellnext LLC v. OVM LLC*, S.D. Fla. No. 17-CV-62107, 2017 U.S. Dist. LEXIS 218128, *3). Nowhere in its Complaint did Oneida allege what its quality control measures were, or how Ms. Fox failed to comply with them. This is because Oneida did not have

<u>such quality control measures in place at the time that Ms. Fox purchased her inventory (i.e., at the time of the "first sale" here.</u>

This last point is perhaps the most important in distinguishing the circumstances of the present case from those of *Warner-Lambert*, *Zion Davidoff*, and *Skullcandy*.  In each of those cases, the brand owner not only had established legitimate quality control policies, but they also had them in place at the time the reseller at issue acquired its goods.   The resellers in these cases made their acquisitions knowing of the restrictions that the brand owner had in place and intended to enforce, and the resellers then either intentionally subverted those quality control measures or simply refused to comply with them.  It was because of the resellers' actions to avoid the brand owners' established quality control measures that the brand owners took action to enjoin the resellers and protect their marks.

Here, the opposite is true.  It is uncontroverted that the present dispute did not begin with Ms. Fox subverting or refusing to comply with any Oneida quality control measures.  It began when Oneida tried to force Ms. Fox to stop selling Oneida flatware on Amazon.  Prior to that time, Oneida never had any quality control measures in place, Oneida never raised any quality control issue with Ms. Fox, nor did it have any issue with Ms. Fox accurately referring to her product as Oneida flatware.  After nearly two decades of business dealings and enjoying profits from Ms. Fox's purchases, it was only when she refused Oneida's illegitimate efforts to control her and force her to stop selling her product on Amazon that Oneida changed Ms. Fox' status to an unauthorized dealer.  Why do such a thing?  It is apparent that Oneida intended to use its new "policy" as a pretext to sue Ms. Fox and force her into submission through the cost and stress of federal litigation.  Accordingly, it is no coincidence that it was only after Ms. Fox refused to stop selling on Amazon that Oneida began asserting claims with respect to its trademarks.

113087\000001\4825-3281-5817v9

Notwithstanding the fact that Oneida profited from every purchase of Oneida flatware Ms. Fox has ever made, Oneida's counsel has represented that it was Ms. Fox's fault that she built up an inventory of Oneida product. This is why this case is exceptional. If a brand owner can pursue the anticompetitive approach that Oneida has undertaken in this case, then the first sale doctrine has no meaning, and every reseller is at the mercy of brand owners who profit from them one day, and then try to put them out of business the next.

   3. ***What are a trademark owner's rights to take steps to protect its trademark when it believes that a reseller is failing to exercise reasonable care of the goods?***

As outlined in the *Sebastian*, *Warner-Lambert*, *Zion Davidoff*, and *Skullcandy* cases cited above, prior to first sale a trademark owner has the ability to put in place quality control measures to help protect the quality of goods bearing its trademark after those goods are released into the stream of commerce. Those measures may include but are not limited to:

(1) Issuing detailed quality control measures as to how resellers are to store, maintain, and distribute the branded goods after they are acquired from the brand owner;

(2) Making sure the brand owner and its resellers comply with those post-sale quality control measures. As to resellers, this means selling only to authorized dealers who have agreed to comply with the brand owner's post-sale quality control measures;

(3) When an authorized reseller fails to comply with the post-sale quality control measures, or sells to an unauthorized reseller, the brand owner can then pursue its contractual rights against the authorized reseller who violates the authorized dealer agreement, and can thereafter de-authorize the particular reseller.

Significantly, when a trademark owner sells only to authorized resellers and one of those authorized resellers sells to an *unauthorized* reseller who is not complying with the brand owner's post-sale quality control measures, as explained by the Ninth Circuit Court of Appeals in *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073 (9th Cir. 1995), the brand owner's recourse is

not to sue the unauthorized reseller in a trademark infringement action, but to pursue a breach of contract action against the authorized reseller that breached the authorized reseller agreement.

Of course, before any quality control measure may be enforced following the first sale, the brand owner must first show that it issued legitimate, non-pretextual quality control measures that the brand owner provided and discussed with its resellers prior to the time it sold its branded goods to those resellers. No brand owner has the right to implement quality control measures after the first sale or product and attempt to retroactively enforce those measures against resellers on the product the reseller already purchased. Such an *ex post facto* measure would eviscerate the first sale doctrine, and would have severe consequences on the reseller's legitimate property right of alienation, having purchased the branded product without any knowledge the brand owner would, or any agreement that the brand owner could, later attempt to change the terms under which the reseller could sell its purchased product.

