**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ONEIDA CONSUMER, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 2:20-cv-2043 |
| | ) | |
| v. | ) | JUDGE JAMES L. GRAHAM |
| | ) | |
| ELYSE FOX, | ) | |
| | ) | MAGISTRATE JUDGE |
| Defendant. | ) | ELIZABETH PRESTON |
| | ) | DEAVERS |
| | ) | |

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF OPINION AND ORDER
DENYING MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 59(e), Plaintiffs Oneida Consumer, LLC,

Anchor Hocking, LLC, and The Oneida Group, Inc. ("Oneida" or "Plaintiffs") move the Court to

reconsider its Opinion and Order (the "Order") (Dkt. 36) denying Oneida's Motion for Preliminary

Injunction (Dkt. 11). During the most recent status conference in this case on August 14, 2020,

Oneida indicated its desire to move for reconsideration. (Transcript of August 14, 2020 Status

Conference (Dkt. 40) at 26:22–27:8.) The Court then decided that the parties should take limited

discovery on particular issues addressed in the Order and that Oneida could then file a motion for

reconsideration. (*Id.* at 27:9–14, 30:10–14.) While Oneida would have preferred to wait until

after taking discovery to file the present motion, Rule 59(e) requires that motions for

reconsideration be filed within twenty-eight days of the date of the order upon which the moving

party seeks reconsideration. As such, Oneida had to file its motion by Tuesday, September 8,

2020. On September 2, 2020, Oneida asked counsel for Defendant Elyse Fox d/b/a Finest Flatware

("Fox" or "Defendant") to agree to an extension of this deadline, but counsel declined and

indicated that they believe the Court is without power to extend this particular deadline. Oneida's

initial research indicates that Fox's counsel may be correct.  Therefore, to avoid missing the deadline imposed by Rule 59(e), Oneida is filing its Motion for Reconsideration at this time.

The grounds for this Motion are set forth in the accompanying Memorandum in Support. A proposed order is attached for the Court's consideration.

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

On August 10, 2020, the Court issued the Order, denying Oneida's Motion for Preliminary Injunction.  The Court began its analysis by noting that "the fate of plaintiff's motion for a preliminary injunction rests with the likelihood of success of its trademark claims."  (Dkt. 36 at 5.)  The Court then determined that Oneida was unlikely to succeed on the merits of its claims for two reasons.

First, the Court found that Oneida was unlikely to succeed in proving an essential element of its claims—that Fox used Oneida's trademarks without Oneida's consent or authorization.  (*Id.* at 6.)  The Court credited Fox's evidence that Oneida and its former licensee, Robinson Home Products Inc. ("Robinson"), had consented to Fox's sales of Oneida flatware and her use of the Oneida name.  (*Id.* at 6–8.)  The Court further found that, on the record before it, Oneida could not now "withdraw the consent" it had previously given to Fox.  (*Id.* at 8.)

Second, the Court found that Oneida "has failed to establish a likelihood of success in overcoming the defense of the first sale doctrine."  (*Id.* at 10.)  Oneida argued, and the Court agreed, that "[t]he first sale doctrine does not apply 'when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner.'"  (*Id.* at 9 (quoting *Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*, 474 F.3d 365, 370 (6th Cir. 2007).)  The Court also agreed with Oneida that "[a] missing or inferior warranty term may constitute a material difference that would defeat the first sale defense."  (*Id.*)  The Court, however, found that Oneida's warranty would still apply to any product Fox might resell from her inventory now because Fox had "submitted unrebutted evidence that Robinson and Oneida authorized Ms. Fox to pass [Oneida's] warranty to her customers and they in fact handled her customers' warranty claims."  (*Id.* at 9–10.)

