**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ONEIDA CONSUMER, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 2:20-cv-2043 |
| | ) | |
| v. | ) | JUDGE JAMES L. GRAHAM |
| | ) | |
| ELYSE FOX, | ) | |
| | ) | MAGISTRATE JUDGE |
| Defendant. | ) | ELIZABETH PRESTON |
| | ) | DEAVERS |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S BRIEF ON LEGAL ISSUES RELEVANT TO PLAINTIFFS' CLAIMS

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION..................................................................................................... 1

II.    TRANSFERABILITY OF ONEIDA'S WARRANTY TO FOX'S
       CUSTOMERS ......................................................................................................... 2

       A.     Factual Background – Oneida's Warranty Has Always Been
              Limited, by its Express Terms, to the "Original Owner" Who
              Purchases from Oneida or its Authorized Dealers. ............................... 2

By its express terms, Oneida's warranty extends only to the "original owner" of Oneida's flatware for that person's lifetime. Thus, it cannot be transferred beyond the original owner. The original owner is the consumer who purchases the flatware from Oneida or its authorized dealers. The authorized dealers are extensions of Oneida and, as such, are not themselves the original owners. Because of the foregoing, throughout the time that Fox was an authorized reseller for Oneida and Robinson, her customers were original owners of the Oneida flatware they purchased, and Oneida and Robinson honored the warranty claims that Fox's customers made. Now that Fox is no longer an authorized dealer, her present and future customers are not original owners.

       B.     New York Law Does Not Apply to this Ohio Case and, Even if
              it Did, Oneida's Warranty Does Not Violate New York Law. ............. 5

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state." *RPM, Inc. v. Hartford Accident & Indem. Co.*, No. 1:03CV1322, 2006 U.S. Dist. LEXIS 101684, at *13 (N.D. Ohio Apr. 11, 2006). "Ohio courts . . . apply the law of the state with the most significant contacts to the dispute." *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 230 n.3 (6th Cir. 1997). New York has no significant contacts to the present dispute, while Ohio has many. Thus, the Court should apply Ohio law to any state law issues in this case. Even if New York law applied, Oneida's warranty would not violate New York General Business Law 369-b. That statute only prohibits a manufacturer from limiting its warranty ***solely*** based on whether a dealer is authorized and does not prohibit warranties that are limited for reasons related to quality control. *Skullcandy, Inc. v. Filter USA, Inc.*, No. 2:18-CV-00748-DAK, 2019 U.S. Dist. LEXIS 104393, at *20–21 (D. Utah June 21, 2019). Oneida is not limiting its warranty based solely on the status of particular dealers, but also on the fact that the flatware sold by unauthorized dealers is not subject to Oneida's quality controls.

       C.     Oneida Offers its Warranty to Consumers, Not Dealers Such
              as Fox, and Oneida Can Revoke its Offer of Warranty Any
              Time Prior to Sale to a Consumer. .......................................................... 6

Oneida never issued its warranty to Fox. A warranty is "[a]ny affirmation of fact or promise made by the seller ***to the buyer*** which relates to the goods and becomes part of the basis of the bargain." Ohio Rev. Code Ann. § 1302.26 (emphasis added). Oneida's lifetime warranty was never directed to Fox or intended to induce her to purchase Oneida flatware. Oneida offers its warranty, through its authorized

dealers, to consumers at the time of purchase to induce them to buy flatware from Oneida and its authorized dealers. Because Oneida's warranty is intended for consumers, the warranty is not issued "to the buyer," and does not become part of the basis of the bargain, until such time as flatware is sold to a consumer. *See Jones v. Cranman's Sporting Goods*, 237 S.E.2d 402, 405–06 (Ga. Ct. App. 1977); *Mootz v. GMC*, No. 84 C.A. 185, 1986 Ohio App. LEXIS 5702, at *1 (Ohio Ct. App. Feb. 21, 1986). Thus, up until the time that a warranty is accepted by a consumer through a purchase of flatware, Oneida can revoke the offer of warranty by, for instance, deauthorizing Fox as a dealer. If, as Fox claims, Oneida made its warranty to her and not to end consumers, then she would be the "original owner" under the terms of the warranty. By its express terms, the warranty extends to the "original owner" and no further. Thus, the warranty would end with her and not extend to her customers. Finally, courts have recognized that warranties may be tied to a trademark owner's ability to implement, control, and enforce the quality control measures of its authorized dealers. *Skullcandy*, 2019 U.S. Dist. LEXIS 104393, at *19–21; *Gen. Nutrition Inv. Co. v. Fieton Enter.*, No. 20-606, 2020 U.S. Dist. LEXIS 148027, at *4, 11 (W.D. Pa. Aug. 14, 2020); *Otters Prods., LLC v. Fisch Enter.*, No. 19-cv-00030-CMA-KLM, 2019 U.S. Dist. LEXIS 223537, at *6 (D. Colo. Oct. 3, 2019). As these cases recognize, a trademark owner can refuse to extend its warranties to products sold by unauthorized dealers who are not subject to the trademark owner's quality controls because the trademark owner has no way of ensuring the quality of such products. That is precisely what Oneida did here.

III. **ONEIDA'S RIGHT, AS A TRADEMARK OWNER, TO TAKE REASONABLE STEPS TO PROTECT ITS TRADEMARKS WHEN A RESELLER REFUSES TO AGREE TO ONEIDA'S QUALITY CONTROLS** ...................................................................................................... 11

    A. **Factual Background – Quality Control Has Always Been a Central Part of Oneida's Operations.** ................................................... 11

Oneida has long taken concrete measures to ensure quality. In 2009, Oneida entered into a Master License Agreement ("MLA") with Robinson under which Robinson was authorized to manufacture and sell Oneida flatware. Oneida imposed certain quality controls through the MLA, and Fox admits that Robinson worked closely with her, overseeing and approving her operations from 2009 to 2018, at which point Oneida terminated its licensee relationship with Robinson. At that time, Oneida took over manufacturing, sales, and distribution of Oneida-branded flatware and imposed certain quality controls over, for instance, customer returns. In early 2019, Oneida also issued its Authorized Dealer Policy ("ADP"). The ADP includes a number of controls over the quality of product packaging, labeling, handling, storage, shipping, returns, inspections, and recalls. Fox admits that she received the ADP and that she refused to be bound by its terms, thus depriving Oneida of the ability to exercise control under the ADP over where and how Fox stored, handled, packaged, and sold flatware. Because Fox refused to abide by the

ADP, in early 2020 Oneida sent Fox a letter stating that Oneida was deauthorizing Fox as an Oneida dealer and that Fox would no longer be authorized to use Oneida's marks. Therefore, as of April 1, 2020, Fox has not been an authorized Oneida dealer, and her continuing use of Oneida's marks is without Oneida's authorization.

**B.    As a Trademark Owner, Oneida May Protect its Valuable Trademarks by Revoking a Reseller's Authorization to Use Oneida's Trademarks and Then, if the Reseller's Use Continues, Suing for Trademark Infringement. .................................. 17**

If a dealer refuses to agree to a trademarks owner's reasonable quality controls, the trademark owner's first line of defense is to revoke its consent to the reseller's use of the trademark owner's marks. Then, if the reseller continues to use the trademark owner's marks, the trademark owner can sue for trademark infringement. *Burger King Corp. v. Metro Club, Inc.*, No. 78-71432, 1980 U.S. Dist. LEXIS 16185, at *21 (E.D. Mich. July 31, 1980); 4 McCarthy on Trademarks § 25.31 (2018). If the ADP applied to Fox, then she had an express, written license to use Oneida's marks under the ADP, and Oneida had the right to terminate Fox for violating the ADP, revoke her license to use Oneida's marks, and stop her from continuing to sell Oneida flatware. *See Ford Motor Co. v. Thermoanalytics, Inc.*, No. 14-cv-13992, 2015 U.S. Dist. LEXIS 145965, at *9, 14–15 (E.D. Mich. Oct. 28, 2015); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1187–89 (6th Cir. 1997). If the ADP did not apply to Fox, then she had either an implied license or oral license to use Oneida's marks. Like express, written licenses, implied licenses and oral licenses can be revoked. *Grand Lodge v. Labor Council Mich. Fraternal Order of Police*, No. 93-2073, 1994 U.S. App. LEXIS 30788, at *8 (6th Cir. Oct. 24, 1994); *G&J Gears Austl. Pty Ltd. v. Rockcrusher U.S. LLC*, No. 06 CV 2314, 2011 U.S. Dist. LEXIS 92315, at *4 (N.D. Ohio Aug. 18, 2011); *Valvoline Co. v. Magic Quick Lube*, No. 09-CV-10829, 2009 U.S. Dist. LEXIS 100944, at *3–4, 9 (E.D. Mich. Oct. 29, 2009). Regardless of whether Oneida gave Fox a written, oral, or implied license to use Oneida's marks, Oneida had the right to revoke that license. When Fox refused to be bound by the ADP or to agree to Oneida's quality controls, Oneida validly exercised that right.

**C.    A Defendant Cannot Shield Behind the First Sale Defense Where the Defendant's Conduct Interferes with the Trademark Owner's Quality Controls, the Defendant's Goods Are Materially Different from the Trademark Owner's, or the Defendant Fails to Prove that All of its Inventory Is Genuine. ......... 22**

**1.    The Quality Control Exception – Fox Has Interfered with, and Continues to Interfere with, Oneida's Legitimate Quality Controls. .................................................... 23**

Courts throughout the Sixth Circuit have recognized the quality control exception to the first sale defense. *RFA Brands, LLC v. Beauvais*, No. 13-14615, 2014 U.S. Dist. LEXIS 181781, at *23–25 (E.D. Mich. Dec. 23, 2014); *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616,

627 (E.D. Tenn. Nov. 27, 2012); *FURminator, Inc. v. Kirk Weaver Enters.*, 545 F. Supp. 2d 685, 690–91 (N.D. Ohio 2008). For the quality control exception to apply, the plaintiff "must first establish that (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the nonconforming sales [by the defendant] will diminish the value of the mark." *Skullcandy*, 2019 U.S. Dist. LEXIS 104393, at *22. Furthermore, in establishing these factors, "a mark holder must have established that the unauthorized reseller either failed to abide by the trademark holder's quality controls . . . or interfered with the trademark holder's ability to implement its quality controls." *Id.* at *22–23. Here, Oneida has established, and abided by, legitimate, substantial, and nonpretextual quality control procedures through the MLA, the ADP, and controls governing returns. In addition, Fox's conduct interferes with Oneida's quality controls in a manner that diminishes the value of Oneida's registered marks. Fox refused to be bound by the ADP, thus depriving Oneida of the ability to exercise the quality controls therein. Now that Fox is no longer an authorized dealer, Oneida also has no ability to exercise quality controls over her returns or to audit her inventory to ensure that she has not obtained counterfeit products or products from an unauthorized source. Finally, Fox's conduct interferes with Oneida's ability to administer its warranty program.