### 4. Does Ms. Fox have a duty (under contract, common law, uniform commercial code) to care for the product?

The answer is no, though it is also true that Oneida has no evidence to support any alleged, legitimate concern regarding the manner in which Ms. Fox cares for her highly valuable inventory. While Ms. Fox certainly has a business interest to maintain and care for the goods in her inventory, neither her purchase orders with or confirmations from Robinson or Oneida, nor the common law or the Uniform Commercial Code impose such a duty on her. Her purchase orders with and confirmations from Robinson and Oneida simply do not touch upon the issues, as prior to December 2018 neither seller ever had quality control standards as to how they expected resellers to store, maintain, or transport Oneida flatware. (Fox Supp. Aff. ¶18). Likewise, how a reseller maintains its inventory is not an element of the common law, nor is it covered in the UCC.

Of course, Oneida's claimed concerns over how Ms. Fox maintains her inventory have no basis in fact.  As Ms. Fox testified to in her original affidavit filed in this case, she has a lifetime positive rating of 99% on Amazon, with over 12,000 purchaser feedbacks, and a lifetime positive rating of 100% on eBay, with over 100,000 sales of Oneida flatware.  (Fox Aff. ¶25).  In contrast, Oneida has a lifetime positive rating of 96% on Amazon. (Fox Aff. ¶26).  This 'last three percent' difference reflects the meticulous handling, storage, care, and professionalism Ms. Fox has demonstrated with her inventory for nearly two decades.  Ms. Fox' customer satisfaction ratings are not surprising given that in seventeen years in business, she never received a single customer complaint that related in any way to how she stored or maintained her inventory.  (Fox Supp. Aff. ¶17).

## IV.    The Doctrines of Estoppel and Abandonment are relevant and applicable here against Oneida's efforts to destroy Ms. Fox's business.

As set forth in Ms. Fox's Answer, she has raised several affirmative defenses in this case, including but not limited to, estoppel and abandonment.  The estoppel argument was set forth in Ms. Fox's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, and due to the length of this brief will not be separately repeated herein.  Rather, Ms. Fox would simply incorporate that law by reference.

Second, Ms. Fox would like to briefly explain her abandonment affirmative defense in this case.  Given the non-fungible nature of flatware, it is not Ms. Fox's position that either Robinson or Oneida were required to have implemented and enforced quality control measures on the resellers of Oneida flatware over the years in order to safeguard the value of the Oneida brand.  Unlike electronics, medicines, or food products, flatware does not on its own deteriorate or "go bad" overtime.  This explains why prior to Oneida's claims in this lawsuit, neither Oneida nor

Robinson had any quality control measures in place governing how a reseller stored and maintained its inventory.

The reason Ms. Fox pled the abandonment affirmative defense is because if the Court were to accept Oneida's argument that post-sale quality control measures are necessary for Oneida to maintain the integrity and value of the Oneida marks, then significant issues arise as to whether Oneida abandoned its mark over the eighty-five years that it sold Oneida flatware with no quality control measures in place governing how a reseller/dealer stored and/or maintained applicable inventory.  *See AmCan Enterprises, Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994) (failure to maintain quality control may render a trademark abandoned). Oneida's arguments as to the need for Oneida to enforce quality control measures over unauthorized resellers rings hollow when it is considered that it never had such measures in place prior to its attempt to force Ms. Fox off of the Amazon platform.

113087\000001\4825-3281-5817v9

## V. Conclusion.

In conclusion, the law clearly permits Ms. Fox to transfer the manufacturer's warranty to her customers, and Oneida must honor that warranty if and when claims are submitted by Ms. Fox's customers.  Moreover, Oneida has no right to control Ms. Fox or her inventory of genuine Oneida branded products, having already benefited from a "first sale" of such products.

Respectfully submitted,

/s/ Robert G. Schuler

Robert G. Schuler          (0039258)
Robert G. Cohen           (0041707)
Saša Trivunić              (0096722)
KEGLER, BROWN, HILL + RITTER CO., L.P.A.
65 East State Street, Suite 1800
Columbus, Ohio  43215
PH:  614-462-5400; Fax:  614-464-2634
rschuler@keglerbrown.com
rcohen@keglerbrown.com
strivunic@keglerbrown.com

Counsel for Defendant
Elyse Fox d/b/a Finest Flatware

Robert E. Zaytoun          (NC Bar #6942)
Matthew D. Ballew          (NC Bar #39515)
John R. Taylor             (NC Bar #43248)
ZAYTOUN, BALLEW & TAYLOR, PLLC
3130 Fairhill Drive, Suite 100
Raleigh, NC 27612
PH:  919-832-6690; Fax:  919-831-4793
rzaytoun@zaytounlaw.com
mballew@zaytounlaw.com
jtaylor@zaytounlaw.com
Co-Counsel for Defendant
Admitted Pro Hac 06/09/2020

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing Defendant's Brief on Legal Issues Relevant to Plaintiff Oneida's Claims was filed and served via the Court's electronic filing system upon all counsel of record on this 28th day of August, 2020.

/s/ Robert G. Schuler
Robert G. Schuler

37