1

Oneida now asks the Court to reconsider each of these two reasons for concluding that Oneida is unlikely to succeed on the merits of its claims. Oneida believes that the first reason is based on an erroneous legal principle—that once a trademark owner consents to use of its trademarks by a particular person it cannot revoke that consent. In this case, Oneida could and did validly revoke in writing as of April 1, 2020 its consent to Fox's continued use of Oneida's marks. As to the second reason given in the Order, Oneida believes it is based on a similar erroneous legal principle—that once a manufacturer allows a dealer to offer the manufacturer's warranty to the dealer's customers, the manufacturer cannot withdraw this power or refuse to extend its warranties to the products that the dealer sells to customers in the future. Oneida will show that it could revoke its offers of warranties on Fox's products any time prior to the acceptance of the warranties by Fox's customers. Furthermore, it was particularly appropriate for Oneida to do so in this case because Fox refused to submit to Oneida's quality controls and, without any control over the quality of Fox's inventory, Oneida cannot reasonably warrant the quality of that inventory. For these reasons, Oneida asks the Court to reconsider its earlier Order and to grant Oneida's Motion for Preliminary Injunction.

## II.    ARGUMENT

"A district court should grant a Rule 59(e) motion, commonly known as a motion to reconsider, 'if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Cline v. City of Mansfield*, 745 F. Supp. 2d 840, 841 (N.D. Ohio 2011) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). Here, the Court should reconsider the Order because it was a clear error of law to determine: (1) that Oneida could not revoke its consent to Fox's continued use of Oneida's trademarks; and (2) that Oneida could not revoke the offers of warranty on the unsold Oneida flatware in Fox's inventory.

**A.      Oneida Could and Did Validly Revoke its Consent to Fox's Continued Use of Oneida's Marks.**

In analyzing consent in this case, it is critical to identify and distinguish the two types of consent at issue.  First, consent is part of Fox's first sale defense.  The first sale defense only applies to goods that the trademark owner authorized to be made and sold in the first instance. *Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825, 834 (S.D. Ohio 2002) (The first sale defense "presupposes that the goods were authorized to be made, in the first instance.").  Where the trademark owner has authorized the initial sale of the goods and the first sale defense applies, "the first purchaser . . . may resell [the goods], regardless of whether the trademark owner consents" to the resale.  (Order (Dkt. 36) at 6.)  Here, the trademark owner's consent to the initial sale attaches to and runs with the goods at issue.  As a matter of common sense, a trademark owner cannot simply withdraw or revoke this consent after the initial sale has been completed and thereby deprive down-the-line owners of the right to resell.  To be clear, Oneida is not attempting to withdraw this consent over any of the goods at issue in this case.[1]

Second, consent is an element of Oneida's claims, as the Court recognized in the Order. (*Id.*)  This consent, however, is different than the consent involved in the first sale doctrine.  It is not a one-time consent to the manufacture and initial sale of trademarked goods.  Instead, it is a

---

[1] Oneida does, however, challenge whether more than half of Fox's inventory is genuine product that Oneida authorized in the first instance.  (*See* Transcript of July 24, 2020 Status Conference (Dkt. 31) at 5:5–23.)  After the parties finished briefing Oneida's Motion for Preliminary Injunction, Fox produced all of the invoices that reflect the origins of the flatware in her inventory. A review of these invoices shows that, for more than a decade, Fox has systematically saved in chronological order hundreds of invoices from Oneida and Robinson.  This suggests that, to the extent Fox lawfully purchased genuine flatware from Oneida or Robinson, the invoices for these purchases should be among those that Fox produced in this case.  Nevertheless, she did not produce invoices for more than half of the flatware in her inventory.  (*Id.*)  This undercuts any assertion that Fox may now make that she purchased all of her inventory from Oneida or Robinson.  Having failed to adequately show that more than half of her inventory is genuine flatware that she purchased legally, Fox cannot validly invoke the first sale defense.

3

consent to the defendant's ongoing conduct. It is consent to use the trademark owner's marks. *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (The trademark owner must show "that the infringer used the mark in commerce without authorization." (internal quotation marks omitted)); 15 U.S.C. § 1114(1)(a) (making it a violation to use a registered trademark "without the consent of the registrant"). Because this is consent to ongoing conduct and not consent to particular goods, this consent does not attach to and run with particular goods. As shown below, this consent can be revoked, even after the defendant has purchased goods from the trademark owner and begun use of the trademark owner's marks.