2.      **The Material Difference Exception – Fox's Flatware Is Materially Different from Oneida's Flatware Because Oneida Cannot Warrant the Quality of Flatware Fox Is Selling Outside of Oneida's Quality Controls. ........................ 27**

"[T]he first sale doctrine does not apply . . . when an alleged infringer sells trademarked goods that are *materially different* than those sold by the trademark owner." *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 370 (6th Cir. 2007). "[A] physically identical product is nevertheless 'materially different' from the genuine article if the bundle of services that attach to the genuine article is not available to the consumer." *ABG Prime Grp., Inc. v. Innovative Salon Prods.*, No. 17-12280, 2018 U.S. Dist. LEXIS 98196, at *11 (E.D. Mich. June 12, 2018). These services include warranties, such that selling a product that would normally carry a warranty with no warranty or with an inferior warranty is a material difference. *Sprint Sols., Inc. v. Lafayette*, No. 2:15-cv-2595-SHM-cgc, 2018 U.S. Dist. LEXIS 104767, at *26–27 (W.D. Tenn. June 22, 2018). Here, it is undisputed that Fox is no longer an authorized Oneida dealer and that Oneida has no ability to apply its quality controls to Fox's inventory. Thus, Oneida cannot reasonably ensure the quality of the flatware that Fox is selling, and Oneida may validly refuse to warrant the quality of that flatware when it is purchased by Fox's customers following Fox's

deauthorization on April 1, 2020.  Because the flatware that Fox is selling is not covered by Oneida's warranty, Fox's flatware is materially different from Oneida's.  Thus, the first sale defense does not apply.

3.    **The Genuineness Limitation – For More Than Half of Her Inventory, Fox Has Not Proven that the Flatware Is Genuine Product that Oneida Authorized in the First Instance and that Fox Lawfully Purchased.** ............................ 30

"[T]he defendant in a civil case bears the burden of proving the product at issue was lawfully purchased before it may invoke the first sale defense." *RFA*, 2014 U.S. Dist. LEXIS 181781, at *19.  Here, Fox produced all of the invoices that reflect the origins of the flatware in her inventory.  A review of these invoices shows that Fox has systematically saved in chronological order hundreds of invoices from Oneida and Robinson.  This suggests that, to the extent Fox lawfully purchased flatware from Oneida or Robinson, the invoices for these purchases should be among those that Fox produced in this case.  Yet, she did not produce invoices for more than half of the flatware in her inventory.  This undercuts any assertion Fox may now make that she purchased all of her inventory from Oneida and Robinson.  Having failed to adequately show that more than half of her inventory is genuine, legally-purchased flatware, Fox cannot validly invoke the first sale defense.

D.    **Fox Admits that, if Oneida Has No Remedy in Trademark Law, it Has No Recourse at all** ................................................................ 31

Fox admits that, if Oneida has no remedy in the current trademark infringement suit that it has brought, it has no recourse at all.  It has no way to control the quality of flatware that Fox is selling, and according to Fox, Oneida must also continue to honor all warranty claims from her customers.  Fox argues that Oneida cannot have legitimate concerns over how she maintains her inventory because her past conduct suggests that she has properly maintained it.  But even if this were true, Fox could decide to lower her standards now, and—unless Oneida is able to obtain relief in this lawsuit—Oneida could do nothing about it.  This loss of control is the very danger that the Lanham Act was designed to protect against.  *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006).  That is why, consistent with this binding authority, Oneida filed the present lawsuit and requested a preliminary injunction.

IV.    **THE AFFIRMATIVE DEFENSES OF ESTOPPEL AND ABANDONMENT ARE INAPPLICABLE** ....................................................... 32

In her brief, Fox raises an abandonment defense that is different from what she pleaded in her Answer and Affirmative Defenses.  That defense is based on the assumption that Oneida has never had any quality controls in place, which simply is not true.

V.    **CONCLUSION** ................................................................... 33

## I.      INTRODUCTION

By its express terms, the lifetime warranty offered by Plaintiffs Oneida Consumer, LLC, Anchor Hocking, LLC, and The Oneida Group, Inc. ("Oneida" or "Plaintiffs") on their flatware has always been limited to the "original owner"—the end consumer who purchases the flatware from Oneida or its authorized distributors.  Thus, the warranty is intended for and directed to consumers, not Oneida's dealers or distributors, such as Defendant Elyse Fox d/b/a Finest Flatware ("Fox" or "Defendant"), and Oneida never issued its warranty to Fox.  As a result, Oneida retains the right to revoke its offer of warranty any time prior to when the warranty is issued to the consumer and becomes a part of the basis of the consumer's decision to purchase flatware.  Oneida validly exercised this right in this case by deauthorizing Fox after she refused to abide by Oneida's quality controls and other policies.  Because Fox's inventory is not subject to Oneida's quality controls, Oneida cannot reasonably warrant the quality of that inventory at the time that it passes into the hands of Fox's future customers.

If, as Fox contends in her Brief on Legal Issues Relevant to Plaintiff Oneida's Claims (the "Brief") (Dkt. 41), Oneida extended the warranty directly to her and cannot now cancel or modify that warranty, then she would be the "original owner."  Under the express terms of the warranty, the warranty would not extend past her, and the flatware that she sells to her customers still would not be covered by Oneida's warranty.

Because Oneida has no control over the quality of Fox's inventory or over how she uses Oneida's valuable trademarks, Fox's activities pose a danger to the value of Oneida's reputation, brand, and trademarks.  To protect itself, Oneida validly revoked its consent to Fox's continued use of Oneida's trademarks and then, when Fox refused to stop her use of the marks and her sales of Oneida's flatware, Oneida filed suit and sought an injunction.  Because Fox's inventory is not covered by Oneida's warranty or subject to Oneida's quality controls, it is materially different

from the flatware that Oneida sells, and the first sale defense does not apply in this case. As Fox herself argues, if the Court does grant Oneida relief in this case, then Oneida has no recourse at all. Thus, the Court should grant judgment in Oneida's favor on its claims for, *inter alia*, trademark infringement and trademark dilution and grant injunctive relief against Fox to end her unauthorized use of Oneida's trademarks through sales of Oneida flatware that is not subject to Oneida's quality controls and is not covered by Oneida's warranty.

## II.     TRANSFERABILITY OF ONEIDA'S WARRANTY TO FOX'S CUSTOMERS

### A.     Factual Background – Oneida's Warranty Has Always Been Limited, by its Express Terms, to the "Original Owner" Who Purchases from Oneida or its Authorized Dealers.

Oneida does not dispute the language of its warranty as reflected in the attachments to Fox's Brief and as quoted in the Brief. (*See* Dkt. 41 at 1–2; Dkt. 41-2; Dkt. 41-3; Dkt. 41-4.) However, Fox's argument that the warranty never "contain[ed] <u>any</u> language restricting Defendant Fox's ability to transfer the warranty to subsequent purchasers" (Dkt. 41 at 3 (emphasis in original)) is belied by the express wording of the warranty itself. By its express terms, the warranty has, at all relevant times, extended only to the "original owner" of Oneida's flatware for that person's lifetime. (Dkt. 41 at 2; Dkt. 41-2; Dkt. 41-3; Dkt. 41-4; *see also* Fox's Memorandum in Opposition to Motion for Preliminary Injunction (Dkt. 22) at 18 ("[A]ll of the Oneida product carried/carries with it a limited lifetime warranty for the lifetime of the original owner."); Declaration of Mark Eichhorn ("Eichhorn Dec.") (Dkt. 11), ¶ 9 ("Oneida provides a lifetime warranty to the original purchaser of its products."); *id.* ¶ 16 ("[T]he Oneida warranty only applies to the original purchaser."); August 28, 2020 Affidavit of Elyse Fox ("Second Fox Aff.") (Dkt. 41-1), ¶ 35 (The warranty from Oneida's licensee, Robinson Home Products Inc. ("Robinson"), was "for the lifetime of the original owner.").) By expressly extending only to the original owner, it necessarily cannot be transferred beyond the original owner.

Read literally, the "original owner" would be whoever purchased the flatware from Oneida, including any distributors, retailers, dealers, or resellers. Fox would be the original owner of the flatware she purchased from Oneida, and the warranties would extend only to her, not to her customers.