Just as a trademark owner has the power to license its marks (i.e. to consent to or authorize their use by others), it also has the power to revoke, rescind, or withdraw that license. As stated by one court:

> It is beyond dispute that an owner of a mark can consent to or license the use of that mark. It is also clear, however, that such consent can be withdrawn, it can be subject to limitations, or the consent can expire under the terms of the agreement between the parties.

*Burger King Corp. v. Metro Club, Inc.*, No. 78-71432, 1980 U.S. Dist. LEXIS 16185, at *21 (E.D. Mich. July 31, 1980) (citing *Prof'l Golfers Ass'n v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir. 1975)). Further, as stated in the leading treatise on trademark law:

> Once a franchisee, dealership or license contract is terminated, there is no doubt that the former franchisee, dealer or licensee has no authorization or consent to continue use of the mark. After the permission to use the mark has ended, use of the mark must cease. The terminated dealer who is a 'hold-over' and refuses to change the mark is an infringer.

4 McCarthy on Trademarks § 25.31 (2018); *see also id.* ("In sum, the law is simple. If, as a matter of contract law, a service mark or trademark license has ended, the licensee has no right to continue use of the licensed mark. Any such use is without the trademark owner's consent and constitutes infringement.").

4

In the present case, the contours of revocation depend to some extent on whether Fox's license was express or implied, written or oral. But the end result is the same: Oneida had the right to revoke Fox's license.

If Oneida's Authorized Dealer Policy ("ADP") applied to Fox, then she had an express, written license. The ADP states: "Dealer is granted a limited, non-exclusive, non-transferable, revocable license to use the Oneida IP solely for purposes of marketing and selling the Products in accordance with the terms herein." (ADP (Dkt. 11-3), § 6.) The ADP further states that "[t]his license shall cease immediately upon termination of Dealer's status as an Authorized Dealer" and that Oneida "has the right to terminate" "[i]f Dealer violates this Policy." (*Id.* §§ 6–7.) It is undisputed that Fox did not comply with certain terms of the ADP. (*See, e.g.*, Affidavit of Elyse Fox ("Fox Aff.") (Dkt. 22-1), ¶¶ 66–67, 71.) As such, if the ADP applied to Fox, Oneida had the right to terminate Fox for violating the ADP, revoke her license to use Oneida's marks, and recover against her under the Lanham Act when she continued to use Oneida's marks. This is consistent with case law involving express, written trademark licenses. *See Ford Motor Co. v. Thermoanalytics, Inc.*, No. 14-cv-13992, 2015 U.S. Dist. LEXIS 145965, at *9, 14–15 (E.D. Mich. Oct. 28, 2015) (granting summary judgment for plaintiff on false designation of origin claim because: the plaintiff's written license agreement with the defendant had expired; the agreement required the defendant to "cease all use of the RadTherm trademark" upon the agreement's termination; and the defendant continued to use the trademark after termination); *see also U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1187–89 (6th Cir. 1997) (affirming summary judgment for franchisor on trademark infringement and unfair competition claims where: the parties had a written franchise agreement that authorized the franchisee to use the franchisor's trademarks; the franchisor terminated the agreement; the franchisor's executives testified that they

no longer consented to the franchisee's use of the franchisor's marks; and the franchisee continued to use the franchisor's marks); *Choice Hotels Int'l, Inc. v. Jagaji, Inc.*, No. 2:10-cv-0964, 2012 U.S. Dist. LEXIS 128048, at *3–4, 11 (S.D. Ohio Sept. 10, 2012) (granting summary judgment for franchisor on trademark infringement and unfair competition claims where: the parties had a written franchise agreement that authorized the franchisee to use the franchisor's trademarks; the franchisor terminated the agreement; the termination letter instructed the franchisee to cease all use of the franchisor's marks; and the franchisee continued to use the franchisor's marks).