Instead, the "original owner" is the consumer who purchases the flatware from Oneida or its retail partners, authorized dealers, and authorized resellers. (Eichhorn Dec. (Dkt. 11), ¶ 10 ("Oneida's warranty is only available to those who buy directly from Oneida or its retail partners, authorized dealers, and authorized resellers.").) Here, the retail partners, authorized dealers, and authorized resellers are extensions of Oneida and, as such, are not themselves the "original owners." Because of the foregoing, throughout the time that Fox was an authorized dealer or reseller for Oneida and Robinson, her customers were "original owners" of the Oneida flatware they purchased, and Oneida and Robinson honored the warranty claims that Fox's customers made.[1]

There are at least three reasons why Oneida cannot extend its warranties to anyone other than those who buy from Oneida or its authorized distributors. First, Oneida has no ability to ensure that particular products were not previously sold, used and/or damaged, then returned, repackaged, and resold. (*Id.* ¶ 10.a.) When Oneida works with authorized partners, all returns ultimately run through Oneida. (*Id.*) The partners will send returned product back to Oneida for inventory purposes or, if the product is used, the partner will instruct the consumer to contact Oneida directly to use Oneida's warranty. (*Id.*) Health and safety protocols require Oneida to discard any used product. (*Id.*) If the product packaging has been opened, Oneida considers the

---

[1] The warranty requires the claimant to submit a proof of purchase, thus allowing Oneida to determine whether the claimant purchased from Oneida or its retail partners, authorized dealers, or authorized resellers. (*See* Dkt. 41 at 2.)

product used.  (*Id.*)  Oneida has no way of ensuring that unauthorized sellers are following these same standards and procedures.  (*Id.*)

Second, Oneida cannot track sales by anyone other than Oneida and its authorized retailers, dealers, and resellers and, therefore, cannot determine how much of the inventory being sold in the market has been discontinued.  (*Id.* ¶ 10.b.)  Higher volumes of discontinued products in the market can be detrimental to consumers that end up needing replacement pieces – pieces that may no longer be available in Oneida's existing inventory.  (*Id.*)

Third, Oneida must ensure that product packaging configurations are authorized to preserve the quality of the packaging and goods inside.  (*Id.* ¶ 10.c.)  Oneida sells particular styles of flatware in particular configurations (e.g. twenty pieces in a single package).  (*Id.*)  Selling repackaged or reconfigured goods voids the customer warranty.  (*Id.*)  In the absence of a warranty, a customer may not be able to obtain a replacement piece for any flatware that the customer loses or damages.  (*Id.*)

In her Brief, Fox points to a recent attempt by one of her customers, Nancy Thomas, to make a warranty claim and Oneida's refusal to honor the claim, even though Thomas purchased flatware from Fox when Fox still was an authorized Oneida dealer.  (Dkt. 41 at 3.)  This was a mistake on Oneida's part, which it is currently investigating.  The Oneida representative may have been confused about when Fox was deauthorized or may have reasonably (but incorrectly) assumed that, given the timing of the warranty claim in July of this year, Thomas's purchase was made after Oneida deauthorized Fox.  This series of events, though, highlights the difficulty of administering a warranty program that applies to sales made by a person or entity who is not communicating with and cooperating with Oneida.  (*See id.* ¶ 9 (Authorized "partnerships provide the necessary level of communication and coordination to" handle returns and administer the

4

warranty program.).)

**B.    New York Law Does Not Apply to this Ohio Case and, Even if it Did, Oneida's Warranty Does Not Violate New York Law.**

Fox argues that Oneida's warranty violates New York General Business Law 369-b, which forbids manufacturers from limiting their warranties based solely on the fact that merchandise is sold by a particular dealer or dealers.  (Dkt. 41 at 4–5.)  She is wrong.

As an initial matter, both parties have assumed up to this point that Ohio law governs any state law issues in this case.  (*See* Fox's Memorandum in Opposition to Motion for Preliminary Injunction (Dkt. 22) at 20–21, 24–25 (citing Ohio case law and statutes on estoppel and warranties); Oneida's Reply in Support of Motion for Preliminary Injunction (Dkt. 25) at 4, 8–11, 15–16 (citing Ohio case law on agency, contract law, estoppel, and warranties).)  Indeed, in her Brief, Fox mostly cites Ohio statutes and Ohio case law on warranties.  (*See* Dkt. 41 at 5, 8, 12–15.)  Fox provides no explanation for suddenly switching to New York law on a single aspect of warranty law.

In any event, under the relevant choice of law rules, Ohio law applies to this case.  "A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state." *RPM, Inc. v. Hartford Accident & Indem. Co.*, No. 1:03CV1322, 2006 U.S. Dist. LEXIS 101684, at *13 (N.D. Ohio Apr. 11, 2006) (citing *Klaxon v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941)). "Ohio courts apply the principles in the Restatement (Second) of Conflict of Laws, directing courts to apply the law of the state with the most significant contacts to the dispute." *Saglioccolo v. Eagle Ins. Co*., 112 F.3d 226, 230 n.3 (6th Cir. 1997) (citing *Lewis v. Stenreich*, 73 Ohio St. 3d 299, 652 N.E.2d 981 (Ohio 1995)).  New York has no significant contacts to the present dispute.  Even if Oneida was based in New York prior to 2017, as Fox claims, it is currently headquartered in Columbus, Ohio (Complaint (Dkt. 1), ¶¶ 1, 2, 5), and the current dispute

centers on Fox's infringement of Oneida's trademarks since Oneida deauthorized her as a dealer and revoked its consent to her use of Oneida's trademarks as of April 1, 2020—long after 2017 (*id.*, ¶¶ 10, 12). Fox's trademark infringement harms Oneida at its headquarters in Ohio (*id.*, ¶¶ 13–14), and Oneida filed suit in Ohio, making it the forum state for this lawsuit. Thus, the Court should apply Ohio law to all of the state law issues in this case.

Even if the New York statute at issue did apply in this case, it would not render Oneida's warranty unlawful. As one court recently explained, the New York statute Fox cites only prohibits a manufacturer from limiting its warranty ***solely*** based on whether a dealer is authorized and does not prohibit warranties that are limited for additional reasons related to, for instance, quality control:

> Section 369-b prohibits manufacturers from limiting their warranty 'solely' on the basis of ensuring that their products are sold by particular dealers (i.e., authorized dealers). In other words, Section 369-b does not apply if a manufacturer limits its warranty based on reasons other than a dealer's status. Here, [the plaintiff] does not limit its Warranty based "solely" on a dealer's status. Instead, it limits the Warranty based on whether a reseller's products have been subjected to [the plaintiff's] strict quality controls.

*Skullcandy, Inc. v. Filter USA, Inc.*, No. 2:18-CV-00748-DAK, 2019 U.S. Dist. LEXIS 104393, at *20–21 (D. Utah June 21, 2019) (internal citations omitted). Such is the case here. Oneida is not limiting its warranty based solely on the status of particular dealers, but also on the fact that the inventory sold by unauthorized dealers is not subject to Oneida's quality controls on returns and packaging configurations. (*See* Eichhorn Dec. (Dkt. 11), ¶ 10.) Therefore, Oneida's warranty does not violate New York General Business Law 369-b.

### C. Oneida Offers its Warranty to Consumers, Not Dealers Such as Fox, and Oneida Can Revoke its Offer of Warranty Any Time Prior to Sale to a Consumer.

Fox argues that, after issuing its warranty to her, Oneida unilaterally modified the terms of

the warranty so that only authorized dealers can transfer the warranty to consumers and, because she is no longer an authorized dealer, this action deprives her of "a valuable contract right"—the warranty—that Oneida made to her and that induced her to buy flatware from Oneida. (Dkt. 41 at 6.) None of this is true.

What has changed in this case is not the terms of the warranty, but rather Fox's relationship with Oneida vis-a-vis that warranty. When Fox was an authorized dealer, she was an extension of Oneida and her customers were, thus, "original owners." Therefore, the warranty passed to Fox's customers, and Oneida honored warranty claims from her customers. Now that Fox is not an authorized dealer, her customers are not "original owners" under the warranty. (Eichhorn Dec. (Dkt. 11), ¶ 16 ("Because Fox is not an authorized Oneida dealer or dealer, her customers are not original purchasers.").)

More fundamentally, though, Oneida never issued its warranty to Fox and she, therefore, holds no "valuable contract right." Under Ohio law, a warranty is "[a]ny affirmation of fact or promise made by the seller *to the buyer* which relates to the goods and becomes part of the basis of the bargain." *See* Ohio Rev. Code Ann. § 1302.26 (emphasis added). It "is created when the seller makes *to the buyer* a material or substantive promise or assurance concerning the quality, performance, or safety of the product sold to the buyer." *Bruns v. Cooper Indus., Inc.*, 605 N.E.2d 395, 397 (Ohio Ct. App. 1992) (emphasis added).

Oneida's lifetime warranty was never directed to Fox or intended to induce her to purchase flatware from Oneida. Indeed, Fox admitted as much in prior briefing: "[A]ll of the Oneida product carried/carries with it a limited lifetime warranty for the lifetime of the original owner," and the "original owner" is a "consumer purchaser." (Fox's Memorandum in Opposition to Motion for Preliminary Injunction (Dkt. 22) at 18.) Oneida offers its lifetime warranty to consumers at the

time of purchase to induce them to buy flatware from Oneida or its retail partners, authorized dealers, and authorized resellers, which are an extension of Oneida. *See Rogers v. Toni Home Permanent Co.*, 147 N.E.2d 612, 615 (Ohio 1958) ("The warranties made by the manufacturer in his advertisements and by the labels on his products are inducements to the ultimate consumers."); *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 740 (W.D. Ky. 2013) ("In this case, while the alleged warranties do not expressly state the identity of the intended beneficiary, it is clear that any alleged warranty was certainly intended for those who would purchase and use the hair product. [The manufacturer] would not have intended to direct any express warranties to the retail stores selling the product; the stores would not be the slightest bit concerned with the product's effects or the ingredients contained therein.").

In her Brief, Fox cites *Jones v. Cranman's Sporting Goods*, 237 S.E.2d 402 (Ga. Ct. App. 1977), a case that is instructive on this point. In *Jones*, the court noted that "an automobile manufacturer, ***through its authorized dealer [may] issue[]*** to a purchaser of one of its automobiles from such dealer admittedly as a part of the sale ***a warranty by the manufacturer running to the purchaser***." *Id.* at 405 (internal quotation marks omitted and emphasis added). Thus, the court found that a manufacturer's warranty became "part of the bargain of sale" at the time that the consumer made his purchase from a retailer. *Id.* at 406; *see also Mootz v. GMC*, No. 84 C.A. 185, 1986 Ohio App. LEXIS 5702, at *1 (Ohio Ct. App. Feb. 21, 1986) ("On May 29, 1979, [the consumer] purchased a new vehicle from [an authorized dealer]. At the time of purchase, [the manufacturer] issued its standard 12-month/12,000 mile warranty to [the consumer].").