If the ADP did not apply to Fox, then she had either an implied license or oral license to use Oneida's trademarks. *See, e.g.*, *Grand Lodge v. Labor Council Mich. Fraternal Order of Police*, No. 93-2073, 1994 U.S. App. LEXIS 30788, at *8 (6th Cir. Oct. 24, 1994) (implied license); *Burger King*, 1980 U.S. Dist. LEXIS 16185, at *22–24 (implied license); *G&J Gears Austl. Pty Ltd. V. Rockcrusher U.S. LLC*, No. 06 CV 2314, 2011 U.S. Dist. LEXIS 92315, at *4 (N.D. Ohio Aug. 18, 2011) (oral license); *Valvoline Co. v. Magic Quick Lube*, No. 09-CV-10829, 2009 U.S. Dist. LEXIS 100944, at *3–4, 9 (E.D. Mich. Oct. 29, 2009) (oral license). As the Court noted in the Order, Fox has come forward with evidence that "Oneida's own agents, Ms. Wyrick and Ms. Saunders" orally approved of Fox's business operations and, thus, implicitly approved of her continued use of Oneida's trademarks. (Dkt. 36 at 7.)

Like express, written licenses, implied licenses can be revoked. For instance, in *Grand Lodge*, the Sixth Circuit found no error in the lower court's finding that "State Lodge, by its silence, granted Labor Council an implied, revocable license in 1985 to use Grand Lodge's marks" and that "State Lodge revoked the implied license in [a] 1990 letter" advising Labor Council "that it was prohibited from using the FOP name or mark." 1994 U.S. App. LEXIS 30788, at *5, 8. Similarly, in *Burger King*, the court found that the trademark holder had withdrawn any implied

consent by making clear, through its words and actions, that it did not consent to the defendant's continued use of the plaintiff's marks. 1980 U.S. Dist. LEXIS 16185, at *24–25.

A trademark owner can also revoke an oral license. For example, in *G&J Gears*, the defendant was granted an oral license to use the plaintiff's name and logo but, when the defendant failed to pay as required by the parties' oral agreement, the plaintiff revoked the oral license. 2011 U.S. Dist. LEXIS 92315, at *4–5. Because the defendant continued to use the marks, the court granted summary judgment to the plaintiff on a claim for false designation of origin. *Id.* at *11.

Even more on point is the *Valvoline* case, which Oneida cited in its Motion for Preliminary Injunction to show that it had "unequivocally revoked [its] consent" to Fox's use of Oneida's marks, thus making "Fox's continued use . . . unauthorized." (Dkt. 11 at 12.) In that case, Valvoline was the trademark owner and plaintiff, and Vesco was Valvoline's exclusive distributor. 2009 U.S. Dist. LEXIS 100944, at *1–3. Valvoline had a policy of allowing oil change businesses to use Valvoline's trademarks on signage only if a certain amount of the oil products and lubricants sold by the business were Valvoline brand. *Id.* at *2–3. At one time, the defendant had a written contract with Vesco for the purchase of Valvoline oil products, and this carried with it a license to use Valvoline's trademarks on signage. *Id.* at *3. The contract then expired. *Id.* But Vesco's representative, Stratton, told the defendant orally that he could continue to use Valvoline's trademarks on signage in connection with his sales of Valvoline motor oil, even though the contract had expired and even though this continued usage was in violation of Valvoline's policy noted above. *Id.* at *3–4. Subsequently, Stratton left Vesco, and both Vesco and Valvoline made clear to the defendant that it no longer had permission to display Valvoline signage. *Id.* at *4. When the defendant continued to display Valvoline's signage, Valvoline sued the defendant for trademark infringement and unfair competition, and it sought a preliminary injunction. *Id.* at *1.