The present case is similar to *Jones* in this regard. Because Oneida's warranty is intended for consumers, the warranty is not issued, offered, or made "to the buyer," and does not become part of the basis of the bargain, until such time as flatware is sold to a consumer. (*See* Second Fox

8

Aff. (Dkt. 41-1), ¶ 36 (Fox issued Oneida's warranty "to [her] customers when they made a purchase," inserting "manufacturer's warranty cards . . . in [her] packages of Oneida branded flatware" prior to shipping.).)  As Fox herself argues, "traditional contract principles apply to claims for breach of warranty."  (Dkt. 41 at 11.)  "[G]eneral contract law . . . holds that an offer may be revoked at any time prior to acceptance."  *Beres v. Board of Educ.*, 723 F.2d 908 (6th Cir. 1983) (table decision).  Thus, up until the time that a warranty is accepted by a consumer through a purchase of flatware, Oneida can revoke the offer of warranty by, for instance, deauthorizing Fox as a dealer.

In arguing to the contrary, Fox relies on *Gold Kist, Inc. v. Citizens & Southern National Bank*, 333 S.E.2d 67 (S.C. Ct. App. 1985).  That case is nothing like the present case.  There, a corn seed supplier warranted to farmers, as part of an oral contract, that its seeds would produce a high yield but then attempted to disclaim the warranty at the time that it delivered its seeds to the farmers.  *Id.* at 69–70.  The *Gold Kist* court held that, after consummating its oral contract with the farmers, the seed supplier could not disclaim the express warranty it made ***to the farmers*** as part of that contract.  *Id*. at 70–71.  Unlike in *Gold Kist*, Oneida is not, for the reasons explained above, attempting to modify or cancel a warranty after making that warranty to the consumers of its products, who are the potential "original owners" of Oneida's flatware.

If, as Fox claims, Oneida made its warranty to her and not to end consumers, then she would be the "original owner" under the terms of the warranty.  By its express terms, the warranty extends to the "original owner" and no further, and Fox's claims to her potential customers that goods sold to those customers would be covered by a warranty are false.  If the warranty could be transferred from owner to owner, this would render the word "original" in the warranty meaningless.  Further, because the Oneida warranty is a lifetime warranty, if it could be transferred

9

from owner to owner, it could last for multiple lifetimes into perpetuity.  While Fox points to statutes and cases endorsing the view that warranties are transferable, these authorities also recognize that a manufacturer may place reasonable limits on express warranties within the warranty itself.  *See, e.g.*, Ohio Rev. Code Ann. § 1302.29(A) ("Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but . . . negation or limitation is inoperative to the extent that such construction is unreasonable.").  The term "original owner" is such a limitation.  If Fox is the "original owner," then the warranty would end with her and not extend to her past, present, or future customers.

On this point, the Court has asked the parties to address: (1) whether a trademark owner can cancel a warranty that was part of the sales transaction by deauthorizing a reseller; and (2) does a failure or refusal by a reseller to enter into an agreement allowing Oneida to inspect the goods give Oneida a basis to cancel the warranty?  As explained above, however, Oneida is not attempting to cancel a warranty that was previously made to Fox.  Instead, Oneida is exercising its right under the law to revoke an offer of warranty prior to its acceptance by those consumers who are potential "original owners."

In any event, courts have recognized that warranties may be tied to a trademark owner's ability to implement, control, and enforce the quality control measures of its authorized dealers.  *See Skullcandy*, 2019 U.S. Dist. LEXIS 104393, at *19–21 (finding that the plaintiff's warranty was not illegal where the warranty "only extends to products sold by sellers that were subject to [the plaintiff's] quality controls" and not "to products sold by unauthorized sellers because [the plaintiff] cannot ensure the quality of such products"); *Gen. Nutrition Inv. Co. v. Fieton Enter.*, No. 20-606, 2020 U.S. Dist. LEXIS 148027, at *4, 11 (W.D. Pa. Aug. 14, 2020)

10

(ruling that the plaintiff established the material difference exception to the first sale defense where it argued that, "[b]ecause [it] cannot ensure that unauthorized sellers are following appropriate quality controls, its money back guarantee does not extend to products purchased from unauthorized sellers"); *Otters Prods., LLC v. Fisch Enter.*, No. 19-cv-00030-CMA-KLM, 2019 U.S. Dist. LEXIS 223537, at *6 (D. Colo. Oct. 3, 2019) ("Because Plaintiffs cannot exercise their quality controls over products sold by unauthorized sellers, the Warranty is not available for products sold by unauthorized sellers who are not subject to Plaintiff's quality controls."); *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 837 F. Supp. 2d 208, 229 (S.D.N.Y. 2011) ("[I]f a dealer is known to the manufacturer to handle the product in a negligent manner, risking damage before the product reaches the consumer, the manufacturer remains free to refuse to honor all warranties from that particular dealer.").  As these cases recognize, a trademark owner can refuse to extend its warranties to the products sold by unauthorized dealers who are not subject to the trademark owner's quality controls because the trademark owner has no way of ensuring the quality of such products.

That is precisely what Oneida did in this case, as discussed more fully in the next section. Because Fox refused to agree to Oneida's authorized dealer policy or to abide by Oneida's quality controls, Oneida deauthorized her as a dealer and validly revoked its offer of warranty on the flatware that she is selling.

## III. ONEIDA'S RIGHT, AS A TRADEMARK OWNER, TO TAKE REASONABLE STEPS TO PROTECT ITS TRADEMARKS WHEN A RESELLER REFUSES TO AGREE TO ONEIDA'S QUALITY CONTROLS

### A. Factual Background – Quality Control Has Always Been a Central Part of Oneida's Operations.

For at least two reasons, Oneida cares about the quality of Oneida-branded flatware and the quality of the operations used in distributing that flatware to consumers.   First, the quality of

the flatware directly impacts the reputation and value of the Oneida brand and trademarks. (Eichhorn Dec. (Dkt. 11), ¶ 8 ("To protect its reputation and valuable marks, Oneida ensures the quality of goods sold under the ONEIDA Marks . . . .").)  Second, the Oneida warranty program can only function properly if Oneida can ensure that its flatware is of the utmost quality when it enters the hands of the original owner.  (*Id.* ¶ 9 ("This lifetime warranty requires quality controls . . . .").)

Oneida has long taken concrete measures to ensure quality.  On August 31, 2009, Oneida entered into a Master License Agreement ("MLA") with Robinson under which Robinson was authorized to manufacture and sell Oneida flatware.  (*See generally* MLA (Dkt. 22).)  Under the section of the MLA titled "Quality Approval," Robinson had to submit to Oneida "for its written approval, samples of" any new products before they were sold or distributed.  (*Id.* § 5.5.)  Further, under a section titled "Quality Review," Robinson agreed to:

> provide [Oneida's] representatives with the opportunity at all reasonable times to visit any plant or office in which [Robinson] is manufacturing, storing or selling Products, in order that they may inspect methods of manufacture, Products, advertising materials, letterhead and other printed material and Products which may utilize licensed Trademarks being employed by [Robinson].

(*Id.* § 5.7.)  Finally, under a section titled "Quality Maintenance," Robinson agreed that its "policy of sale, distribution and exploitation of the Products shall be of high standard and shall not materially adversely reflect upon the good name of [Oneida] or upon the goodwill and reputation associated with the licensed Trademarks."  (*Id.* § 5.8.)  As reflected in these provisions, Oneida expected Robinson to exercise reasonable controls over the quality of Oneida-branded flatware— and flatware sales, distribution, handling, and shipping—whether product was coming directly from Robinson or from dealers or resellers with which Robinson was working.

Following the August 2009 execution of the MLA, Fox worked with Robinson until 2018, when Oneida terminated its licensee relationship with Robinson. Fox has testified that, during this period, Robinson "had direct knowledge of [her] business operations and expressly approved [her] business model" and operations, including how Fox packaged Oneida flatware for sale. (June 24, 2020 Affidavit of Elyse Fox ("First Fox Aff.") (Dkt. 22-1), ¶¶ 27, 48–51.)

Following the end of the licensing relationship between Oneida and Robinson, Oneida took over manufacturing, sales, and distribution of Oneida-branded flatware. "To protect its reputation and valuable marks, Oneida ensure[d] the quality of goods sold under the ONEIDA Marks by only allowing sales through retailers, partners, dealers, and resellers with which Oneida ha[d] an established relationship or express agreement." (Eichhorn Dec. (Dkt. 11), ¶ 8.) These relationships allow Oneida, for instance, to exercise quality controls over the handling of returns:

> When Oneida works with authorized partners, all returns ultimately run through Oneida. The partners will send returned product back to Oneida for inventory purposes or, if the product is used, the partner will instruct the consumer to contact Oneida directly to use Oneida's warranty. Health and safety protocols require Oneida to discard any used product. If the product packaging has been opened, Oneida considers the product used.

(*Id.* ¶ 10.a.) "Oneida has no way of ensuring that unauthorized sellers are following these same standards and procedures." (*Id.*) It "has no ability to ensure that particular products were not previously sold, used and/or damaged, then returned, repackaged, and resold." (*Id.*)

On January 2, 2019, Oneida issued several policies, including a Minimum Advertised Price Policy ("MAPP") and an Authorized Dealer Policy ("ADP"), relating to the business it had recently taken back over from Robinson. The ADP was intended to give Oneida reasonable control over how all of its distributors—not just Fox—were storing, handling, packaging, and selling Oneida-branded flatware. The ADP states, in relevant part, that "Oneida may review Dealer's activities for compliance with this Dealer Policy and Dealer agrees to cooperate with any such

investigation, including, but not limited to, permitting inspection of Dealer's facilities and records related to the sale of the Products."  (ADP (Dkt. 11-3) at introduction.)  Section 4 of the ADP is titled "Oneida Product Care and Quality Controls."  (*Id.* § 4.)  It includes a number of controls over the quality of product packaging, labeling, handling, storage, shipping, returns, inspections, and recalls:

> a) ***No Alterations:*** Dealer shall not alter the Products in any way and shall sell Products in their original packaging.  Relabeling, repackaging (including the separation of bundled products or the bundling of products), and other alterations are prohibited.  Dealer shall not remove, translate, or modify the contents of any Product label or literature.  Dealer shall not tamper with, deface, or alter any serial number, item number, UPC code, or other identifying information on Products or their packaging.