7

In opposing the motion for preliminary injunction, the defendant "argue[d] that its use of Plaintiff's trademarks [was] authorized because Stratton told [the defendant] that [it] could display its Valvoline signage." *Id.* at *8. Valvoline responded that "even if Stratton, at one time, authorized Defendant's use of Valvoline signage, the authorization has been effectively revoked, repeatedly." *Id.* at *8–9. The Court "agree[d] with Plaintiff" because "[t]he uncontroverted evidence in this case demonstrates that Defendant's current use of Valvoline signage is not authorized." *Id.* at *9. The "permission has been revoked." *Id.* Thus, the court found that Valvoline had a strong likelihood of prevailing on the merits of its claim and granted a preliminary injunction. *Id.*

A second case is also highly instructive: *Amyotrophic Lateral Sclerosis Association v. Amytrophic Lateral Sclerosis of Michigan, Inc.*, No. 05-73464, 2006 U.S. Dist. LEXIS 64323 (E.D. Mich. Sept. 8, 2006). In *Amyotrophic*, each year the plaintiff granted a royalty-free license to its chapters to use the plaintiff's trademarks, provided that the chapters signed a memorandum outlining how the trademarks could be used. *Id.* at *16. The defendant was one of the plaintiff's chapters, and it signed the memorandum in 2002 and 2003. *Id.* at *4. In 2004, however, it refused to sign the memorandum, and plaintiff did nothing, allowing the defendant to use the trademarks anyway. *Id.* at *16. In 2005, the plaintiff made clear in writing that it intended to enforce its policy and that, if the chapters did not sign the memorandum, they could not use the trademarks. *Id.* at *16–17. The defendant did not sign the memorandum but continued to use the marks. *Id.* The plaintiff subsequently sued for trademark infringement and moved for a preliminary injunction. *Id.* at *10. The court granted the preliminary injunction in part and found that the defendant's use of the marks was not authorized in 2005, even if it had been implicitly authorized in 2004. *Id.* at

8

*1, 16–17.  In 2005, the plaintiff had effectively withdrawn its permission to use the marks.  *Id.* at *18.

Under these authorities, regardless of whether Oneida gave Fox a written license to use Oneida's marks or an oral or implied license—as Fox seems to contend—Oneida had the right to revoke that license.  This is true even if, as in the cases of *Valvoline* and *Amyotrophic*, Oneida granted Fox an oral or implied license inconsistent with Oneida's written policy—the ADP.  It is undisputed that Oneida exercised its right to revoke the license it had granted to Fox, clearly stating in writing that, as of April 1, 2020, Fox "will no longer be authorized or licensed to use ONEIDA®'s trademarks."  (Dkt. 11-4.)  When Fox still continued to sell Oneida flatware and use Oneida's registered trademarks, Oneida sent her a cease and desist letter (Dkt. 11-12) and then sued for trademark infringement—just like all of the plaintiffs in the cases cited above.  Because Oneida could and did validly revoke its consent to Fox's continued use of Oneida's marks, Oneida asks that the Court reconsider its determination that Oneida is unlikely to succeed in showing that Fox's use of Oneida's marks was unauthorized.

**B.**     **Oneida Could and Did Validly Revoke the Offers of Warranty on the Unsold Oneida Flatware in Fox's Inventory.**

**1.**     **Oneida Offers its Warranty to Consumers, Not Dealers Such as Fox, and Oneida Can Revoke its Offer of Warranty Any Time Prior to Sale to a Consumer.**

Any analysis of Oneida's warranties must begin with the language of the warranty.  By its express terms, the warranty has, at all relevant times, extended only to the "original owner" of Oneida's flatware for that person's lifetime.  (Dkt. 22-7 (Oneida's warranty); *see also* Fox's Memorandum in Opposition to Motion for Preliminary Injunction (Dkt. 22) at 18 ("[A]ll of the Oneida product carried/carries with it a limited lifetime warranty for the lifetime of the original owner."); Declaration of Mark Eichhorn ("Eichhorn Dec.") (Dkt. 11), ¶ 9 ("Oneida provides a

lifetime warranty to the original purchaser of its products."); *id.* ¶ 16 ("[T]he Oneida warranty only applies to the original purchaser.").)  By expressly extending only to the original owner, it necessarily cannot be transferred beyond the original owner.