> b) ***Product Handling/Storage:*** Dealer shall comply with all instructions provided by Oneida regarding the storage, handling, shipping, disposal or other aspect of the Products.  Dealer shall store Products in a cool, dry place, away from direct sunlight, extreme heat, and dampness.

> c) ***Product Shipping:*** All Products shipped by Dealer to the End User must clearly identify the Dealer as the seller.

> d) ***Returned/Repackaged Products:*** Dealer shall not represent or advertise any Product as "new" that has been returned opened or repackaged.

> e) ***Product Inspection:*** Promptly upon receipt, Dealer shall inspect the Products for damage, defects, and other nonconformance (a "Defect").  If a Defect is identified, Dealer shall not offer the Product for sale and shall report the Defect to Oneida by email at policyadmin@theoneidagroup.com.

> f) ***Recall and Consumer Safety:*** Dealer shall cooperate with Oneida with respect to any Product recall or other consumer safety information dissemination efforts.

> g) ***Product Tracking:*** Dealer shall cooperate with Oneida regarding any Product tracking systems.

> h) ***Investigations****:* Dealer shall cooperate in the investigation and resolution of any issues regarding Product quality, customer service, or counterfeiting, including disclosing information regarding Product sources and Dealer's customer service, shipping, and handling procedures.

(*Id.* § 4.)  Finally, the ADP states: "Dealer is granted a limited, non-exclusive, non-transferable,

revocable license to use the Oneida IP solely for purposes of marketing and selling the Products in accordance with the terms herein. . . . This license shall cease immediately upon termination of Dealer's status as an Authorized Dealer." (*Id.* § 6.) "Oneida has the right to terminate Dealer's status as an Authorized Dealer" "[i]f Dealer violates th[e]" ADP. (*Id.* § 7.)

Fox admits that Oneida sent her a copy of the ADP and that she refused to "be bound by [its] terms" or "to allow Oneida to inspect her inventory," thus depriving Oneida of the ability to exercise control under the ADP over where and how Fox stored, handled, packaged, and sold flatware. (Dkt. 41 at 17–19.) Fox claims that, nevertheless, an Oneida representative told her, at or near the time that the ADP issued, that she did not need to abide by the terms of the ADP relating to sales on Amazon and eBay and relating to custom configurations of product. (First Fox Aff. (Dkt. 22-1), ¶ 67.) Instead, Oneida tried to work with Fox without requiring immediate, strict compliance with the ADP. Less than a year later, though, in late 2019, Oneida indicated that it planned to strictly enforce the ADP going forward. (*Id.*, ¶ 71.)

At that time, Oneida explored ways of allowing Fox to continue her business under the ADP or dispose of her inventory of Oneida flatware. Oneida reached out to Fox and presented her with two particular options, but also made clear that it was open to any other proposals that Fox might have. First, Fox could have a sell-down period, where she would stop acquiring new inventory and would have a limited period of months to sell—through Amazon, eBay, and her own website—all of her existing inventory. Fox rejected that option. Second, Oneida suggested that it could purchase Fox's inventory. As Fox admits, however, this option fell through because she was unwilling to allow Oneida to see her inventory, and Oneida refused to make an offer on the inventory without reviewing it first. (*Id.* ¶ 72.)

Because Fox refused to abide by the ADP or to agree to the other proposals that Oneida

had made, on January 20, 2020, Oneida sent Fox a letter stating that, as of April 1, 2020, Oneida was deauthorizing Fox as an Oneida dealer such that Fox "will no longer be authorized or licensed to use ONEIDA®'s trademarks." (Dkt. 11-4.) Thus, Oneida gave Fox three months to sell down her existing inventory—from January 2020 through the end of March 2020. She did not do so. Oneida also gave Fox the option of filling out an application to once again become an authorized reseller, which would have allowed her to continue selling on her website, but not on Amazon or eBay. (Eichhorn Dec. (Dkt. 11-1), ¶ 14 & Ex. D (Dkt. 11-5).) She did not complete and submit the application. (*Id.* ¶ 15.)

Therefore, as of April 1, 2020, Fox has not been an authorized Oneida dealer, and her continuing use of Oneida's trademarks is without Oneida's consent, permission, or authorization. "Because Fox is no longer an authorized Oneida dealer or reseller and is unwilling to cooperate with Oneida, Oneida does not know the source of the flatware that Fox is selling." (*Id.* ¶ 22.) "Nor does it know how or where Fox is storing her stock, and it has no way to audit or control the quality of her stock." (*Id.*) "It also cannot control how Fox uses the ONEIDA Marks in her marketing or advertisements—other than filing the present lawsuit and seeking injunctive relief." (*Id.*)

In her Brief, Fox argues that, contrary to the assertions above, Oneida and Robinson never had any quality controls. To make this argument, however, she focuses exclusively on how and where she stores her inventory. (*See* Dkt. 41 at 17–19.) In doing so, she overlooks quality controls relating to, for instance, returns and product packaging. She also overlooks the fact that, by refusing to agree to the ADP, she deprived Oneida of the opportunity to exercise reasonable control over the quality of her inventory and business practices, leaving Oneida no other choice but to file this suit.

**B.      As a Trademark Owner, Oneida May Protect its Valuable Trademarks by Revoking a Reseller's Authorization to Use Oneida's Trademarks and Then, if the Reseller's Use Continues, Suing for Trademark Infringement.**

If a dealer refuses to agree to a trademarks owner's reasonable quality controls or takes other actions that could damage the trademark owner's marks, brand, or reputation, the trademark owner's first line of defense is to revoke the reseller's consent, permission, authorization, or license to use the trademarks.  Then, if the reseller continues to use the trademark owner's marks in commerce, the trademark owner can sue for trademark infringement and/or trademark dilution.

Just as a trademark owner has the power to license its marks, it also has the power to revoke, rescind, or withdraw that license.  As stated by one court:

> It is beyond dispute that an owner of a mark can consent to or license the use of that mark.  It is also clear, however, that such consent can be withdrawn, it can be subject to limitations, or the consent can expire under the terms of the agreement between the parties.

*Burger King Corp. v. Metro Club, Inc.*, No. 78-71432, 1980 U.S. Dist. LEXIS 16185, at *21 (E.D. Mich. July 31, 1980) (citing *Prof'l Golfers Ass'n v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir. 1975)).  Further, as stated in the leading treatise on trademark law:

> Once a franchisee, dealership or license contract is terminated, there is no doubt that the former franchisee, dealer or licensee has no authorization or consent to continue use of the mark.  After the permission to use the mark has ended, use of the mark must cease.  The terminated dealer who is a 'hold-over' and refuses to change the mark is an infringer.

4 McCarthy on Trademarks § 25.31 (2018); *see also id.* ("In sum, the law is simple.  If, as a matter of contract law, a service mark or trademark license has ended, the licensee has no right to continue use of the licensed mark.  Any such use is without the trademark owner's consent and constitutes infringement.").

In the present case, the contours of revocation depend to some extent on whether Fox's license was express or implied, written or oral. But the end result is the same: Oneida had the right to revoke Fox's license.

If the ADP applied to Fox, then she had an express, written license under Section 6 of the ADP. The ADP also states, in Sections 6 and 7, that "[t]his license shall cease immediately upon termination of Dealer's status as an Authorized Dealer" and that Oneida "has the right to terminate" "[i]f Dealer violates this Policy." As such, if the ADP applied to Fox, Oneida had the right to terminate Fox for violating the ADP, revoke her license to use Oneida's marks, and stop her from continuing to sell Oneida flatware. This is consistent with case law involving express, written trademark licenses. *See Ford Motor Co. v. Thermoanalytics, Inc.*, No. 14-cv-13992, 2015 U.S. Dist. LEXIS 145965, at *9, 14–15 (E.D. Mich. Oct. 28, 2015) (granting summary judgment for plaintiff on false designation of origin claim because: the plaintiff's written license agreement with the defendant had expired; the agreement required the defendant to "cease all use of the RadTherm trademark" upon the agreement's termination; and the defendant continued to use the trademark after termination); *see also U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1187–89 (6th Cir. 1997) (affirming summary judgment for franchisor on trademark infringement and unfair competition claims where: the parties had a written franchise agreement that authorized the franchisee to use the franchisor's trademarks; the franchisor terminated the agreement; the franchisor's executives testified that they no longer consented to the franchisee's use of the franchisor's marks; and the franchisee continued to use the franchisor's marks); *Choice Hotels Int'l, Inc. v. Jagaji, Inc.*, No. 2:10-cv-0964, 2012 U.S. Dist. LEXIS 128048, at *3–4, 11 (S.D. Ohio Sept. 10, 2012) (granting summary judgment for franchisor on trademark infringement and unfair competition claims where: the parties had a written franchise agreement that authorized the

franchisee to use the franchisor's trademarks; the franchisor terminated the agreement; the termination letter instructed the franchisee to cease all use of the franchisor's marks; and the franchisee continued to use the franchisor's marks).

If the ADP did not apply to Fox, then she had either an implied license or oral license to use Oneida's trademarks. *See*, *e.g.*, *Grand Lodge v. Labor Council Mich. Fraternal Order of Police*, No. 93-2073, 1994 U.S. App. LEXIS 30788, at *8 (6th Cir. Oct. 24, 1994) (implied license); *Burger King*, 1980 U.S. Dist. LEXIS 16185, at *22–24 (implied license); *G&J Gears Austl. Pty Ltd. v. Rockcrusher U.S. LLC*, No. 06 CV 2314, 2011 U.S. Dist. LEXIS 92315, at *4 (N.D. Ohio Aug. 18, 2011) (oral license); *Valvoline Co. v. Magic Quick Lube*, No. 09-CV-10829, 2009 U.S. Dist. LEXIS 100944, at *3–4, 9 (E.D. Mich. Oct. 29, 2009) (oral license). Like express, written licenses, implied licenses can be revoked. For instance, in *Grand Lodge*, the Sixth Circuit found no error in the lower court's finding that "State Lodge, by its silence, granted Labor Council an implied, revocable license in 1985 to use Grand Lodge's marks" and that "State Lodge revoked the implied license in [a] 1990 letter" advising Labor Council "that it was prohibited from using the FOP name or mark." 1994 U.S. App. LEXIS 30788, at *5, 8. Similarly, in *Burger King*, the court found that the trademark holder had withdrawn any implied consent by making clear, through its words and actions, that it did not consent to the defendant's continued use of the plaintiff's marks. 1980 U.S. Dist. LEXIS 16185, at *24–25.