Read literally, the "original owner" would be whoever purchased the flatware from Oneida, including any distributors, retailers, dealers, or resellers.  Fox would be the original owner of the flatware she purchased from Oneida, and the warranties would extend only to her, not to her customers.

Instead, the "original owner" is the consumer who purchases the flatware from Oneida or its partners, authorized dealers, and authorized resellers.  (Eichhorn Dec. (Dkt. 11), ¶ 10 ("Oneida's warranty is only available to those who buy directly from Oneida or its retail partners, authorized dealers, and authorized resellers.").)[2]  Here, the retail partners, authorized dealers, and authorized resellers are extensions of Oneida and, as such, are not themselves the "original owners."  Because of the foregoing, throughout the time that Fox was an authorized dealer or reseller for Oneida and Robinson, her customers were "original owners" of the Oneida flatware they purchased, and Oneida and Robinson honored the warranty claims that Fox's customers made.  As of April 1, 2020, however, Fox is not an authorized dealer, and any customers who buy from her now are not "original owners" under the warranty.  (*Id.* ¶ 16 ("Because Fox is not an authorized Oneida dealer or dealer, her customers are not original purchasers.").)

Contrary to the assertions that Fox has made in her briefing, Oneida never issued its warranty to Fox.  (*See* Fox's Memorandum in Opposition to Motion for Preliminary Injunction (Dkt. 22) at 20.)  Under Ohio law, a warranty is "[a]ny affirmation of fact or promise made by the

---

[2] The warranty requires the claimant to submit a proof of purchase, thus allowing Oneida to determine whether the claimant purchased from Oneida or its retail partners, authorized dealers, or authorized resellers.  (*See* Dkt. 22-7.)

10

seller *to the buyer* which relates to the goods and becomes part of the basis of the bargain."  *See* Ohio Rev. Code Ann. § 1302.26 (emphasis added).  It "is created when the seller makes *to the buyer* a material or substantive promise or assurance concerning the quality, performance, or safety of the product sold to the buyer."  *Bruns v. Cooper Indus., Inc.*, 605 N.E.2d 395, 397 (Ohio Ct. App. 1992) (emphasis added).

Oneida's lifetime warranty was never directed to Fox or intended to induce her to purchase flatware from Oneida.  Indeed, Fox admitted as much in her briefing: "[A]ll of the Oneida product carried/carries with it a limited lifetime warranty for the lifetime of the original owner," and the "original owner" is a "consumer purchaser."  (Fox's Memorandum in Opposition to Motion for Preliminary Injunction (Dkt. 22) at 18.)  Oneida offers its lifetime warranty to consumers at the time of purchase to induce them to buy flatware from Oneida or its retail partners, authorized dealers, and authorized resellers, which are an extension of Oneida.  *See Rogers v. Toni Home Permanent Co.*, 147 N.E.2d 612, 615 (Ohio 1958) ("The warranties made by the manufacturer in his advertisements and by the labels on his products are inducements to the ultimate consumers."); *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 740 (W.D. Ky. 2013) ("In this case, while the alleged warranties do not expressly state the identity of the intended beneficiary, it is clear that any alleged warranty was certainly intended for those who would purchase and use the hair product. [The manufacturer] would not have intended to direct any express warranties to the retail stores selling the product; the stores would not be the slightest bit concerned with the product's effects or the ingredients contained therein.").

In recent briefing, Fox cited *Jones v. Cranman's Sporting Goods*, 237 S.E.2d 402 (Ga. Ct. App. 1977), a case that is instructive on this point.  In *Jones*, the court noted that "an automobile manufacturer, *through its authorized dealer [may] issue[]* to a purchaser of one of its automobiles

11

from such dealer admittedly as a part of the sale *a warranty by the manufacturer running to the purchaser*." *Id.* at 405 (internal quotation marks omitted and emphasis added).  Thus, the court found that a manufacturer's warranty became "part of the bargain of sale" at the time that the consumer made his purchase from a retailer.  *Id.* at 406; *see also Mootz v. GMC*, No. 84 C.A. 185, 1986 Ohio App. LEXIS 5702, at *1 (Ohio Ct. App. Feb. 21, 1986) ("On May 29, 1979, [the consumer] purchased a new vehicle from [an authorized dealer].  At the time of purchase, [the manufacturer] issued its standard 12-month/12,000 mile warranty to [the consumer].").