A trademark owner can also revoke an oral license. For example, in *G&J Gears*, the defendant was granted an oral license to use the plaintiff's name and logo but, when the defendant failed to pay as required by the parties' oral agreement, the plaintiff revoked the oral license. 2011 U.S. Dist. LEXIS 92315, at *4–5. Because the defendant continued to use the marks, the court granted summary judgment to the plaintiff on a claim for false designation of origin. *Id.* at *11.

19

The *Valvoline* case is even more on point.  In that case, Valvoline was the trademark owner and plaintiff, and Vesco was Valvoline's exclusive distributor.  2009 U.S. Dist. LEXIS 100944, at *1–3.  Valvoline had a policy of allowing oil change businesses to use Valvoline's trademarks on signage only if a certain amount of the oil products and lubricants sold by the business were Valvoline brand.  *Id.* at *2–3.  At one time, the defendant had a written contract with Vesco for the purchase of Valvoline oil products, and this carried with it a license to use Valvoline's trademarks on signage.  *Id.* at *3.  The contract then expired.  *Id.*  But Vesco's representative, Stratton, told the defendant orally that he could continue to use Valvoline's trademarks on signage in connection with his sales of Valvoline motor oil, even though the contract had expired and even though this continued usage was in violation of Valvoline's policy noted above.  *Id.* at *3–4.  Subsequently, Stratton left Vesco, and both Vesco and Valvoline made clear to the defendant that it no longer had permission to display Valvoline signage.  *Id.* at *4.  When the defendant continued to display Valvoline's signage, Valvoline sued the defendant for trademark infringement and unfair competition, and it sought a preliminary injunction.  *Id.* at *1.

In opposing the motion for preliminary injunction, the defendant "argue[d] that its use of Plaintiff's trademarks [was] authorized because Stratton told [the defendant] that [it] could display its Valvoline signage."  *Id.* at *8.  Valvoline responded that "even if Stratton, at one time, authorized Defendant's use of Valvoline signage, the authorization has been effectively revoked, repeatedly."  *Id.* at *8–9.  The Court "agree[d] with Plaintiff" because "[t]he uncontroverted evidence in this case demonstrates that Defendant's current use of Valvoline signage is not authorized."  *Id.* at *9.  The "permission has been revoked."  *Id.*  Thus, the court found that Valvoline had a strong likelihood of prevailing on the merits of its claim and granted a preliminary injunction.  *Id.*

A second case is also highly instructive: *Amyotrophic Lateral Sclerosis Association v. Amytrophic Lateral Sclerosis of Michigan, Inc.*, No. 05-73464, 2006 U.S. Dist. LEXIS 64323 (E.D. Mich. Sept. 8, 2006). In *Amyotrophic*, each year the plaintiff granted a royalty-free license to its chapters to use the plaintiff's trademarks, provided that the chapters signed a memorandum outlining how the trademarks could be used. *Id.* at *16. The defendant was one of the plaintiff's chapters, and it signed the memorandum in 2002 and 2003. *Id.* at *4. In 2004, however, it refused to sign the memorandum, and plaintiff did nothing, allowing the defendant to use the trademarks anyway. *Id.* at *16. In 2005, the plaintiff made clear in writing that it intended to enforce its policy and that, if the chapters did not sign the memorandum, they could not use the trademarks. *Id.* at *16–17. The defendant did not sign the memorandum but continued to use the marks. *Id.* The plaintiff subsequently sued for trademark infringement and moved for a preliminary injunction. *Id.* at *10. The court granted the preliminary injunction in part and found that the defendant's use of the marks was not authorized in 2005, even if it had been implicitly authorized in 2004. *Id.* at *1, 16–17. In 2005, the plaintiff had effectively withdrawn its permission to use the marks. *Id.* at *18.

Under these authorities, regardless of whether Oneida gave Fox a written license or an oral or implied license—as Fox seems to contend—to use Oneida's trademarks, Oneida had the right to revoke that license, such that Fox can no longer continue selling Oneida product bearing Oneida's registered trademarks. This is true even if, as in the cases of *Valvoline* and *Amyotrophic*, Oneida granted Fox an oral or implied license inconsistent with Oneida's written policy—the ADP. When Oneida subsequently decided to strictly apply the ADP and Fox refused to be bound by the ADP or to agree to Oneida's quality controls, Oneida exercised its right to revoke the license it had granted to her, clearly stating in writing that, as of April 1, 2020, Fox "will no longer be

21

authorized or licensed to use ONEIDA®'s trademarks." (Dkt. 11-4.)  When Fox still continued to sell Oneida flatware and use Oneida's registered trademarks, Oneida sent her a cease and desist letter (Dkt. 11-12) and then sued for trademark infringement (and trademark dilution)—just like all of the plaintiffs in the cases cited above.  Under these circumstances, Fox can escape liability only if she is able to prove the first sale defense, which essentially creates an exception to the requirement that a trademark owner must consent to the ongoing use of its marks by others.  Where the first sale defense applies, "the first purchaser of a trademarked good may resell it [and thereby use the trademark], regardless of whether the trademark owner consents."  (Order and Opinion (Dkt. 36) at 6.)  But where the first sale defense does not apply, Fox is an infringer.

## C.    A Defendant Cannot Shield Behind the First Sale Defense Where the Defendant's Conduct Interferes with the Trademark Owner's Quality Controls, the Defendant's Goods Are Materially Different from the Trademark Owner's, or the Defendant Fails to Prove that All of its Inventory Is Genuine.

On pages 19 to 22 of her Brief, Fox discusses case law governing the first sale defense. Oneida does not dispute this case law.  Nor does Oneida dispute the holding that, where the first sale defense applies, a trademark owner cannot control branded goods following the first sale.  (*See* Dkt. 41 at 22–26.)  This case law, however, only begs the question of whether the first sale defense is available here or whether, instead, one of the many reasonable limitations and exceptions to the first sale defense applies.

Fox's discussion of the first sale defense is incomplete because she does not directly address all of the exceptions to, or limitations upon, this defense that may apply to the injunctive/declaratory portion of this case.[2]  There are three relevant exceptions/limitations: (1) the

---

[2] An additional exception will apply to the damages portion of the case.  The first sale defense is unavailable "when the reseller used the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees."  *PACCAR Inc. v. TeleScan Techs., LLC*, 319 F.3d 243, 257 (6th Cir. 2003), *overruled on other grounds, KP*

quality control exception; (2) the material difference exception; and (3) the genuineness limitation. If any one of these three exceptions or limitations applies, then the first sale defense is unavailable to Fox.

### 1. The Quality Control Exception – Fox Has Interfered with, and Continues to Interfere with, Oneida's Legitimate Quality Controls.

In her Brief, Fox discusses the quality control exception to the first sale defense as though it were a limited exception recognized only by the Second Circuit and subsequently extended by the District Court for the District of Utah. (Dkt. 41 at 27–30.) It is not.

Courts throughout the Sixth Circuit have recognized the quality control exception to the first sale defense. *See RFA Brands, LLC v. Beauvais*, No. 13-14615, 2014 U.S. Dist. LEXIS 181781, at *23–25 (E.D. Mich. Dec. 23, 2014) (finding that the first sale defense was precluded, in part, because "defendant impeded plaintiffs' product quality/warranty and quality control mechanisms"); *Ford Motor Co. v. Heritage Mgmt. Grp., Inc.*, 911 F. Supp. 2d 616, 627 (E.D. Tenn. Nov. 27, 2012) (granting summary judgment in favor of Ford on its trademark infringement claim because "Defendants violated Ford's trademark by interfering with the implementation of Ford's quality control standards"); *FURminator, Inc. v. Kirk Weaver Enters.*, 545 F. Supp. 2d 685, 690–91 (N.D. Ohio 2008) ("[B]y employing their own quality standards[] and selling the tools under FURminator's mark, defendants violated FURminator's right under the Lanham Act to retain control of the use of its trademark in the sale of the product."). In addition, in the *Skullcandy* case that both parties have cited, the court collected cases from the Second, Third, Fourth, and Ninth Circuits adopting and following the quality control exception. 2019 U.S. Dist. LEXIS

---

*Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) (internal quotation marks omitted) (summarily concluding, on this basis alone, that the first sale defense was unavailable to the defendant). Fox has admitted that she continued to hold herself out as an authorized Oneida dealer even after she was no longer authorized. (*See* First Fox. Aff. (Dkt. 22-1), ¶¶ 80–82.)

104393 at *15–17.

In *Skullcandy*, the court did not, as Fox contends, purport to extend the quality control exception. *Id.* at *15–16, 22–25. It simply applied a well-recognized exception to a fact pattern very similar to the present case. The court applied the following test for the quality control exception: "the plaintiff trademark holder must first establish that '(i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the nonconforming sales [by the defendant] will diminish the value of the mark.'" *Id.* at *22 (quoting *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996)). Furthermore, in establishing these factors, "a mark holder must have established that the unauthorized reseller either failed to abide by the trademark holder's quality controls . . . **_or_** interfered with the trademark holder's ability to implement its quality controls." *Id.* at *22–23 (emphasis added). Applying these rules to the facts in *Skullcandy*, the court found that the plaintiff had adequately pleaded each of the foregoing factors, and it discussed at length the allegations regarding the third factor and regarding interference with the trademark holder's ability to implement its quality controls:

> Skullcandy has alleged that Defendants' interference with its quality controls will further diminish the value of the Skullcandy Trademarks because it impedes Skullcandy's ability to ensure that all products bearing those marks adhere to its quality standards. Similarly, Skullcandy's allegations establish various ways in which Defendants, as anonymous sellers, are interfering with its quality controls. For example, Defendants' sales prevent Skullcandy from (1) being able to address faulty products sold by Defendants; (2) being able to recall products sold by Defendants; (3) providing consumer safety information to Defendants' customers; and (4) being able to audit Defendants and ensure that they have not obtained counterfeit products or products from another unauthorized source.