The present case is similar to *Jones* in this regard.  Because Oneida's warranty is intended for consumers, the warranty is not issued, offered, or made "to the buyer," and does not become part of the basis of the bargain, until such time as flatware is sold to a consumer.  As Fox herself recently argued, "traditional contract principles apply to claims for breach of warranty."  (Dkt. 41 at 11.)  "[G]eneral contract law . . . holds that an offer may be revoked at any time prior to acceptance."  *Beres v. Board of Educ.*, 723 F.2d 908 (6th Cir. 1983) (table decision).  Thus, up until the time that a warranty is accepted by a consumer through a purchase of flatware, Oneida can revoke the offer of warranty by, for instance, deauthorizing Fox as a dealer.

If, as Fox claims, Oneida made its warranty to her and not to end consumers, then she would be the "original owner" under the terms of the warranty.  By its express terms, the warranty extends to the "original owner" and no further, and Fox's claims to her potential customers that goods sold to those customers would be covered by a warranty are false.  If the warranty could be transferred from owner to owner, this would render the word "original" in the warranty meaningless.  Further, because the Oneida warranty is a lifetime warranty, if it could be transferred from owner to owner, it could last for multiple lifetimes into perpetuity.  Therefore, if Fox is right that she is the "original owner," the warranty would end with her and not extend to her current and

future customers.  In sum, regardless of to whom the warranty was intended to extend in the first instance, the warranty does not extend to Fox's current and future customers.

> ### 2.   Oneida Validly Revoked its Offers of Warranty on Fox's Unsold Inventory of Flatware Because She Refused to Abide by Oneida's Quality Controls.

Oneida has valid reasons for not extending its warranty to Fox's current and future sales of flatware.  Courts have recognized that warranties may be tied to a trademark owner's ability to implement, control, and enforce the quality control measures of its authorized dealers.  *See Skullcandy, Inc. v. Filter USA, Inc.*, No. 2:18-CV-00748-DAK, 2019 U.S. Dist. LEXIS 104393, at *19–21 (D. Utah June 21, 2019) (finding that the plaintiff's warranty was not illegal where the warranty "only extends to products sold by sellers that were subject to [the plaintiff's] quality controls" and not "to products sold by unauthorized sellers because [the plaintiff] cannot ensure the quality of such products"); *Gen. Nutrition Inv. Co. v. Fieton Enter.*, No. 20-606, 2020 U.S. Dist. LEXIS 148027, at *4, 11 (W.D. Pa. Aug. 14, 2020) (ruling that the plaintiff established the material difference exception to the first sale doctrine where it argued that, "[b]ecause [it] cannot ensure that unauthorized sellers are following appropriate quality controls, its money back guarantee does not extend to products purchased from unauthorized sellers"); *Otters Prods., LLC v. Fisch Enter.*, No. 19-cv-00030-CMA-KLM, 2019 U.S. Dist. LEXIS 223537, at *6 (D. Colo. Oct. 3, 2019) ("Because Plaintiffs cannot exercise their quality controls over products sold by unauthorized sellers, the Warranty is not available for products sold by unauthorized sellers who are not subject to Plaintiff's quality controls."); *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 837 F. Supp. 2d 208, 229 (S.D.N.Y. 2011) ("[I]f a dealer is known to the manufacturer to handle the product in a negligent manner, risking damage before the product reaches the consumer, the manufacturer remains free to refuse to honor all warranties from that particular dealer.").  As these

cases recognize, a trademark owner can refuse to extend its warranties to the products sold by unauthorized dealers who are not subject to the trademark owner's quality controls because the trademark owner has no way of ensuring the quality of such products.