*Id.* at *24–25.

In the present case, Oneida satisfies each of the factors in the test enunciated in *Skullcandy*. First, Oneida has established legitimate, substantial, and nonpretextual quality control procedures.

24

It contractually required Robinson, from 2009 to 2018, to exercise reasonable controls over the quality of flatware sales, distribution, handling, and shipping, whether product was coming directly from Robinson or from dealers or resellers with which Robinson was working.  (MLA (Dkt. 22), §§ 5.5, 5.7, 5.8.)  After ending its relationship with Robinson, Oneida adopted quality controls on returns, and in January 2019 it adopted the ADP to give Oneida the ability to directly control how authorized dealers store, handle, package and ship their Oneida flatware.  (Eichhorn Dec. (Dkt. 11), ¶ 10.a; ADP (Dkt. 11-3).)

Second, Oneida and Robinson have abided by these procedures.  Fox herself argues that Robinson worked closely with her from 2009 to 2018 and was aware of and approved of her operations, exercising control over, for instance, how she packaged her Oneida flatware.  (First Fox Aff. (Dkt. 22-1) at ¶¶ 27, 48–51.)  Oneida has also shown that it abides by, for instance, its procedures for quality controls on returns.  (*See* Eichhorn Dec. (Dkt. 11), ¶ 10.a.)  Oneida insists that its authorized distributors send returned product back to Oneida for inventory purposes or, if the product is used, the distributor will instruct the consumer to contact Oneida directly to use Oneida's warranty.  (*Id.*)  If the product packaging has been opened, Oneida considers the product used and, to ensure the health and safety of its customers, Oneida will discard the product.  (*Id.*)  Finally, while Oneida may have initially allowed Fox to deviate from the ADP, it quickly made clear that it would strictly apply the policies and procedures in the ADP going forward.  (First Fox Aff. (Dkt. 22-1), ¶ 71; Dkt. 11-4 (Oneida "inten[ds] to enforce the [ADP] against all third-party dealers and resellers of ONEIDA® branded products.").)

Third, Fox's conduct interferes with Oneida's quality controls in a manner that diminishes the value of Oneida's registered trademarks.  Fox admits that she refused to be bound by the ADP, thus depriving Oneida of the ability to exercise the quality controls therein.  (Dkt. 41 at 18–19.)

Now that Fox is no longer an authorized dealer, Oneida also has no ability to exercise quality controls over her returns.  And, as in *Skullcandy*, Oneida is not "able to audit [Fox] and ensure that [she has] not obtained counterfeit products or products from another unauthorized source."  2019 U.S. Dist. LEXIS 104393, at *25.  As Mark Eichhorn has testified: "Because Fox is no longer an authorized Oneida dealer or reseller and is unwilling to cooperate with Oneida, Oneida does not know the source of the flatware that Fox is selling."  (Eichhorn Dec. (Dkt. 11), ¶ 22.)  Even during the pendency of this litigation, Fox has resisted efforts to audit or directly review her inventory.  Finally, Fox's conduct also interferes with Oneida's ability "to address faulty products," *Skullcandy*, 2019 U.S. Dist. LEXIS 104393, at *25, through its warranty program, which Oneida "views . . . as an essential feature of its product and its brand."  (Eichhorn Dec. (Dkt. 11) at ¶ 9.)  Because Oneida cannot ensure the quality of the flatware that Fox is selling, it cannot reasonable warrant the quality of that flatware.  (*Id.* ¶ 10.a.)

Fox has raised various arguments for why she believes that the quality control exception does not apply here, but none of these arguments has merit.  Fox argues that Oneida has ***never*** had any quality control measures.  And then, reversing course, she argues Oneida did not have its quality controls in place when Fox purchased her inventory and that she never interfered with Oneida's quality control measures.  As shown above, none of this is true.

Fox next argues that the ADP is pretextual—that it is only "a paper trail laid by Oneida to manufacture a reason to bring a federal lawsuit against Ms. Fox to try and [sic] force her out of the marketplace."  (Dkt. 41 at 29.)  There is no evidence to support this.  Instead, the ADP is one of several policies that Oneida adopted in early 2019 after taking back over its flatware business from Robinson.  Oneida created the ADP, in particular, to exercise reasonable control over how all of Oneida's dealers—not just Fox—were storing, handling, packaging, and selling Oneida-branded

26

flatware.  It is absurd to suggest that the ADP was created only with Fox in mind or that it was created only to use in litigation that was filed more than a year after the ADP was issued.

Finally, Fox argues that Oneida did not adequately plead the quality control exception in its Complaint.  There is no dispute that Oneida did actually raise this issue in its Complaint, putting Fox on notice, through the following allegations:

> 27.    Plaintiff Oneida ensures the quality of goods sold under the ONEIDA Marks by instituting stringent quality control processes with its dealers and resellers, and by retaining complete control over the manufacturing and production of goods bearing the ONEIDA Marks.

> 28.    Because of the complete and stringent quality control measures that Plaintiff Oneida and its authorized dealers and resellers take, Plaintiff Oneida provides a lifetime warranty to the original purchaser of its products.

> …

> 81.    By deceiving purchasers into believing her products are covered by a lifetime warranty, when they are in fact covered by no warranty, and by selling products for which Plaintiff Oneida's stringent quality control standards have not been maintained, Defendant Fox has harmed the reputation of the ONEIDA Marks and has caused dilution by tarnishment.

(Complaint (Dkt. 1), ¶¶ 27, 28, 81.)  If Fox honestly believed that these allegations were insufficiently detailed, she could have moved to dismiss or for a more definite statement.  She did not do so at the outset of the case, and it is too late to do so now.  Because Oneida adequately pleaded the quality control exception in its Complaint and adequately established the exception above, the first sale defense is unavailable in this case.

> **2.    The Material Difference Exception – Fox's Flatware Is Materially Different from Oneida's Flatware Because Oneida Cannot Warrant the Quality of Flatware Fox Is Selling Outside of Oneida's Quality Controls.**

Fox omits from her Brief any discussion of the "material difference" exception to the first sale defense.  Under this exception, "the first sale doctrine does not apply . . . when an alleged infringer sells trademarked goods that are *materially different* than those sold by the trademark

owner." *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 370 (6th Cir. 2007) (internal quotation marks omitted).  The "rationale behind [this] exception is that a material difference in a product is likely to cause consumer confusion and could dilute the value of the trademark."  *Id.*  "To be material, a difference must be one that consumers consider relevant to a decision about whether to purchase a product."  *Id*. (internal quotations marks omitted).  "Because a myriad of considerations may influence consumer preferences, the threshold of materiality must be kept low to include even subtle differences between products."  *Id.* (internal quotation marks omitted).  Thus, "a physically identical product is nevertheless 'materially different' from the genuine article if the bundle of services that attach to the genuine article is not available to the consumer."  *ABG Prime Grp., Inc. v. Innovative Salon Prods.*, No. 17-12280, 2018 U.S. Dist. LEXIS 98196, at *11 (E.D. Mich. June 12, 2018) (internal quotation marks omitted).  As the Court already recognized in its earlier Opinion and Order on Oneida's Motion for Preliminary Injunction (Dkt. 36 at 9), these services include warranties, such that selling a product that would normally carry a warranty with no warranty or with an inferior warranty is a material difference.  *See Sprint Sols., Inc. v. Lafayette*, No. 2:15-cv-2595-SHM-cgc, 2018 U.S. Dist. LEXIS 104767, at *26–27 (W.D. Tenn. June 22, 2018) (collecting cases and finding that the first sale defense did not apply where the defendants' conduct voided the warranties on the phones at issue); *RFA*, 2014 U.S. Dist. LEXIS 181781, at *26 (finding that first sale defense failed as a matter of law because, *inter alia*, "reselling products with inferior warranties constitutes a material difference negating the first sale defense"); *ABG*, 2018 U.S. Dist. LEXIS 98196, at *11 (quoting and following *RFA*).

For example, in *Skullcandy*, the plaintiff alleged in its complaint that the warranty it provided on its products did not extend to "products sold by unauthorized sellers because such products are not subject to [the plaintiff's] quality controls, and [the plaintiff] cannot ensure their

quality." 2019 U.S. Dist. LEXIS 104393, at *6. Because the defendants were unauthorized sellers and were not subject to the plaintiff's quality controls, the plaintiff's warranty did not extend to the products sold by the defendants. *Id.* at *19. Therefore, the defendants' products were materially different from the plaintiff's products. *Id.* The court concluded that the plaintiff had adequately pleaded the material difference exception to the first sale defense and denied the defendants' motion to dismiss the plaintiff's trademark infringement claims. *Id.* at *21; *see also Gen. Nutrition*, 2020 U.S. Dist. LEXIS 148027, at *4, 11 (ruling that the plaintiff established the material difference exception to the first sale defense where it argued that, "[b]ecause [it] cannot ensure that unauthorized sellers are following appropriate quality controls, its money back guarantee does not extend to products purchased from unauthorized sellers"); *Otters Prods.*, 2019 U.S. Dist. LEXIS 223537, at *6–7, 12 ("Because Plaintiffs cannot exercise their quality controls over products sold by unauthorized sellers, the Warranty is not available for products sold by unauthorized sellers who are not subject to Plaintiffs' quality controls," and the products are materially different.).

Fox has never challenged the foregoing legal principles, despite Oneida having raised them in its prior briefing on its Motion for Preliminary Injunction. As applied to the present case, it is undisputed that Fox is no longer an authorized Oneida dealer and that Oneida has no ability to apply its quality controls to Fox's inventory. Thus, as in *Skullcandy*, Oneida cannot reasonably ensure the quality of the flatware that Fox is selling and, as shown above in Section I.C, Oneida may validly refuse to warrant the quality of that flatware when it is purchased by Fox's customers following Fox's deauthorization on April 1, 2020. If, as Fox claims, Oneida makes its warranty to her and not to end consumers, then she would be the "original owner" under the terms of the warranty. By its express terms, the warranty extends to the "original owner" and no further. Either

way, the product Fox is selling does not carry the warranty she claims it does in her online listings. Because the flatware that Fox is selling is not covered by Oneida's warranty, Fox's flatware is materially different from Oneida's.  Thus, the first sale defense does not apply.[3]

### 3.    The Genuineness Limitation – For More Than Half of Her Inventory, Fox Has Not Proven that the Flatware Is Genuine Product that Oneida Authorized in the First Instance and that Fox Lawfully Purchased.