For example, in *Skullcandy*, the plaintiff alleged in its complaint that the warranty it provided on its products did not extend to "products sold by unauthorized sellers because such products are not subject to [the plaintiff's] quality controls, and [the plaintiff] cannot ensure their quality." 2019 U.S. Dist. LEXIS 104393, at *6. Because the defendants were unauthorized sellers and were not subject to the plaintiff's quality controls, the plaintiff's warranty did not extend to the products sold by the defendants. *Id.* at *19. Therefore, the defendants' products were materially different from the plaintiff's products. *Id.* The court concluded that the plaintiff had adequately pleaded the material difference exception to the first sale defense and denied the defendants' motion to dismiss the plaintiff's trademark infringement claims. *Id.* at *21; *see also Gen. Nutrition*, 2020 U.S. Dist. LEXIS 148027, at *4, 11 (ruling that the plaintiff established the material difference exception for similar reasons); *Otters Prods.*, 2019 U.S. Dist. LEXIS 223537, at *6–7, 12 (same).

Fox has never challenged the foregoing legal principles. As applied to the present case, Oneida has submitted evidence of its quality controls concerning returns, as well as controls in the ADP over the quality of product packaging, labeling, handling, storage, shipping, returns, inspections, and recalls. (Eichhorn Dec. (Dkt. 11-1), ¶ 10.a (quality controls on returns); ADP (Dkt. 11-3), § 4.) It is undisputed that Fox refused to be bound by, or to abide by, the ADP. (*See*, *e.g.*, Fox Aff. (Dkt. 22-1), ¶¶ 66–67, 71.) It also is undisputed that Fox is no longer an authorized Oneida dealer and that, as such, Oneida has no ability to apply any quality controls to Fox's inventory or operations. (Eichhorn Dec. (Dkt. 11-1), ¶ 22 ("Because Fox is no longer an

authorized Oneida dealer or reseller and is unwilling to cooperate with Oneida, Oneida . . . has no way to audit or control the quality of her stock.").)  Thus, as in *Skullcandy*, Oneida cannot reasonably ensure the quality of the flatware that Fox is selling and, as discussed above, Oneida may validly refuse to warrant the quality of that flatware when it is purchased by Fox's customers following Fox's deauthorization on April 1, 2020.  Because the flatware that Fox is selling is not covered by Oneida's warranty, Fox's flatware is materially different from Oneida's.  (*See* Order (Dkt. 36) at 9.)  Therefore, Oneida asks that the Court reconsider its determination that Oneida is unlikely to succeed in overcoming the first sale defense.

## III.    CONCLUSION

For all of the foregoing reasons, Oneida requests that the Court reconsider its earlier Opinion and Order (Dkt. 36) and determine that Oneida is likely to succeed on the merits of its claims.  And because "the fate of [Oneida's] motion for a preliminary injunction rests with the likelihood of success of its trademark claims" (*id.* at 5), the Court should grant Oneida's Motion for Preliminary Injunction.

Dated: September 8, 2020                              Respectfully submitted,


                                                     /s/ Marla R. Butler
                                                     Marla R. Butler (*pro hac vice*)
                                                     THOMPSON HINE LLP
                                                     Two Alliance Center
                                                     3560 Lenox Road NE, Suite 1600
                                                     Atlanta, Georgia 30326-4266
                                                     Phone: 404-407-3680
                                                     Fax: 404-541-2905
                                                     Email: Marla.Butler@ThompsonHine.com

Jesse Jenike-Godshalk (0087964)
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 352-6702
Fax: (513) 241-4771
Email: Jesse.Godshalk@ThompsonHine.com

*Attorneys for Plaintiffs*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2020 a copy of the foregoing was filed electronically, and that notice of this filing will be sent to registered parties by operation of the Court's electronic filing system.

*/s/ Marla R. Butler* _____