Oneida does not dispute Fox's assertion that the first sale defense only applies to genuine goods that the trademark owner authorized to be made and released into the stream of commerce in the first instance.  (*See* Dkt. 41 at 22–23.)  Indeed, "the defendant in a civil case bears the burden of proving the product at issue was lawfully purchased before it may invoke the first sale defense." *RFA*, 2014 U.S. Dist. LEXIS 181781, at *19.  As to half of her inventory, Fox cannot meet that burden.

Fox asserts in her Brief that all of the flatware in her inventory was authorized by Oneida or Robinson.  (Dkt. 41 at 26–27.)  She earlier made similar assertions in an affidavit.  (First Fox Aff. (Dkt. 22-1), ¶¶ 52–54.)  While Oneida does not deny that Fox purchased flatware from Oneida and Robinson, Oneida does challenge the origins of the majority of the inventory and whether Fox lawfully purchased it.  (*See* Transcript of July 24, 2020 Status Conference (Dkt. 31) at 5:5–23.)  In response to direction from the Court, Fox produced all of the invoices that reflect the origins of the flatware in her inventory.  A review of these invoices shows that, for more than a decade, Fox has systematically saved in chronological order hundreds of invoices mostly from Robinson and

---

[3] In prior briefing, Fox claimed that if Oneida refuses warranty claims on flatware sold from her inventory, "she will honor those warranty claims herself."  (Fox's Memorandum in Opposition to Motion for Preliminary Injunction (Dkt. 22) at 21–22.)  But the facts demonstrate otherwise.  Fox is a 65-year-old sole proprietor with a limited and steadily decreasing inventory of flatware.  Her business may no longer even been in existence by the time that some of her younger customers need to use their lifetime warranty.  Therefore, fulfillment of any warranty claim from Fox's inventory would be inherently inferior to Oneida's fulfillment of the same claim.

to a lesser extent from Oneida.  This suggests that, to the extent Fox lawfully purchased genuine flatware from Oneida or Robinson, the invoices for these purchases should be among those that Fox produced in this case.  Nevertheless, she did not produce invoices for more than half of the flatware in her inventory.  (*Id.*)  This undercuts any conclusory assertion that Fox may now make that she purchased all of her inventory from Oneida or Robinson.  Having failed to adequately show that more than half of her inventory is genuine flatware that she purchased legally, Fox cannot validly invoke the first sale defense.

**D. Fox Admits that, if Oneida Has No Remedy in Trademark Law, it Has No Recourse at all.**

Fox argues that she does not have a legal duty, under contract, the common law, or the uniform commercial code, to care for the product in her inventory.  (Dkt. 41 at 33–34.)  Thus, Fox admits that, if Oneida has no remedy in the current trademark infringement suit that it has brought, it has no recourse at all.  It has no way to control the quality of flatware that Fox is selling, even though, for instance, Fox's conduct dilutes the value of Oneida's trademarks.[4]  And, according to Fox, Oneida must also continue to honor all warranty claims from her past, present, and future customers.

Fox argues that Oneida cannot have legitimate "concerns over how Fox maintains her inventory" because her past conduct suggests that she has properly maintained it.  (Dkt. 41 at 34.)

---

[4] If a product is not subject to the manufacturer's quality controls, this may dilute the manufacturer's trademarks.  *See*, *e.g.*, *H-D U.S.A., LLC v. Square Wear LLC*, No. 20-10644, 2020 U.S. Dist. LEXIS 63156, at *9 (E.D. Mich. Apr. 10, 2020) (finding that plaintiffs would likely succeed on merits of claim for dilution by tarnishment where plaintiffs "argue that their brand is automatically tarnished because Defendants' products are not subject to Plaintiffs' strict quality-control standards and procedures" (internal quotation marks omitted)); *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15 Civ. 8775 (LGS), 2016 U.S. Dist. LEXIS 87345, at *10-11 (S.D.N.Y. July 5, 2016) (finding that plaintiff adequately stated a claim for dilution by tarnishment in "alleg[ing] that Defendant advertises and sells products without [plaintiff's] warranties and quality control assurances").

But even if this were true, Fox could decide to lower her standards now, and—unless Oneida is able to obtain relief in this lawsuit—Oneida could do nothing about it.  (Eichhorn Dec. (Dkt. 11), ¶ 22 (Oneida has no way to "audit or control the quality of [Fox's] stock" or "control how Fox uses the ONEIDA Marks in her marketing or advertisements—other than filing the present lawsuit and seeking injunctive relief.").)  This loss of control is the very danger that the Lanham Act was designed to protect against.  As the Sixth Circuit has stated, "[i]n [trademark infringement] cases, . . . the harm stems not from the actual quality of the goods (which is legally irrelevant) but rather from [the plaintiff's] loss of control over the quality of goods that bear its marks." *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006); *accord Am. Petroleum Inst. v. Copper*, 718 F.3d 347, 359–60 (4th Cir. 2013) ("[T]he Lanham . . . Act affords the trademark holder the right to control the quality of the goods manufactured and sold under its trademark.  The actual quality of the goods is irrelevant; it is the control of the quality that a trademark holder is entitled to maintain.").  That is why, consistent with this binding authority, Oneida filed the present lawsuit and requested a preliminary injunction.

## IV.  THE AFFIRMATIVE DEFENSES OF ESTOPPEL AND ABANDONMENT ARE INAPPLICABLE.

At the end of her Brief, Fox briefly raises the affirmative defenses of estoppel and abandonment.  (Dkt. 41 at 34–35.)  Neither defense applies in this case.

For estoppel, Fox merely incorporates her prior briefing on this issue.  (Dkt. 41 at 34.)  In response, Oneida likewise incorporates its prior briefing.  (Dkt. 25 at 9–12.)

For abandonment, Fox provides the following under-developed argument:

The reason Ms. Fox pled the abandonment defense is because if the Court were to accept Oneida's argument that post-sale quality control measures are necessary for Oneida to maintain the integrity and value of the Oneida marks, then significant issues arise as to whether Oneida abandoned its marks over the eighty-five years

that it sold Oneida flatware with no quality control measures in place governing how a reseller/dealer stored and/or maintained applicable inventory.

(Dkt. 41 at 35.)

Fox is wrong for several reasons. As an initial matter, it is disingenuous to state that this is "[t]he reason Ms. Fox pled the abandonment defense." In pleading her affirmative defense of abandonment, Fox made no mention of quality controls (*see* Answer and Affirmative Defenses (Dkt. 21), ¶¶ 129–32), even though Oneida had raised this issue in its Complaint (Dkt. 1 at ¶¶ 27–28, 81) and earlier Motion for Preliminary Injunction (Dkt. 11 at 1, 3–4, 7, 21–24). Furthermore, contrary to Fox's assertion, Oneida has had quality controls in place over the years through the MLA, the ADP, and—as a last resort—through litigation, such as the present case.

Finally, Fox cites only a single case in support of her newly-developed abandonment defense: *AmCan Enterprises, Inc. v. Renzi*, 32 F.3d 233 (7th Cir. 1994). Fox's reliance on *AmCan* is misplaced. There an alleged infringer asserted that a trademark owner had abandoned its mark because it licensed the mark to another company. *Id.* at 235. The Seventh Circuit acknowledged that a mark may be abandoned if a trademark owner grants a bare license, but it explained:

> [T]he owner of a trademark is allowed to license its use, provided that it takes effective steps to ensure that the product sold by the licensee is of the same quality as the product sold by the licensor under the same name, so that consumers are not deceived by the identity of names into buying a product different from what they reasonably expected.

*Id.* at 235. Again, Oneida has taken reasonable, effective steps in the MLA and ADP to ensure the quality of Oneida-branded product sold by others. Thus, *AmCan* is inapposite, and abandonment does not apply in this case.

## V.     CONCLUSION

Oneida's lifetime warranty has always been limited to the "original owner"—the consumer who purchases the flatware from Oneida or its authorized distributors. Because the warranty is

intended for and directed to consumers, Oneida retains the right to revoke the offer of warranty any time prior to when the warranty is issued to the consumer and becomes a part of the basis of the bargain with the consumer. Oneida validly exercised this right with regard to Fox's inventory by deauthorizing Fox when she refused to abide by Oneida's quality controls. Because Fox's inventory is not subject to Oneida's quality controls, Oneida cannot reasonably warrant the quality of that inventory, and Fox's activities pose a danger to the value of Oneida's reputation, brand, and trademarks. To protect itself, Oneida has also validly revoked its consent to Fox's continued use of Oneida's valuable trademarks. Because Fox's inventory is not covered by Oneida's warranty or subject to Oneida's quality controls, it is materially different from the flatware that Oneida sells, and the first sale defense does not apply. For all of these reasons, Oneida is entitled to judgment in its favor on its claims and to injunctive relief against Fox.

Dated: September 8, 2020        Respectfully submitted,

        */s/ Marla R. Butler*

        Marla R. Butler (*pro hac vice*)
        THOMPSON HINE LLP
        Two Alliance Center
        3560 Lenox Road NE, Suite 1600
        Atlanta, Georgia 30326-4266
        Phone: 404-407-3680
        Fax: 404-541-2905
        Email: Marla.Butler@ThompsonHine.com

Jesse Jenike-Godshalk (0087964)
THOMPSON HINE LLP
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 352-6702
Fax: (513) 241-4771
Email: Jesse.Godshalk@ThompsonHine.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2020, I filed a copy of the foregoing via the Court's

ECF/CM and that a copy will be sent to all counsel of record in this case.


_/s/ Marla R. Butler_
_____
